Exhibit A

Hon. Rosalyn Chapman
JAMS
555 West Fifth Street, 32nd Floor
Los Angeles, CA 90013
Tel: 213.253.9740
Fax: 213.620.0100
ARBITRATOR

## JAMS ARBITRATION
## JAMS CASE NO. 1220053540

| | |
|---|---|
| **Raven-Asset Based Opportunity Fund II LP and Raven-Asset Based Opportunity Fund III LP,** | ) ) ) ) |
| **Claimants,** | ) ) |
| **v.** | ) ) |
| **Green-Light International LLC,** | ) ) ) |
| **Respondent.** | ) ) ) |

## PARTIAL FINAL AWARD
## GRANTING PRELIMINARY INJUNCTION

On April 29, 2016, Claimant Raven-Asset Based Opportunity Fund II LP (Claimant Fund II) and Claimant Raven-Asset Based Opportunity Fund III LP (Claimant Fund III) (jointly, Claimants) concurrently filed a Demand for Arbitration against Respondent Green-light International LLC (Respondent) and also sent a letter to JAMS, with a copy to Respondent and its counsel, requesting the appointment of an Emergency Arbitrator under Rule 2(c) of the JAMS Comprehensive Arbitration Rules & Procedures (Rules). Pursuant to Claimants' request, JAMS appointed Hon. Rosalyn Chapman (Ret.) to act as Emergency Arbitrator (Emergency Arbitrator or Arbitrator).

Exhibit A

The Arbitrator, having considered all documentary and testimonial evidence, and having made credibility determinations, applied the appropriate burdens of proof, and weighed the evidence, hereby issues the following Partial Final Award:

## I.

### Temporary Restraining Order; Preliminary Injunction Hearing

On May 3, 2015, Claimants filed a Notice of Application and an Application for a Temporary Restraining Order (TRO) and Issuance of an Order to Show Cause (OSC) Re: Preliminary Injunction; a supporting memorandum of points and authorities; and the supporting declarations of Messrs. Robert J. Sherman and Warren Goz (previously submitted on April 29, 2016). On May 6, 2016, Respondent filed a memorandum of points and authorities in Opposition to the Application and the opposing declaration of Jeff Elliott. And on May 9, 2016, Claimants filed a reply. Oral argument was held telephonically before the Arbitrator on May 10, 2016.

On May 11, 2016, the Arbitrator issued an Order Granting, in part, and Denying, in part, Claimants' Application for TRO and OSC Re: Preliminary Injunction (Order Granting TRO). The Arbitrator granted Claimant Fund II's request for emergency or interim relief as to its claim that Respondent had breached the terms of the Inter-party Agreement (IPA) between Claimant Fund II and Respondent (and others) as to the picture titled "Urge" (known as the Urge IPA), finding Respondent had breached Paragraphs 3(a)(ii) and 5(a), as discussed below. However, the Arbitrator denied Claimant Fund III's request for emergency or interim relief as to its claims that Respondent had breached the terms of the Inter-Agency Agreement (IPA) between Claimant Fund III and Respondent (and others) as to the picture titled "Imperium" (known as the Imperium IPA). On May 11, 2016, a TRO was issued against Respondent, as a separate document.

On May 16, 2016, Respondent filed its Response to the OSC Re: Preliminary Injunction and on May 23, 2016, Claimant Fund II filed its Reply in Support of Application for Preliminary Injunction, with the supporting declaration of Matthew R. Gershman, with exhibits, and the supplemental declaration of Warren Goz, with exhibits.

An evidentiary hearing on the OSC was held before the Arbitrator on May 26, 2016. Mathew S. Rosengart and Matthew R. Gershman, shareholders with the law firm Greenberg Traurig LLP, represented Claimant Fund II. Mr. Chad Moore, a partner in Respondent, appeared on behalf of Respondent, which was represented by John Burgee, a partner with the law firm Burgee & Abramoff. Oral testimony was taken under oath of Mr. Gadi Wildstrom.

## II.
### Procedural History and Pleadings

**A. Scheduling Conference.**

On May 2, 2016, the Arbitrator held a scheduling conference, determined that the letter dated April 29, 2016 to JAMS constituted the Notice required by Rule 2(c)(i), and issued a scheduling order. On May 2, 2016, the Arbitrator ordered Claimants to file an Amended Demand for Arbitration that complied with Rule 9(b).

**B. Amended Demand for Arbitration.**

Claimants filed their Amended Demand for Arbitration (ADA) on May 3, 2016. The ADA raises four causes of action against Respondent: (1) declaratory relief as to the rights and duties of the parties under the Inter-Party Agreements entered into between Claimants and Respondent (and others) dated November 12, 2015, and September 28, 2015, regarding the motion pictures titled "Urge" and "Imperium," respectively (collectively, IPAs); (2) breach of contract; (3) breach of fiduciary duties; and (4) failure to provide a full accounting.

Common to all causes of action, Claimants make the following allegations in the ADA: "Claimants loaned money for the ongoing productions of the Urge and Imperium films, and … Respondent acted as a sales agent to secure distribution deals for those films in various territories around the world." (ADA ¶ 5). "Respondent expressly agreed that it would direct all of the distributors to pay those funds directly into a specifically identified 'Control Account' for each film, which account is maintained at East West Bank and administered by a neutral third party." (Id. ¶ 7). Respondent also agreed that it "had no security interest in the distributor proceeds, … to subordinate all of its interest in those funds to Claimants' interests[,]" and to waive all rights of offset and deduction and to set up reserves. (Id. ¶¶ 8-9).

Claimants recently learned that "Respondent had wrongfully instructed various distributors to pay funds under the distributor agreements *to Respondent* instead of to the Collection Account. …" (Id. ¶ 19 (emphasis in original)). Claimants also have learned that the following distributors remitted funds to Respondent's personal bank account at JP Morgan Chase (Chase account), rather than the Urge Collection Account: a distributor named Falcon Films remitted $100,000; a distributor named Polarstar remitted $105,000; a distributor named Mis. Label remitted $100,000; and distributors named OctoArts and Tanweer Vision Pictures Ltd. remitted funds. (Id.).

In the IPAs, Respondent agreed "to timely provide Claimants (or Claimants' designee, including Sculptor Media, LLC ('Sculptor')) with certain information and documents regarding the marketing of the films. …" (Id. ¶ 10). "On several occasions during the months of March and April 2016, Claimants' designee Sculptor asked Respondent for information due under the IPAs. … Respondent did not produce the requested information." (Id. ¶ 11).

3

Respondent represented to Claimants' designee Sculptor that Respondent would be attending the Berlin Film Festival, and in reliance thereon, Claimants "approved funding for Respondent's marketing (and other) fees." (Id. ¶ 13). However, Claimants have learned that Respondent failed to attend the Berlin Film Festival. (Id. ¶ 14).

On April 25, 2016, Claimants "terminat[ed] Respondent as the sales agent and inform[ed] Respondent that all marketing and sales materials relating to the films … should be forwarded to [Claimants' counsel]." (Id. ¶ 17). On April 27, 2016, "Respondent sent written notices of acceptance of its termination as sales agent … [a]nd with respect to 'Urge' in particular, … claimed it was holding the distributor funds … to 'protect' the distributors. …" (Id. ¶ 18).

Claimants seek the following relief on their claims: (1) a declaration that under the IPAs: (a) Respondent has no security interest in any of the proceeds payable in connection with the distribution agreements; (b) Respondent's interests in the distributor proceeds are subordinated to Claimants' interests; (c) Respondent waived all rights of offset and deduction; and (d) all distributor proceeds are required to be paid into the Collection Accounts; (2) damages; (3) an accounting; (4) a temporary restraining order and preliminary and permanent injunctions; (5) interest; (6) attorneys' fees and costs; (7) emergency relief under Rule 2(c); (8) a hearing; (9) application of expedited procedures under JAMS Rules 16.1 and 16.2; and (10) other just and proper relief.

### C.  Response To Amended Demand for Arbitration and Counter-Claim.

On May 17, 2016, Respondent filed its Response to the ADA and a Counter-Claim (CC). Respondent generally denies all allegations and that Claimants have been injured and suffered damages, and raises the following affirmative defenses: (i) lack of consideration; (ii) failure of consideration; (iii) any losses were due to causes beyond the control of Respondent; (iv) all contractual obligations have been fulfilled, discharged, excused or rendered impossible; (v) estoppel; (vi) unclean hands; (vii) waiver of relief by virtue of termination and frustration of the contracts; (viii) Respondent has acted in good faith; (ix) Respondent exercised its business judgment; (x) failure to mitigate damages; (xi) any losses were due to Claimants' own intentional or negligent conduct and refusal to cooperate with Respondent; (xii) lack of standing to pursue claims; (xiii) lack of capacity to pursue claims; (xiv) failure to join necessary parties; (xv) indispensable parties cannot be joined; and (xvi) remedies sought are beyond those available through arbitration. (CC ¶¶ 2-17).

Respondent's Counter-Claim raises causes of action: (a) breach of contract, based on wrongful termination as sales agent for Imperium picture; (b) breach of contract, based on wrongful termination as sales agent for the Urge picture; (c) breach of contract, based on failure to support marketing efforts and hiring other sales agents, among other things; (d) breach of

4

contract, based on failure to pay amounts due, including fees and commissions, among other things; (e) interference with business relationships; (f) defamation; (g) declaratory relief as to who should retain foreign distributors' funds until third party claims are resolved; and (h) declaratory relief as to Respondent's obligations under the foreign distribution agreements. (Id. ¶¶ 28-35).

Common to all claims, Respondent alleges:  Respondent was retained in August 2015, as the foreign sales agent on the Imperium picture and, as such, entered into a Sales Agency Agreement with the third party producer, TDSD, and an IPA with TDSD, Claimant Fund III and Prosight Syndicate 1110 at Lloyd's of London, which was the production completion guarantor. (Id. ¶ 20).  Respondent was retained in November 2015, as the foreign sales agent on the Urge picture  and, as such, entered into a Sales Agency Agreement with the third party producer, Urge Productions LLC, and an IPA with Urge Productions LLC and Claimant Fund II. (Id. ¶ 21).  At some point, Urge Productions LLC was taken over by Claimants' manager. (Id.).  There is no production completion guarantor for the Urge picture. (Id.).

Although Respondent was performing its duties as exclusive sales agent, Claimants hired a competing sales agent in February 2016 to represent the Imperium picture, which resulted in confusion and loss of sales. (Id. ¶ 23).  In April 2016, Claimants terminated Respondent as sales agent on both the Imperium and Urge pictures.  (Id. ¶ 24).  In connection with terminating Respondent, Claimants contacted foreign distributors with whom Respondent had established business relationships and wrongly and falsely disparaged Respondent and its personnel, thus harming Respondent's reputation and ability to conduct business. (Id. ¶ 25).

Claimants have breached agreements with Respondent by failing to pay amounts due under marketing budgets and also failing to support marketing efforts, which hampered sales of the pictures. (Id. ¶ 26).  Additionally, Claimants have breached delivery requirements for the Urge picture, resulting in distributors seeking to rescind distribution agreements and demanding the return of deposits. (Id. ¶ 27).

Respondent seeks monetary damages (commissions due, commissions that would have been earned, marketing budgets, producing fees, reimbursements and injuries to reputation and interference with business relationships); an order allowing Respondent to retain the deposits from foreign distributors in trust until any claims are resolved; and an order requiring Claimants to assume the distribution contracts and indemnify Respondent from past and future breaches by Claimants or their new sales agent. (Id. ¶¶ 36-38).

//

### III.
### Arbitrability of Claims

The Urge IPA contains the following arbitration provision in Paragraph 10(b):

(b)  Non-Delivery Disputes.  All controversies, claims, disputes, or counterclaims between the parties hereto concerning, based in any way upon, arising under, relating to, or arising in connection with the Picture, this Agreement, or any resulting transaction, including but not limited to, their respective obligations hereunder, payment of the Distribution Proceeds (other than a dispute concerning Delivery, which shall be resolved in accordance with the procedures specified in Paragraph [11(a) [sic] hereof), a disagreement about the meaning, interpretation, application performance, breach, termination, enforceability, or validity of this Agreement, and whether based on statute, tort, contract, common law or otherwise, shall be subject to and resolved by binding arbitration conducted under the auspices of the Arbitration Rules.

The Arbitrator determines that the claims or causes of action raised by Claimant Fund II in the ADA, as well as the claims or causes of action raised by Respondent in the Counter-Claim, are arbitrable under Paragraph 10(b) of the Urge IPA.

### IV.
### Applicable Law and Rules.

Paragraph 10(b) of the Urge IPA further provides the rules and law governing arbitrations:

All such arbitration proceedings shall be conducted in accordance with the [Arbitration] rules.  To the extent not otherwise covered by the Rules, the arbitration shall be conducted in accordance with Title 9 of the U.S. Code [the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq.]. … The award issued by the arbitrator in any arbitration proceeding may be enforced in the courts of the Superior Court for the County of Los Angeles or the United States District Court for the Central District of California or any courts having personal jurisdiction over any of the parties, and the parties waive any and all objections to personal jurisdiction in such case which they may otherwise have. …

Additionally, Paragraph 10(c) of the Urge IPA provides that "[e]ach party agrees to abide by the award rendered in any arbitration pursuant hereto, and agrees that a judgment of a court having jurisdiction may be entered upon the award."  Finally, Paragraph 17 of the Urge IPA states, in part:

17.  Governing Law; Jurisdiction.  This Agreement … and the rights and obligations of the parties hereto shall be governed and construed and enforced in accordance with the laws of the State of New York without reference to principles regarding the conflict or

6

choice of law.  Any matter arising under this Agreement or any other document provided for herein (subject to the arbitration provisions hereof and in the Notices of Assignment with each Distributor) and including, without limitation, any suit to enforce an award under the arbitration provisions hereof, may be finally adjudged or determined in any court or courts of the State of California or in the federal courts of the United States for the Central District of California.  … Lender may, at its option, bring suit or institute other judicial proceedings against any party hereto or any of their respective assets in any state or federal court of the United States or in any court of any country or place where such party or such assets may be found.

## V.
## Factual Findings

Claimant Fund II makes loans to borrowers, including borrowers in the motion picture production and distribution industries.  (Declaration of Robert J. Sherman (Sherman Declaration (Decl.)) ¶ 2). Claimant Fund II made a secured "finishing loan" in the original principal amount of approximately $5 million to fund a portion of the production costs of a motion picture titled "Urge." (Id. ¶ 3).  The Urge loan was "identified, underwritten and originated … with the assistance of Sculptor Media LLC ('Sculptor') and its principal, Warren T. Goz."  (Id. ¶ 5).

Claimants structured the Urge loan as project financing, which means the loan was underwritten, in part, on the value of "pre-sales" and existing sales of domestic and foreign territorial distribution rights for each film. (Sherman Decl. ¶ 6).  Such secured debt financing is generally structured by "the borrower/producer engag[ing] a foreign sales agent to provide estimates for the territorial sales/licensing value for the particular motion picture and to act as its sales agent in the sale and/or licensing of such foreign territorial distribution rights. …" (Id. ¶ 7).

Each distributor "customarily pays a deposit upon execution of its distribution agreement (from 10 to 20% of the agreed upon 'minimum guaranty' distribution or license fee) and agrees that it will pay the remainder of the 'minimum guaranty' amount upon delivery of the motion picture to it. …" (Id. ¶ 7).  If a completion guaranty is issued, it provides protection that "the motion picture will be completed and timely delivered to distributors whose payment obligations with respect to the remaining 'minimum guaranty' are triggered by such delivery." (Id.).

In November 2015, Claimant Fund II engaged Respondent as the foreign sales agent on Urge. (Declaration of Jeff Elliott (Elliott Declaration (Decl.)) ¶ 8).  As sales agent, Respondent entered into the Urge IPA with Claimant Fund II and the third-party producer, Urge Productions, LLC.  (Sherman Decl. ¶ 12, Exh. A). Additionally, Respondent entered into a Sales Agency Agreement with producer Urge Productions, LLC.  (Elliott Decl. ¶ 8, Exh. A).  Respondent pre-approved Freeway Entertainment KFT (Freeway) to act as the collection manager for the Collection Account on Urge.  (Id., Exh. A ¶ 10).  Mr. Gadi Wildstrom is the founder of, and partner in, Freeway, which is a Dutch entity with its principal place of business in Bucharest,

Hungary. (May 26, 2016 Testimony of Gadi Wildstrom (hereafter Wildstrom Testimony)).

Respondent did not enter into a CAMA with Claimant Fund II and others to govern the Collection Account on Urge. (Elliott Decl. ¶ 10). Nevertheless, it is the custom and practice in the independent film industry for sales agents to remit receipts from foreign distributors to the Collection Account prior to the finalization of a CAMA on the Collection Account. (Testimony of Gadi Wildstrom). Such finalization often takes months, as it requires signatories on behalf of various entertainment-related guilds. (Id.).

Freeway established a bank account at East West Bank (original East West account) to be the Collection Account under the Urge IPA, and Mr. Wildstrom intended to act as a neutral fiduciary on that Collection Account. (Id.). However, Respondent has not accepted the original East West account as the Collection Account under the Urge IPA or the Sales Agency Agreement, contending Claimant Fund II could freely access the funds if deposited into that account. Mr. Wildstrom denies this, and the Arbitrator accepts his statement as credible.

Respondent solicited foreign distributors, entered into distribution or licensing agreements with them, and did not remit those receipts into the Collection Account. (Elliott Decl. ¶ 12). In fact, Respondent directed the foreign distributors it solicited to remit receipts to its personal Chase account, and the distributors did as directed. (Declaration of Warren Goz filed April 29, 2016 (Goz Declaration (Decl.)) ¶¶ 13-14, Exhs. G-L). So far, Claimant Fund II has obtained copies of wire transfers and other documents showing foreign distributors of the Urge picture have remitted the following receipts have to Respondent's personal Chase account:

- On January 15, 2016, distributor Polarstar (Uruguay) remitted payment in the amount of $35,000, and on March 10, 2016, remitted payment in the amount of $70,000, for a total amount of $105,000;
- On or about February 22, 2016, distributor Mis. Label (Scandinavia) remitted payment in the amount of $100,000;
- On March 22, 2016, distributor OctoArts (Philippines) remitted payment in the amount of $12,000;
- On or about March 8, 2016, distributor Transmission Films TPY Ltd (Australia/New Zealand) remitted payment in the amount of $19,000; and
- On or about March 28, 2016, distributor Tanweer (Malaysia) remitted payment in the amount of $9,600; and
- On April 20, 2016, distributor Falcon Films (Middle East) remitted payment in the amount of $100,000.

(Goz Decl. ¶¶ 14-19, Exhs. G-L). Respondent entered into distribution agreements with the following additional distributors on the Urge picture:

Exhibit A

- On or about January 14, 2016, distributor Lanterna de Pedra Filmes (Portugal) entered into a distribution agreement in the amount of $15,000;
- On or about April 14, 2016, distributor ACE Entertainment Films UK SARL (France) entered into a distribution agreement in the amount of $25,000; and
- On or about April 18, 2016, distributor Fine Films (Japan) entered into a distribution agreement in the amount of $25,000.

(Gershman Declaration (Gershman Declaration (Decl.))  ¶ 6, Exh. E).   In its invoice to Claimants, Respondent acknowledges distribution agreements on Urge totaling $390,000 (Goz Decl. ¶ 20, Exh. M), and at the hearing on the OSC, Respondent produced a document acknowledging distribution agreements on Urge totaling $410,430.

On April 25, 2016, Claimant Fund II sent a letter to Respondent terminating Respondent as sales agent on the Urge picture.  (Goz Decl. ¶ 12, Exhs. E & F).  On April 27, 2016, Respondent acknowledged it had received the termination letters. (Sherman Decl. ¶ 21, Exhs. D & E).

On or about April 25, 2016, Claimants hired EVP – International Sales and Distribution Inception Film Partners ("Inception") as their new sales agent on the Imperium and Urge films. (Sherman Decl. ¶ 22, Exh. G-3).

## VI.
### Breach of Contract

Claimant Fund II asserts that Respondent has breached the provisions of Paragraphs 3(a)(ii) and 5(a) of the Urge IPA, which require Respondent as sales agent to remit receipts from the foreign distributors to the Collection Account and to "use its reasonable best efforts" to cause the distributors to deposit their receipts into the Collection Account.

The establishment of the Collection Account is governed by Paragraph 2 of the Urge IPA, which provides that the Collection Account is managed by a third-party, neutral fiduciary who takes directions from the parties pursuant to a CAMA that directs how the proceeds should be distributed.  Paragraph 10 of the Sales Agency Agreement entered into by Respondent and Urge Productions LLC, the producer, requires that "the parties shall negotiate in good faith" the terms of a CAMA and utilize a collection agent to administer the CAMA.  The parties, including Respondent, pre-approved Freeway as the collection agent, pursuant to Paragraph 10. Ultimately, the fiduciary (Freeway) is responsible for distributing the funds in the Collection Account, as set forth in Paragraph 4 of the Urge IPA.

Paragraph 3 of the Urge IPA provides that Respondent agrees to remit the distributors' receipts to the Collection Account and to "use its reasonable best efforts to cause" the distributors to pay the receipts into the Collection Account:

> **3.   Acceptance and Acknowledgment.**   Sales Agent hereby covenants and agrees for the benefit of the Lender only that: (a) …(ii)   To remit any Lender's Assigned Receipts received by Sales Agent, and to use its reasonable best efforts to cause the Distributors to pay the Lender's Assigned Receipts, to the Collection Account provided herein[.]

(Sherman Decl. ¶12, Exh. A).   Paragraph 2 affords a notice of assignment of rights to Claimant Fund II, gives Respondent such notice, and provides for the establishment of the Collection Account to be governed by the CAMA.[1]

Paragraph 5(a) requires Respondent to remit all receipts to the Collection Account:

> **5.   Payments to Lender and Rights of Offset.**
> (a)   Remittal of Assigned Receipts.   Notwithstanding anything to the contrary contained in … the Sales Agency agreement or otherwise with respect to the Picture, subject to the arbitration provisions set forth in Paragraph 11 [sic] below, Sales Agent agrees that it shall remit all Lender's Assigned Receipts to the Collection Account promptly upon receipt thereof as herein provided, without

---

[1] Paragraph 2 provides:

**2.   Notice of Assignment.**
(a)(i)   Pursuant to the Loan Documents, Borrower and certain third parties have irrevocably collaterally assigned to Lender and have irrevocably granted to Lender a security interest in and to the Lender Collateral, including without limitation, all of Borrower's, Borrower's and such third parties' respective right, title and interest in and to the Picture and all elements thereof, and all proceeds of the Lender Collateral including, without limitation, all amounts payable to Borrower under the Sales Agency Agreement or otherwise.
(b)   Borrower hereby:
(i)
(A)   Notifies Sales Agent of the security interest and assignment described in Paragraph 2(a)(i) above;
(B)   Borrower hereby authorizes, directs and instructs Sales Agent to remit any Lender's Assigned Receipts received by Sales Agent, and to use Sales Agent's reasonable best efforts to cause the Distributors to pay all Lender's Assigned Receipts to the following Collection Account at East West Bank Account Name: Stichting Freeway Custody … for further disbursement pursuant to that certain collection account management agreement, collection account management agreement or any other similar instrument ("CAMA") to be entered into by and among Sales Agent, Borrower, Lender and the collection account manager, among others[.]

(Sherman Decl. ¶12, Exh. A).

10

> offsets, deductions, counterclaims or defenses which Sales Agent may have or claim against Borrower or any other Person pursuant to the Sales Agency Agreement or otherwise, all of which are expressly reserved by Sales Agent against Borrower and any other Person, but only to the extent that the exercise of such rights does not derogate from Lender's rights to receive payment of Lender's Assigned Receipts (or any portion thereof) hereunder. ...

(Sherman Decl. ¶ 12, Exh. A).

As set forth in Part V above, Respondent has not remitted the receipts it received from foreign producers on Urge into the original Collection Account established by Freeway and, in fact, directed the foreign distributors to remit their receipts to Respondent's personal Chase account. Additionally, despite pre-approving Freeway as the neutral fiduciary on the original Collection Account, Respondent has not entered into a CAMA directing the distribution of funds in the Collection Account -- and has not offered any explanation for its failure to do so. Thus, the Arbitrator determines that Respondent has breached Paragraphs 3(a)(ii) and 5(a) of the Urge IPA.

Respondent offers two separate and distinct defenses or explanations why it has not remitted the receipts from the foreign distributors to the Collection Account, as required by the Urge IPA. First, Respondent claims that it must protect the foreign distributors with whom it has signed distribution agreements in the event the Urge picture is not delivered as Urge is an "unbonded film" without a CAMA. *See* Sherman Decl. ¶ 21, Exh. D; *see also* Goz Decl. ¶ 20, Exh. M ("[W]e have collected and are holding certain URGE deposits in an attempt to protect our buyers from your constant unnecessary and unwarranted rule changes on both films, especially un-bonded and no CAMA URGE.").

According to Respondent, Claimants have breached the delivery requirements for Urge:

> Claimants, who have effectively taken over Urge, are in breach of delivery requirements for that picture. Although part of [Respondent's] duties as sales agent was to effect delivery of the picture to foreign distributors, since [it] has been terminated it no longer has control over delivery to ensure that Claimants comply with the delivery requirements. In this regard, Claimants are already in breach in failing to deliver "Key Art". Foreign distributors therefore have the ability to declare a default under the distribution agreements and demand that any deposit that they have paid be returned. Since [Respondent] signed the distribution agreements with the distributors, [Respondent] is concerned that it is potentially liable to the foreign distributors. ...

(Elliott Decl. ¶ 23).

However, Mr. Goz, who is now the producer on Urge, avers that "no foreign distributors have issued a notice of delivery default to Claimants or the licensor, and no foreign distributor has made any demands to Claimants or the licensor for refunds." (Declaration of Warren Goz filed May 23, 2016 (Goz Supplemental Declaration (Supp. Decl.))) ¶ 2). Moreover, Mr. Wildstrom testified that the custom and practice in the independent film industry is to remit foreign distributors' receipts into the Collection Account even without a CAMA existing for the Collection Account. And further, as Claimant Fund II aptly notes, citing various sections in Third Restatement of Agency, Respondent has been acting solely as Claimant Fund II's *agent* – not as the licensor or the principal who is responsible for compliance with the terms of the distribution agreements. Thus, the Arbitrator determines this defense by Respondent is without merit, being based solely on speculation.

Second, Respondent asserts Claimants owe it commissions and fees for services rendered as the sales agent on the Imperium and Urge pictures. To support this claim, Respondent relies on Paragraph 3(a)(v) of the Urge IPA and Paragraph 11 of the Sales Agency Agreement, which provide that Respondent "is entitled to be paid half of its sales commissions and all of its marketing expenses before any money is paid to Claimants." (Oppo. at 3:20-21).[2]

However, as to the Urge picture, Respondent's invoice lists its fees in the total amount of

---

[2] Paragraph 11 of the Sales Agency Agreement provides, in part:

> **11. Gross Receipts:** … Sales Agent and Licensor agree that all Gross Receipts shall be disbursed in accordance with the following schedule:
>
> a. First, any foreign taxes or withholding costs, bank charges, costs to convert proceeds in U.S. dollars, and/or other similar expenses shall be paid from the Gross Receipts;
>
> b. Second, the Collection Agent shall be entitled to recoup its costs to set up the Collection Account … , in addition to its customary fees and expenses in connection with the operation of the Collection Account and the calculation and disbursement of the proceeds in accordance with this Agreement;
>
> c. Third, Sales Agent for the Sales Fee (non-deferred portion) and Service Fee (non-deferred portion);
>
> d. Fourth, Sales Agent for the (i) Market Attendance and Sales Expenses Fee; and (ii) Delivery Costs (if any);
>
> e. Fifth, to the senior lender until recoupment of the senior loan …;
>
> f. Sixth, Sales Agent for the Deferred Sales Fee and Deferred Service Fee;
>
> g. Seventh, Sales Agent for the Event Costs (if any), legal Costs (if any) and Audit Costs (if any); and
>
> h. Eighth, all remaining Gross Receipts shall be paid in accordance with the CAMA.

(Elliott Decl. ¶ 8, Exh. A).

Exhibit A

$133,850 for:  Marketing fees -- $20,000; foreign sales commission (10% of $390,000) -- $39,000; fortitude servicing fee (5% of $1.7 million) -- $54,850; and legal fees -- $20,000. (Goz Decl. ¶ 20, Exh. M). This amount is substantially *less* than the amount of the receipts from foreign distributors Respondent has wrongfully failed to remit to the Collection Account -- $410,000.  Thus, there also is no merit to the defense that Respondent is merely withholding fees and commissions owed to it by Claimant Fund II.

Further, Respondent's reliance on Paragraph 3(a)(v) of the Urge IPA and Paragraph 11 of the Sales Agency Agreement is misplaced.  Paragraph 3(a)(v) of the Urge IPA provides:

> **3.  Acceptance and Acknowledgment.**  Sales Agent hereby covenants and agrees *for the benefit of the Lender only* that: (a) ... (v) *Notwithstanding anything to the contrary in the Sales Agency Agreement ..., except for the fees set forth below* in this Section 3(a)(v) ..., the payment of any sales fees, commissions, distribution and marketing costs incurred by and payable or reimbursable to Sales Agency ... in connection with the Picture *shall be deferred* ... until the obligations have been indefeasibly satisfied and paid in full and all of Lender's obligations under the Loan Agreement have terminated:
>
> > (A)  fifty percent (50%) of the "Sales Fee" and "Service Fee" ...; and
> > (B)  one hundred percent (100%) of the "Market Attendance and Sales Expenses Fee" and "Delivery Costs" ... shall be payable prior to the Obligations.

(Sherman Decl. ¶ 12, Exh. A (emphasis added)).  Additionally, Paragraph 1(b)(iv) of the Urge IPA provides that the sales agent (Respondent) has no right to any security interest; Paragraph 5(a) of the Urge IPA provides that the sales agent (Respondent) has no rights to offset, deduction or to set up a reserve; and Paragraph 6(a) of the Urge IPA is an acknowledgment by Respondent as sales agent that Claimant has a first priority lien and security interest in its collateral, including any proceeds from Urge.

It is not necessary, at this time, for the Arbitrator to address these defenses, which will be considered fully at the hearing on the merits of the ADA and Counter-Claim.  It is enough for the Arbitrator to conclude that, at this stage of the proceedings, Claimant Fund II has shown that it is more likely than not that it will prevail on its claim that Respondent has breached its obligations under Paragraphs 3(a)(ii) and 5(a) of the Urge IPA.

## VII.
## Injunctive Relief

### A. Legal Standard.

JAMS Rules address emergency or interim relief in two contexts.  As to emergency relief under Rule 2 proceedings, Rule 2(iv) provides:

<center>13</center>

The Emergency Arbitrator shall determine whether the Party seeking emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief and whether the requesting Party is entitled to such relief.   The Emergency Arbitrator shall enter an order or Award granting or denying the relief, as the case may be, and stating the reasons therefor.

As to interim relief under other, non-emergency arbitration proceedings, Rule 24(e) provides:

Interim Measures.   The Arbitrator may grant whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods.   Such interim measures may take the form of an interim or Partial Final Award, and the Arbitrator may require security for the costs of such measures. …

Applying general principles of statutory construction, where there are applicable specific contract provisions, those provisions govern over general provisions; thus, Rule 2 will govern over Rule 24(e), if it specifically addresses our proceedings for emergency relief.   Thus, pursuant to Rule 2(iv), the Arbitrator will determine whether (i) "immediate and irreparable loss or damage will result in the absence of emergency relief" and (ii) "whether the requesting Party is entitled to such relief."

This dual standard is not unlike the standard governing the granting of injunctive relief under California law, which requires that "[t]rial courts should evaluate two interrelated factors when deciding whether or not to issue a [TRO or] preliminary injunction.   The first is the likelihood that the plaintiff will prevail on the merits at trial.   The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued."   *IT Corp. v. Cnty. of Imperial*, 35 Cal.3d 63, 69 (1983); *Hunt v. Superior Court*, 21 Cal.4th 984, 999 (1999); *see also Butt v. State of Cal.*, 4 Cal.4th 668, 678 (1992) ("The trial court's determination must be guided by a 'mix' of the potential-merit and interim harm factors, the greater the plaintiff's showing on one, the less must be shown on the other to support a preliminary injunction.… ).

**B. Relief.**

When issuing the TRO, the Arbitrator determined:

Claimants have shown that Respondent has not complied with the terms of the Urge IPA requiring it to remit receipts from distributors, and to use its best reasonable efforts to have the foreign distributors remit the receipts, to the Collection Account. … In turn, Respondent has shown that there is no Collection Account meeting the requirements under the IPA, i.e. governed by the terms of a CAMA.   Under the Sales Agency Agreement, however, Respondent promised to "negotiate in good faith" the CAMA and

14

pre-approved Freeway as the collection agent.  Yet, Respondent offers no explanation as to why it did not enter into a CAMA and establish a Collection Account.

Despite the lack of a Collection Account, with a CAMA governing its administration,  Respondent nonetheless solicited foreign distributors, entered into distribution or licensing agreements with the distributors, and directed the distributors to remit the receipts to Respondent's Chase account, which is not an account administered by a neutral fiduciary subject to the parties' mutual direction.  Thus, Claimant Fund II has made a prima facie showing that Respondent breached its obligations under Paragraphs 3(a)(ii) and 5(a) of the Urge IPA and it is entitled to relief.

Considering the nature of the movie production loan on Urge, and balancing the equities on each side, the Arbitrator determines that Claimant Fund II's request for injunctive relief should be granted to preserve the *status quo*.  The evidence shows that, to date, approximately $390,000 in receipts from foreign distributors have been paid into Respondent's Chase account, which Respondent may access; but neither Claimant Fund II nor a neutral fiduciary can reach.  As these funds are vital for Claimant Fund II to recoup its investment in Urge, Claimants will suffer immediate and irreparable loss if the funds disappear.  Thus, injunctive relief should be awarded to prevent Respondent from dissipating receipts from distributors in the Chase account and to maintain the *status quo* pending the arbitration.  Further, it is prudent to order Respondent to transfer the receipts from distributors in the Chase account to some sort of neutral receiver or depository *pendente lite*.  Of course, the neutral depository could be a Collection Account governed by a CAMA and managed by a neutral fiduciary, such as Freeway, if the parties can reach agreement on the terms of the CAMA and the neutral fiduciary.  Otherwise, the Arbitrator can appoint a receiver for the funds, who would take directions from the Arbitrator.

(Order Granting TRO at 16).

Subsequent to the TRO being issued, "Freeway agreed to setup and manage the Temporary Collection Account mandated by the Arbitrator's TRO and Claimant's counsel John Burgee's agreement, and to hold the funds deposited therein until further order of the Arbitrator." (Gershman Decl. ¶ 2).  Accordingly, Freeway has established "the Temporary Collection Account … pursuant to the Arbitrator's TRO," and Claimant Fund II's counsel relayed this information to Respondent's counsel along with "wire instructions for Respondent to transfer the funds into the Temporary Collection Account pursuant to the TRO." (Id.).  Mr. Wildstrom confirmed that the Temporary Collection Account has existed since May 12, 2016, and that he, as manager of the Temporary Collection Account, will not disburse funds to anyone without written authority from the Arbitrator or a court.  (Wildstrom Testimony).  However, as of May

Exhibit A

26, 2016, Respondent has not transferred any funds into the Temporary Collection Account. (Id.).

It appears that Respondent has not complied with the provisions of the TRO and placed the disputed funds into the Temporary Collection Account, a neutral depository under the control of a third party fiduciary. Rather, the disputed funds remain under Respondent's exclusive control. Moreover, Respondent has not provided an accounting of the disputed funds or disclosed their current location. The purpose of the TRO to maintain the *status quo* remains unfulfilled. Accordingly, the Arbitrator's rationale behind issuing the TRO continues to apply and a Preliminary Injunction should issue to maintain the *status quo* pending the outcome of the arbitration.

To assure that the Preliminary Injunction is effective, Respondent must disclose whether it has spent or otherwise dissipated any receipts from foreign distributors on Urge and must disclose the current location of the disputed funds. Thus, Respondent will be ordered to provide financial statements to Claimant Fund II showing the amount of receipts from foreign distributors since December 2015, and the current location(s) of such receipts; however, Respondent will be allowed to redact financial information unrelated to the Urge proceeds.

### C. Bond.

Respondent claims a bond is mandatory to support any injunctive relief under California Code of Civil Procedure Section 529(a).[3] (Opposition to Application at 7:7-13). Respondent requests that a bond in the amount of $750,000 should be undertaken in order to cover its "prospective damages," which Respondent argues exceed $570,000 plus interest and attorney's fees. (Id. at 7:9-13). On the other hand, Claimant Fund II asserts there is no bond requirement under Rule 2 and, in any event, it is Respondent who should post a bond in the event Claimant Fund II's request for emergency relief is not granted. (Reply at 7:12-23).

It is true that Rule 2 is silent regarding the posting of a bond or security in an emergency arbitration when injunctive relief is awarded; thus, there is no specific JAMS provision applicable to our proceeding. However, Rule 24(e) generally provides: "An arbitrator may grant whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property. ... Such measures may take the form of a[] Partial

---

[3] California Code of Civil Procedure Section 529(a) provides, in part:

> On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding the amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction.

Cal. Civ. Pro. Code § 529(a).

16

Final Award, and the Arbitrator may require security for the costs of such measures." As such, Rule 24(e) applies to the issuance of the Partial Final Award.

Under Rule 24(e), the granting of a request for a bond is discretionary with the Arbitrator. At the hearing on the OSC, Claimant Fund II argued persuasively that requiring a bond as security for an injunction designed to prohibit the dissipation of funds that all along should have been in a secure, neutral depository (not accessible to either party) turns the purposes behind requiring a surety upside down. The Arbitrator agrees. Placing the money in a secure, neutral depository, which is similar to an escrow account, is all the insurance the parties need. Moreover, the amount of bond requested by Respondent has no relationship to the nature of the injunctive relief awarded; rather, it reflects the parties' disputes under the Amended Demand for Arbitration and Counter-Claim, which include the Imperium picture and are much broader than the subject of the injunctive relief – the Urge IPA. Thus, Respondent's request for a bond is denied.

**THE FOLLOWING PARTIAL FINAL AWARD SHALL ISSUE GRANTING CLAIMANT RAVEN-ASSET BASED OPPORTUNITY FUND II'S REQUEST FOR A PRELIMINARY INJUNCTION AGAINST RESPONDENT GREEN-LIGHT INTERNATIONAL LLC:**

A. Respondent Green-light International LLC shall immediately transfer any and all receipts and revenues from foreign distributors in connection with the motion picture Urge (the Urge Distributor Proceeds), previously received or received hereafter, to the Temporary Collection Account (beneficiary name "Stichting Freeway Custody – Temporary Urge Deposits") which Freeway Entertainment KFT has established at East West Bank and which Freeway will manage. Neither Claimant Raven-Asset Based Opportunity Fund II nor Respondent Green-light International LLC may directly access the Temporary Collection Account, which will remain intact pending further order of the JAMS Arbitrator or a court of competent jurisdiction.

B. Respondent Green-light International LLC is enjoined and prohibited from accessing, spending, using, transferring, dissipating or otherwise appropriating any of the Urge Distributor Proceeds, regardless of when Respondent received or will receive such Urge Distributor Proceeds, except as set forth in Paragraph A herein.

C. Respondent Green-light shall immediately, if not already performed, provide Claimant Fund II with the following information:
    1. A list of all foreign distributors, including their names, addresses and contact information;

2.   Copies of all foreign distributor agreements;

3.   All financial information relating to the distribution agreements, including invoices or statements to the distributors and receipts or payments from the distributors; and

4.   Copies of all monthly financial statements from the Chase account, and other financial institutions, if any, showing the location(s) of Urge Distributor Proceeds from December 1, 2015, to the present.  Financial information not pertaining to Urge Distributor Proceeds may be redacted from the financial statements.

**FURTHER, IT IS HEREBY ORDERED** that Senior Case Manager Anne Lieu shall file this Partial Final Award and serve it on the parties.

June 2, 2016

By: _____

Hon. Rosalyn Chapman (Ret.), Arbitrator

120053540.5
6/2/2016

18

Exhibit A

### PROOF OF SERVICE BY E-Mail

Re: Raven Asset-Based Opportunity Fund II LP, et al. vs. Green-Light International LLC
Reference No. 1220053540

I, Anne Lieu, not a party to the within action, hereby declare that on June 03, 2016, I served the

attached Partial Final Award on the parties in the within action by electronic mail at Los Angeles,

CALIFORNIA, addressed as follows:

Mathew Rosengart Esq.
Matthew R. Gershman Esq.
Greenberg Traurig LLP
1840 Century Park East
19th Floor
Los Angeles, CA  90067
Phone: 310-586-7700
rosengartm@gtlaw.com
gershmanm@gtlaw.com
    Parties Represented:
    Raven Asset-Based Opportunity Fund II LP
    Raven Asset-Based Opportunity Fund III LP

John G. Burgee Esq.
Burgee & Abramoff P.C.
20501 Ventura Blvd.
Suite 262
Woodland Hills, CA  91364
Phone: 818-264-7575
jburgee@bandalaw.net
    Parties Represented:
    Green-Light International LLC

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,

CALIFORNIA on  June 03, 2016.

_____
Anne Lieu
JAMS
ALieu@jamsadr.com

Exhibit A

Exhibit B

INTER-PARTY AGREEMENT

THIS INTER-PARTY AGREEMENT (as amended, modified, supplemented or restated from time to time, this "Agreement") is made and entered into as of November 12, 2015 by and among URGE PRODUCTIONS. LLC, a New York limited liability company ("Borrower"), RAVEN ASSET-BASED OPPORTUNITY FUND II LP   (together with its successors and assigns, "Lender"), and GREEN-LIGHT INTERNATIONAL LLC, a California limited liability company ("Sales Agent").

W I T N E S S E T H

WHEREAS Borrower owns all right, title and interest in and to a theatrical motion picture presently and tentatively entitled "URGE" (the "Picture"), based on the screenplay of the same name written by Aaron Kaufman and Jason Zumwalt, with revisions by Jerry Stahl, with revisions through November 13, 2014 (the "Approved Screenplay"), and has undertaken the production thereof;

WHEREAS, pursuant to that certain Sales Agency Agreement dated as November 12, 2015 (as amended, modified, supplemented or restated from time to time, the "Sales Agency Agreement"), between Borrower and Sales Agent, Borrower engaged Sales Agent as its exclusive sales agent for the Picture in certain media for the term described therein throughout the "Territory" (as such term is defined in the Sales Agency Agreement, the "Territory"), all as more particularly set forth in the Sales Agency Agreement;

WHEREAS, in connection with the financing of the Picture, (i) Lender and Borrower are concurrently herewith entering into that certain Amended and Restated Loan and Security Agreement, dated concurrently herewith (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"), and (ii) Lender, on the one hand, and Borrower and certain third parties, on the other hand, are concurrently entering into certain other ancillary agreements, documents and instruments (collectively with the Loan Agreement, as any or all of the foregoing may be modified, supplemented, extended, renewed or replaced, the "Loan Documents"), pursuant to which among other things Lender has agreed to lend funds (the "Loan") to Borrower for use in payment of a portion of the cost of the production and the delivery of the Picture upon and subject to the terms and conditions set forth therein.  Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Loan Agreement;

WHEREAS, pursuant to the Loan Documents, Borrower and certain other third parties have irrevocably assigned to Lender and have irrevocably granted to Lender a security interest in the "Collateral," as that term is defined in the Loan Agreement (the "Lender Collateral"), including all of Borrower's and such other third parties' respective right, title and interest in and to the Picture and all elements thereof, and all proceeds of the Lender Collateral (hereinafter collectively referred to as the "Lender's Assigned Receipts");

WHEREAS, as a condition precedent to Lender entering into the Loan Documents and making the Loan thereunder, Lender requires that Borrower and Sales Agent enter into this Agreement.

1

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,  the parties hereto agree as follows:

1.    <u>Sales Agent's Agreements</u>.  For the benefit of Lender only, the Sales Agency Agreement is hereby modified and amended, and Sales Agent hereby represents, warrants, covenants and agrees, as follows:

(a)    <u>Approval of Elements</u>.  To the extent, if any, that, pursuant to the Sales Agency Agreement or otherwise, Sales Agent may exercise certain rights of approval with respect to various elements (the "<u>Elements</u>") of the Picture, Sales Agent hereby acknowledges, for the benefit of Lender only, that it has approved all such Elements specified to be approved in the Sales Agency Agreement and as set forth herein.  All conditions precedent to Sales Agent's obligations hereunder and under the Sales Agency Agreement have been satisfied, and if not satisfied, waived.  Sales Agent hereby waives, for the benefit of Lender, any and all rights of approval with respect to Elements of the Picture granted to Sales Agent pursuant to the Sales Agency Agreement or otherwise.

(b)    <u>Amendments to Sales Agency Agreement</u>.  Notwithstanding anything to the contrary contained in, referred to, or incorporated by reference in, the Sales Agency Agreement or otherwise:

(i)    <u>Payment of Assigned Receipts</u>.  The Assigned Receipts shall be payable as provided herein;

(ii)    <u>Grants of Rights Conditioned on Payments of Minimum Guarantees</u>.  Any grants of rights made to any Distributor to date are and all grants of rights made to any Distributor hereafter shall be conditioned on the full and timely payment to Lender of the minimum guarantee in connection therewith;

(iii)    <u>No Amendment/Termination Without Lender's Consent</u>.  Until the indefeasible repayment of the "<u>Obligations</u>" (as such term is defined in the Loan Agreement) in full, (A) Sales Agent may only be terminated upon the terms and conditions set forth herein or as otherwise agreed by Lender, (B) Sales Agent may not terminate the Sales Agency Agreement, except as expressly provided in <u>Paragraph 10(b)</u> below, and (C) Borrower and Sales Agent will not, without the prior written consent of Lender, or as otherwise expressly provided herein, modify, alter, terminate, or amend the Sales Agency Agreement or this Agreement, in any way that might adversely affect payment of Lender's Assigned Receipts to Lender (including, without limitation, the time, manner, amount, or conditions to payment thereof) or providing Borrower or Sales Agent with any right to terminate the Sales Agency Agreement other than as expressly provided herein;

(iv)    <u>No Rights; Consent to Security Interests</u>.  Sales Agent has no, and Sales Agent shall not take any, security interest and/or ownership right in the Picture, any of the existing distribution agreements, any of the distribution agreements to be entered into with respect to any and all of the remaining unsold media, markets and territories in respect of the Picture, or any of the proceeds from the exploitation of the Picture payable under or in

2

connection with any of the foregoing ("Distribution Proceeds").  Sales Agent hereby approves of and consents to the respective assignment by Borrower and any other third parties to Lender of all of Borrower's and such third parties' respective right, title and interest in, to and under the Lender Collateral;

(v)     Approval of Distribution/License Agreements and Notices of Assignment.   Lender (until the indefeasible repayment of the Obligations and until the termination of all of Lender's obligations under the Loan Agreement) has a right of final approval with respect to the terms and provisions of all distribution or license agreements and notices of assignment and distributors' acceptances (each, a "Notice of Assignment" and collectively, "Notices of Assignment") (or the equivalent thereof) entered into by Borrower and/or Sales Agent (as agent for Borrower) or any agent of either of them with respect to the Picture that  in the case of Lender, (i) could be expected to affect Borrower's ability to timely repay the Obligations, and (ii) require delivery to any Person on or before the Delivery Date (or Outside Delivery Date)(as such terms are defined below), or require delivery of items that are not budgeted (and in the event that any Distributor requires delivery of unbudgeted items, Borrower or Sales Agent must have made arrangements, satisfactory to Lender, in its sole discretion, to pay for such items), and, prior to executing the same, Sales Agent will promptly provide Lender with copies of all proposed deal memos, long-form distribution agreements and Notices of Assignment (or the equivalent thereof) for Lender's approval of the provisions set forth;

(vi)     Approval Process for Distribution/License Agreements and Notices of Assignment.   Borrower and Sales Agent shall endeavor to procure license and distribution agreements in all territories, media and markets specified in the Sales Agency Agreement and in accordance with the terms and requirements set forth herein.  Until the full and indefeasible repayment of the Obligations and the termination of all of Borrower's obligations under the Loan Agreement, Lender shall have the right to approve any distribution agreement (i) that is below the "Take Price" as set forth in the Sales Estimates; and/or (ii) with payment terms which are not customary (i.e. 20% payable on execution and 80% on delivery). Lender shall then have five (5) Business Days (and, in the major film markets (e.g., Toronto, AFM, Berlin and Cannes), two (2) Business Days) from Lender's receipt of all of the Relevant Information to approve or disapprove such proposed transaction; provided, however, that in the event that Lender does not respond within the aforesaid time period (although Lender shall use its commercially reasonable efforts to so respond), Lender shall be deemed to have disapproved the proposed transaction.  Furthermore, when Sales Agent confirms the terms for a distribution agreement with a distributor, Sales Agent shall send or shall cause to be sent to Lender for each license and distribution agreement, or written notification containing the following information ("Relevant Information") for each agreement:

(A)     the amount of the fixed (or other, if any) payment(s) payable thereunder;

(B)     the condition(s) for payment of the fixed (or other, if any) amount(s) payable thereunder;

3

(C)      the time(s) at which such fixed (or other, if any) amount(s) would be due and payable;

(D)      the identity of the proposed distributor or licensee; and

(E)      the applicable territories.

Notwithstanding anything to the contrary set forth in this Paragraph 1 or in the Sales Agency Agreement, the parties hereto further agree and acknowledge that (until the indefeasible repayment of the Obligations and the termination of all of Lender's obligations under the Loan Agreement) Lender shall have the power and authority and is hereby authorized by Borrower on behalf of Borrower as Borrower's attorney-in-fact, in lieu of Borrower and on its behalf, to instruct and direct Sales Agent in all presales activities, including without limitation the sole right at any time to direct Sales Agent to enter into license and distribution agreements wherein the fixed (or other, if any) payment(s) payable thereunder for a particular territory are less than the estimated "take" payment(s) set forth in Exhibit "B" for that same territory. Lender's rights set forth in the preceding sentence are coupled with an interest and shall be irrevocable until such time as the Obligations under the Loan Agreement have been indefeasibly repaid in full and Lender's obligations under the Loan Agreement have terminated. As used herein, "Business Day" shall mean any day on which Lender is open for business in New York, New York;

(vii)   Documentation/Delivery of Distribution/License Agreements and Notices of Assignment.   Until the full and indefeasible repayment of the Obligations, all distribution and license agreements entered into by Sales Agent, as amended by the applicable Notice of Assignment, shall contain and shall be documented with terms acceptable to Lender and, if required by Lender, shall require a letter of credit in form and substance acceptable to Lender.  In connection with any and all distribution or license agreements entered into by Sales Agent after the date hereof, Sales Agent shall deliver to Lender, within ten (10) Business Days after the same are fully executed, complete original copies of all such distribution and license agreements, together with all other documentation required by Lender in connection therewith, and shall cause all Distributors to execute and return to Lender an original Notice of Assignment concurrently.  Each Notice of Assignment shall be in the form of Exhibit "A" attached hereto and incorporated herein by reference, with such changes as are approved by the Lender;

(viii)  Performance and Amendment of Agreements, Etc.  Borrower and Sales Agent shall each supervise and monitor the performance of and payments by all Distributors under all license and distribution agreements relating to the Picture.  Each of Sales Agent and Borrower shall fully perform all of its respective obligations under the Sales Agency Agreement and all license and distribution agreements and shall enforce all of its respective rights and remedies thereunder as it deems appropriate in its prudent business judgment; provided, however, that neither Borrower nor Sales Agent shall take any action or fail to take any action with respect to the Sales Agency Agreement or any license or distribution agreement which would adversely affect the amount or timely payment of any minimum guarantee.  Neither Borrower nor Sales Agent shall, without Lender's prior consent:  (A) assign, satisfy, release, or terminate (except as expressly permitted hereby based on a failure to effect Delivery), or

4

discharge the Sales Agency Agreement, or any license or distribution agreement, any Notice of Assignment, any collateral securing the same, any Person liable directly or indirectly with respect thereto, or any agreement relating to the Sales Agency Agreement, any license or distribution agreement, any Notice of Assignment, or the collateral therefor, or (B) amend, supplement or otherwise modify or purport to amend, supplement, or otherwise modify the Sales Agency Agreement, any license or distribution agreement, any Notice of Assignment, any collateral securing the same, or any agreement relating to the Sales Agency Agreement, any license or distribution agreement, any Notice, of Assignment or the collateral therefor, in any manner that would adversely affect the amount or payment due date(s) or the conditions of the payment of any minimum guarantee, the timely payment of the Obligations, and/or the Collateral (all as determined by Lender in its sole and absolute discretion);

(ix)    Enforcement of Agreements.  Each of Borrower and Sales Agent shall notify Lender promptly after it becomes aware of any event or fact which could reasonably be expected to give rise to a material breach, as applicable, of the Sales Agency Agreement, any license or distribution agreement or Notice of Assignment, and shall diligently pursue such right and report to Lender on all further developments with respect thereto.  Borrower shall, at its expense, collect and take all commercially reasonable legal actions necessary, and Sales Agent shall use its reasonable efforts, in each case at the respective parties' own expense, to enforce collection of all payments, receipts and revenues, as and when due, which may be owing by a Distributor under any license or distribution agreement, Notice of Assignment, or from any other Person pursuant to any other agreement entered into by Borrower or Sales Agent with respect to the Collateral, and shall remit all sums so collected to the Collection Account.  As a matter of clarification, all out-of-pocket expenses incurred by Sales Agent pursuant to this Paragraph 1(b)(x) shall be deemed Sales Expenses.  If Borrower or Sales Agent fails, after Lender's demand, to pursue diligently any right under any license or distribution agreement or any such other agreement, and such failure would adversely affect the timely payment of any of the Obligations or any minimum guarantee or the value of the Collateral (all as determined by Lender in its sole and absolute discretion), or if a "Termination Event" (as hereinafter defined) then exists, then Lender may, as Borrower's and/or Sales Agent's attorney-in-fact, directly enforce such right in its own or in Borrower's and/or Sales Agent's name and may enter into such settlements or other agreements with respect thereto as Lender shall determine in its sole and absolute discretion.  This power of attorney provided to Lender in the preceding sentence is coupled with an interest and is irrevocable until such time as the Obligations have been indefeasibly paid in full and Lender's obligations under the Loan Agreement have terminated.  Lender shall provide Borrower with copies of any settlements or other agreements Lender executes in Borrower's name; provided, however, no casual or inadvertent failure by Lender to provide Borrower with such copies shall constitute a breach hereof;

(x)    Sales Information.  Borrower and Sales Agent, as applicable, shall promptly furnish to Lender (and its designees, including Sculptor Media, LLC, hereinafter "Sculptor") all financial and other information relating to the exploitation of the Picture as Lender or Sculptor may reasonably request.  Without limiting the generality of the foregoing, Borrower and Sales Agent shall furnish to Lender and Sculptor, in such detail as Lender or Sculptor shall reasonably request, the following:

(A)      As soon as reasonably practicable, copies of all invoices for payments due under all license and distribution agreements sent to Distributors by Borrower or Sales Agent since the date such invoices were last delivered to Lender;

(B)      As soon as reasonably practicable, statements of all completed sales for the Picture, including a list of the name and address of each Distributor and the financial details of each license and distribution agreement;

(C)      As soon as reasonably practicable, copies of all invoices and other correspondence between Borrower or Sales Agent and any Distributor concerning or mentioning the payment of the minimum guarantee due thereunder; and

(D)      As soon as reasonably practicable, upon any change to the "Sales Estimates" attached hereto as Exhibit "B" and incorporated herein by this reference (the "Sales Estimates"), the updated and most current Sales Estimates.

(xi)      Key Man.  Sales Agent agrees to provide the services of Christian De Gallegos ("De Gallegos") in connection with the sales and licensing of the Picture until the full and indefeasible repayment of the Obligations.  The parties agree that Sales Agent's ability to provide such services of De Gallegos is of the essence of this Agreement, failing which Lender may exercise its termination rights set forth in Paragraph 15 below. Should Lender exercise its termination rights under this provision, then Lender may replace the Sales Agent with another sales agent selected by Lender in its sole discretion (including one at which De Gallegos is employed or is affiliated) and grant such Person the right to license any and all rights in the Picture which have not been licensed by Sales Agent (as agent for Borrower) or Borrower on terms which Lender, in its sole and absolute discretion, deems appropriate under the circumstances;

(xii)      Picture Exhibition.   Prior to the earlier of the initial theatrical release of the Picture pursuant to an approved distribution or license agreement and the full and indefeasible repayment of the Obligations, absent Lender's consent, Sales Agent shall not exhibit or authorize any other Person to exhibit the Picture to any other Person other than (A) Persons involved in the production of the Picture, Lender and their respective authorized representatives, and (B) any potential distributors of the Picture; and

(xiii)      OFAC Countries.  Borrower and Sales Agent shall not enter into a distribution agreement or any other agreement with respect to the Picture or any right therein with any Person organized under or doing business in a Prohibited Territory.   "Prohibited Territory" means any country listed by the Office of Foreign Assets Control of the United States Department of Treasury as to which transactions between a United States Person and that territory are prohibited, which, as of the date of this Agreement, include:  Cuba, Iran, North Korea, Sudan, Liberia, Syria, Burma (Myanmar), and Zimbabwe.

(c)      General Representations and Warranties.  Sales Agent hereby agrees, represents and warrants to Lender as follows, which agreements, representations and warranties

6

shall survive the execution and delivery of this Agreement and the full and indefeasible repayment of the Obligations:

(i)     Sales Agent is a limited liability company duly organized and now existing in good standing under the laws of its jurisdiction of formation; is duly qualified to do business as a foreign company in any other jurisdiction in which the failure to so qualify would have a material adverse effect on Lender; and has the power and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business. All actions heretofore taken and agreements heretofore entered into by Sales Agent in connection with the Picture were duly authorized and constitute valid, binding and enforceable actions and obligations of Sales Agent subject, as to enforcement only, to bankruptcy, insolvency, moratorium or similar laws then in effect affecting the rights of creditors generally and general equitable principles.  The chief office and principal place of business of Sales Agent and place where Sales Agent's books and records are maintained is Sales Agent's address set forth in Paragraph 12 herein below.  Sales Agent shall notify Lender in writing immediately upon any change in its chief office or principal place of business or of the place where its books and records are maintained;

(ii)    Sales Agent has the power and authority to execute, deliver and carry out the terms and provisions of this Agreement and all documents, instruments and agreements to be executed and/or delivered by Sales Agent hereunder, and has taken all necessary corporate action to authorize the execution, delivery and performance thereof;

(iii)   The execution, delivery and performance of this Agreement by Sales Agent and all other documents, instruments and agreements to be executed or delivered pursuant hereto, and the consummation of the transactions herein contemplated, and compliance with the terms and provisions hereof and thereof (A) will not violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency to which Sales Agent is subject in the United States, (B) will not conflict with or be inconsistent with, or result in any breach of, any of the terms, covenants, conditions or provisions of any mortgage, indenture, deed of trust, agreement or other instrument to which Sales Agent is a party or by which it may be bound or to which it may be subject; and will not violate any provision of the certificate of formation pursuant to which Sales Agent was formed;

(iv)    There are no actions, suits or proceedings, pending or, to the best knowledge of Sales Agent, threatened, against, affecting or relating to, Sales Agent or the Picture before any court or governmental or administrative body or agency which might result in any material adverse change in the business, operations, properties or assets or in the condition, financial or otherwise, of Sales Agent or which would otherwise adversely affect the rights and security interest granted to Lender in the Picture.  Sales Agent is not in default under any applicable statute, rule, order or regulation of any governmental authority, bureau or agency having jurisdiction over it;

(v)     In connection with Sales Agent's execution, delivery, performance, validity and enforceability of this Agreement and any other instrument, agreement or document

LA 132359103v1

to be executed and delivered hereunder, no consent of any person, and no consent, license, approval, authorization, registration or declaration with any governmental authority, bureau or agency is required, or if it is required, it has been obtained;

(vi)    This Agreement, and each document, instrument or agreement executed and delivered by Sales Agent hereunder, when executed and delivered pursuant hereto, will constitute legal, valid and binding obligations of Sales Agent, enforceable against Sales Agent in accordance with the respective terms hereof and thereof subject, as to enforcement only, to bankruptcy, insolvency, moratorium or similar laws then in effect affecting the rights of creditors generally and general equitable principles;

(vii)    Except as specifically permitted hereunder with respect to the distribution and license agreements with Distributors, Sales Agent has not transferred, assigned, or encumbered any rights in or to the Picture or in or to the proceeds thereof prior to the date hereof and will not do so after the date hereof until the full and indefeasible repayment of the Obligations;

(viii)    No litigation or claims exist or, to the best knowledge of Sales Agent, are threatened relating to the Picture, the rights therein or thereto or otherwise, which would materially adversely affect the rights granted to Lender hereunder, under the Loan Documents;

(ix)    The Sales Estimates represent Sales Agent's opinion (as opposed to guarantee) of the expected sums of Distribution Proceeds payable prior to the maturity date;

(x)    Other than the Existing Distribution Agreements, no distribution or license agreement has been negotiated or entered into by Sales Agent in connection with the Picture; and

(xi)    No insolvency proceedings of any nature are now pending or threatened by or against Sales Agent.

2.    <u>Notice of Assignment</u>

(a)

(i)    Pursuant to the Loan Documents, Borrower and certain third parties have irrevocably collaterally assigned to Lender and have irrevocably granted to Lender a security interest in and to the Lender Collateral, including, without limitation, all of Borrower's, Borrower's and such third parties' respective right, title and interest in and to the Picture and all elements thereof, and all proceeds of the Lender Collateral including, without limitation, all amounts payable to Borrower under the Sales Agency Agreement or otherwise.

(b)    Borrower hereby:

(i)

(A)     Notifies Sales Agent of the security interest and assignment described in Paragraph 2(a)(i) above;

(B)     Borrower hereby authorizes, directs and instructs Sales Agent to remit any Lender's Assigned Receipts received by Sales Agent, and to use Sales Agent's reasonable best efforts to cause the Distributors to pay all Lender's Assigned Receipts to the following Collection Account at East West Bank's branch located at 135 N. Los Robles Ave. Suite 600, Pasadena, California 91101 United States; ABA No.:  322 070 381; Swift code: EWBKUS66; Account Name:    Stichting Freeway Custody Re:   Urge; Account No.: 8003057661; Attention: Tom Garry (the "Collection Account") for further disbursement pursuant to that certain collection account management agreement, collection account management agreement or any other similar instrument (the "CAMA"), to be entered into by and among Sales Agent, Borrower, Lender and the collection account manager, among others;

(C)     Instructs Sales Agent to afford Lender or its representatives (including Sculptor), in addition to Borrower, all rights of examination and audit of Sales Agent's books and records relating to the Picture (as provided in Section 3(a)(v) below);

(D)     Instructs Sales Agent to furnish to Lender and its representatives (including Sculptor) duplicates of all notices and statements from Sales Agent to Borrower under the Sales Agency Agreement or otherwise relating to the Picture which relate to the Lender Collateral and/or the Lender Assigned Receipts;

(E)     Instructs Sales Agent to comply with any instructions given by Lender or its representatives (including Sculptor) pursuant to Paragraph 1(vi) above; and

(F)     Notifies Sales Agent that the authority, instructions and directions contained in this Paragraph 2(b)(i) are coupled with an interest and are in all respects irrevocable and without right of rescission or modification without the written consent of Lender.

3.     Acceptance and Acknowledgment.  Sales Agent hereby covenants and agrees for the benefit of Lender only that:

(a)

(i)     That the Lender's Assigned Receipts includes all amounts payable to Borrower under the Sales Agency Agreement or otherwise with respect to the Picture;

(ii)     To remit any Lender's Assigned Receipts received by Sales Agent, and to use its reasonable best efforts to cause the Distributors to pay the Lender's Assigned Receipts, to the Collection Account as provided herein;

(iii)     To send to Lender and Sculptor duplicates of all notices and statements furnished by Sales Agent to Borrower under the Sales Agency Agreement and otherwise relating to the Picture which relate to the Lender Collateral and/or the Lender Assigned Receipts, to permit Lender or its representatives (including Sculptor), in addition to

9

Borrower, to audit, examine and take excerpts from all books and records of Sales Agent pertaining to the Picture at all reasonable times upon reasonable notice (and Sales Agent agrees that ten (10) Business Days notice will be deemed reasonable prior to the occurrence of any Default or Event of Default under the Loan Agreement, and following the occurrence of any such Default or Event of Default, one (1) Business Day shall be deemed reasonable);

(iv)    To notify Lender and Sculptor promptly of any conflicting notice received by Sales Agent of any claim by any third party that such third party is entitled to receive all or any portion of Lender's Assigned Receipts; and

(v)    Notwithstanding anything to the contrary in the Sales Agency Agreement and/or any agreement relating to the Picture, except for the fees set forth below in this Section 3(a)(v) (all of which shall be payable as set forth below), the payment of any sales fees, commissions, distribution and marketing costs incurred by and payable or reimbursable to Sales Agent or any of its affiliates in connection with the Picture shall be deferred, and shall not be due and payable to Sales Agent, until the Obligations have been indefeasibly satisfied and paid in full and all of Lender's obligations under the Loan Agreement have terminated:

(A)    fifty percent (50%) of the "Sales Fee" and "Service Fee" (as such terms are defined in the Sales Agency Agreement) shall be payable prior to the Obligations; and

(B)    one hundred percent (100%) of the "Market Attendance and Sales Expenses Fee" and "Delivery Costs" (if any) (as such terms are defined in the Sales Agency Agreement) shall be payable prior to the Obligations.

4.    Application of the Assigned Receipts.

(a)    Upon receipt of Lender's Assigned Receipts pursuant to the CAMA, Lender shall be entitled to retain all Lender's Assigned Receipts and shall immediately apply the same to repay the Obligations of Borrower to Lender as provided in the Loan Documents; provided, however, that any portion of such Lender's Assigned Receipts which exceeds the amount of Borrower's Obligations shall be disbursed by Lender in accordance with Paragraph 4(b)(iii) below.

(b)    Upon the full and indefeasible repayment of the Obligations owed to Lender under the Loan Documents and the termination of its obligations under the Loan Agreement, Lender shall:

(i)    Notify Sales Agent and Borrower thereof in writing (such notice is hereinafter referred to as the "Repayment Notice"), and thereupon the authority, instructions, and directions from Borrower to Sales Agent under Paragraph 2(b)(i) hereof shall terminate and Sales Agent shall thereafter be relieved of its obligations to Lender under Paragraph 3(a) hereof;

(ii)    Deliver to Borrower, upon Borrower's request and at Borrower's sole cost and expense, termination statements executed by Lender as the secured party for filing

10

in all jurisdictions where financing statements or copyright mortgages have been filed by Lender to perfect the security interest granted under the Loan Documents; and

                (iii)     Direct all additional receipts as provided in the CAMA.

        5.      <u>Payments to Lender and Rights of Offset</u>.

        (a)     <u>Remittal of Assigned Receipts</u>.  Notwithstanding anything to the contrary contained in, referred to or incorporated by reference in the Sales Agency Agreement or otherwise with respect to the Picture, subject to the arbitration provisions set forth in <u>Paragraph 11</u> below, Sales Agent agrees that it shall remit all Lender's Assigned Receipts to the Collection Account promptly upon receipt thereof as herein provided, without offsets, deductions, counterclaims or defenses which Sales Agent may have or claim against Borrower or any other Person pursuant to the Sales Agency Agreement or otherwise, all of which are expressly reserved by Sales Agent as against Borrower and any other Person, but only to the extent that the exercise of such rights does not derogate from Lender's rights to receive payment of Lender's Assigned Receipts (or any portion thereof) hereunder.  Sales Agent hereby waives for the benefit of Lender only all rights of offset and deduction, and all rights to set up reserves, whether provided for in the Sales Agency Agreement or otherwise, which could or would adversely affect the payment of Lender's Assigned Receipts (or any portion thereof) hereunder.  Sales Agent shall not make any payment of Lender's Assigned Receipts contrary to the provisions of this Agreement without the express written consent of Lender, as the case may be, and shall not fail to remit any Lender's Assigned Receipts received by Sales Agent or to use its reasonable best efforts to cause the Distributors to pay any Lender's Assigned Receipts to the Collection Account.  Sales Agent agrees that once the Lender's Assigned Receipts (or any portion thereof) have been paid to Lender hereunder, the same shall not be subject to refund or return by Lender to Sales Agent for any reason.  If Sales Agent fails to remit any Lender's Assigned Receipts (or any portion thereof) to the Collection Account when due as provided in this Agreement, Sales Agent shall reimburse Lender for any and all actual, out-of-pocket costs and expenses paid or payable to third parties (including, without limitation, court costs and reasonable outside attorneys' fees) incurred by Lender in enforcing collection of Lender's Assigned Receipts (or any portion thereof) from Sales Agent.

        (b)     <u>Chain of Title</u>.  For the benefit of Lender only, Sales Agent hereby acknowledges that it has approved all "chain of title" documentation relating to the Picture, and acknowledges and agrees that, notwithstanding anything to the contrary set forth in the Sales Agency Agreement or otherwise, Sales Agent may not refuse to remit any Lender's Assigned Receipts (or any portion thereof) as provided herein, or to use its reasonable best efforts to cause the Distributors to pay any Lender's Assigned Receipts as provided herein, or refuse to accept delivery of the Picture under the Sales Agency Agreement or hereunder, by reason of (i) any deficiency with respect to such "chain of title" documentation or to any underlying materials upon which the Picture is or shall be based, including, without limitation, any deficiency in the copyright or any other right acquired in the underlying materials or the Picture, or any claim, proceeding or judgment arising out of any such actual or claimed deficiency, (ii) any deficiency with respect to any composer's agreement, music synchronization, performance or master use licenses or any other agreement or instrument under which any music has been acquired for the

<div align="center">11</div>

Picture, or any claim, proceeding or judgment arising out of any such actual or claimed deficiency (including, without limitation, any actual or claimed deficiency in or relating to the copyright or any other right in any music synchronized with or recordings embodied in the soundtrack of the Picture), or (iii) any deficiency with respect to the title of the Picture. Without limiting the generality of the foregoing, neither the title *Urge* nor any other title to the Picture is a condition precedent to or included within the definition of Delivery to Sales Agent and/or to any Distributor. Sales Agent shall perform all of its obligations hereunder and under the Sales Agency Agreement, including, without limitation, causing the Distributors to pay the Lender's Assigned Receipts to the Collection Account, in each case regardless of whether: (a) any such title is available; (b) the use of any such title is advisable; and/or (c) Delivery to Sales Agent and/or Delivery to any Distributor is effected with the Picture having any such title.

      6.    Subordination; Acknowledgment of Priority.

      (a)    Sales Agent hereby acknowledges, confirms and agrees as follows:

      (i)    That Borrower and certain third parties have each granted to Lender a first priority lien on and security interest in and to the Lender Collateral, including, without limitation, all of Borrower's and such third parties' rights, title and interest in and to the Picture, the copyright therein, the physical materials thereof and the proceeds therefrom, and that the Lender Collateral includes, without limitation, all personal property relating to the Picture in which any of the Borrower, such third parties or Sales Agent has or hereafter acquires any right, title, interest, lien or security interest; and

      (ii)    That Borrower has assigned to Lender all of its rights, title and interests in and to the Sales Agency Agreement (including, without limitation, all amounts payable to and by Sales Agent).

      (b)    Sales Agent (except as expressly provided in Section 3(a)(v) herein) hereby subordinates and makes subject all of its rights, title and interests (including, without limitation, any liens or security interests) which Sales Agent may now have or hereafter acquire in or to any item of the Lender Collateral and to the rights, liens and security interests of Lender in and to the Lender Collateral under the Loan Documents. Upon request of Lender at any time and from time to time, Sales Agent (at Sales Agent's sole cost and expense) agrees to execute and deliver to Lender all agreements, documents, instruments and statements, including, without limitation, all security agreements and financing statements and amendments to financing statements, Lender deems reasonably necessary or desirable to accomplish and put on record such subordination and/or terminate any lien or security interest that Sales Agent may have in the Lender Collateral if it shall no longer be entitled to hold or have the benefit thereof.

      (c)    The provisions hereof as to subordination are solely for the purpose of defining the relative rights of Lender, and none of such provisions shall impair the obligations of: (A) Borrower to repay the Obligations to Lender, (B) Borrower and any third parties to perform their other obligations to Lender under the Loan Documents, (C) Sales Agent to pay and perform the obligations of Sales Agent to Lender hereunder and to Borrower under the Sales Agency Agreement, as amended hereby, or (D) Borrower to perform the obligations of Borrower to Sales

Agent under the Sales Agency Agreement; nor shall any such provisions prevent Lender from exercising all remedies otherwise permitted by applicable law upon a default thereunder, subject to the provisions contained herein.  It is expressly understood and agreed that this Agreement shall be for the sole and exclusive benefit of Lender. Lender does not intend that any rights, duties or restrictions contained herein shall inure to the benefit of any third party.  The execution of this Agreement by Borrower is not intended to make Borrower a third party beneficiary of this Paragraph 6(c).  In executing this Agreement, Borrower hereby waives any rights, if any, created or implied in its favor by this Paragraph 6(c).

      7.     <u>No Default Under Sales Agency Agreement</u>.  Borrower and Sales Agent each warrant and represent that, as of the date of execution hereof, no default exists or is threatened or imminent under the Sales Agency Agreement, and that the Sales Agency Agreement is in full force and effect.

      8.     <u>No Performance Required</u>.

      (a)     It is expressly agreed by the parties hereto that, anything herein to the contrary notwithstanding, each of Borrower and Sales Agent shall remain responsible for the performance of all of its respective obligations under the Sales Agency Agreement, and Lender shall not have any obligation under the Sales Agency Agreement by reason of or arising out of this Agreement, the Loan Documents or otherwise, nor shall Lender be required or obligated in any manner to perform any obligations of Borrower or Sales Agent under or pursuant to the Sales Agency Agreement. Lender shall not be required to present or file any claim or to take any other action as a condition to collecting or enforcing the payment of Lender's Assigned Receipts.

      9.     <u>Additional Agreements</u>.  It is further agreed among the parties hereto as follows:

      (a)     <u>Delivery</u>.  Borrower (shall effect "Delivery" (as such term is hereinafter defined) to Sales Agent not later than the "Delivery Date" (as hereinafter defined).   The "Delivery Date" shall mean a date no later than October 1, 2016, subject to extension for (i) a period of time not to exceed sixty (60) days caused by any Force Majeure Event(s) (as hereinafter defined) and/or exigencies of production and/or post production as Lender may designate in its sole discretion, and/or (ii) a period of time not to exceed sixty (60) days caused by any Event of Essential Element Force Majeure (as hereinafter defined); provided the aggregate extension under  (i) and (ii) hereof shall not exceed one hundred and five  (105) days (the "Outside Delivery Date")  as such dates may be extended for the duration of any notice and/or cure periods as described in Paragraph 10 of this Agreement.  For purposes hereof, (1) "Force Majeure Event" shall mean any fire, earthquake, delay at laboratories or post production facilities performing work on the Picture not caused by Borrower, flood, torrential rain, epidemic, accident, explosion, casualty, strike or labor stoppage or threat thereof, lockout, riot, civil disturbance, act of a public enemy, embargo, war, terrorist event, act of God, or death, disability or incapacity of a principal cast member or the director of the Picture, or effect of any municipal, state or federal ordinance or law, or act by any legally constituted authority, whether municipal, state or federal, or the issuance of any judicial or executive order, the action of any legally constituted authority, or any other similar event or cause of the nature of force majeure beyond the control of Borrower, which causes an interruption or suspension of or materially

<div align="center">13</div>

hampers, interferes with or delays the commencement of production or the completion and delivery of the Picture, (2) "Event of Essential Element Force Majeure" shall mean an event which renders the Essential Element incapable of rendering services in connection with the Picture; and (3) "Essential Element" means Pierce Brosnan in the role of "The Man" (or by whatever other name that character is known in the completed Picture) through the completion of principal photography.  Borrower shall provide written notice to Sales Agent and Lender that Delivery has been tendered to Sales Agent in accordance with the provisions of this Agreement (the "Delivery Notice").

(b)     Sales Agent acknowledges that Borrower is relying on Sales Agent to deliver the Picture to the Distributors following Sales Agent's receipt of Sales Agent Delivery Items and Sales Agent's failure to deliver the Picture to any Distributor may cause Borrower to incur liability to Lender pursuant to the Loan Agreements.  In that regard, Sales Agent agrees to deliver the Picture to all Distributors in accordance with the Notices of Assignment within thirty (30) days after Delivery of the Picture to Sales Agent has been effected in accordance with the provisions of this Agreement.  Sales Agent acknowledges and agrees that if Borrower has reasonable grounds to believe Sales Agent shall fail to deliver the Picture to the Distributors on or before such date, at Borrower's option and upon written notice to Sales Agent, Borrower may deliver the Picture to the Distributors, and Sales Agent shall provide access to Borrower to all delivery items which may be required by Borrower to timely effect such delivery. In any suit, proceeding, arbitration proceeding, or action brought by the Lender under any Distribution Agreement or any related Distributor Notice for any sum owing thereunder or to enforce any provision thereof, the Sales Agent shall indemnify and hold the Lender harmless from and against all expense, loss or damage suffered by reason of any defense, setoff, counterclaims, recoupment, or reduction of liability whatsoever of a Distributor or other obligor thereunder arising out of the Sales Agent's breach of its own obligations thereunder or arising out of any other agreement, indebtedness or liability at any time owing from the Sales Agent to or in favor of such obligor or its successors.  The Borrower, and provided Delivery has been made to the Sales Agent, the Sales Agent shall indemnify the Lender with respect to all reasonable costs and liabilities incurred by the Lender arising out of or relating to the Sales Agent's failure to timely effect Delivery to a Distributor.  The Borrower's and the Sales Agent's obligation to indemnify the Lender shall survive the termination of the Sales Agency Agreement.

(c)     Sales Agent's Termination of Sales Agency Agreement.  Notwithstanding anything to the contrary in the Sales Agency Agreement or herein, Sales Agent shall have the right to terminate the Sales Agency Agreement with respect to the Picture (as provided thereunder) only if Borrower or Lender (in the event Lender or Sculptor takes over production of the Picture) shall fail, on or before the Delivery Date (or the Outside Delivery Date, if applicable), to make Delivery to Sales Agent as provided in Paragraph 9(a) hereof. Notwithstanding anything to the contrary in the Sales Agency Agreement or otherwise, Sales Agent hereby agrees to remit to the Collection Account the Lender's Assigned Receipts received by Sales Agent.  If Sales Agent fails to remit any Lender's Assigned Receipts (or any portion thereof) to the Collection Account when due as provided herein, Sales Agent shall reimburse Lender for any and all actual, out-of-pocket costs and expenses paid or payable to third parties (including, without limitation, court costs and reasonable outside attorneys' fees) incurred by

14

Lender in enforcing collection of Lender's Assigned Receipts (or any portion thereof) from Sales Agent.

        (d)     [Intentionally omitted].

        (e)     Insurance Recoveries.  All insurance recoveries with respect to the production of the Picture (except proceeds of errors and omissions insurance) shall be paid as follows:  (i) they shall be deposited in the "Production Account" (as defined in the Loan Agreement) and they shall be made available to pay production costs of the Picture or (ii) any surplus remaining after such receipts have been applied pursuant to the foregoing shall be paid to Lender in payment toward Borrower's obligations and, upon payment in full of all of Borrower's Obligations to Lender under the Loan Agreement, to Borrower.

    10.    Arbitration.

        (a)     Delivery Procedures and Disputes.

            (i)     Notwithstanding anything to the contrary provided in the Sales Agency Agreement, or otherwise, and following the applicable cure period, each of the parties hereto agrees that any dispute under this Agreement relating to Delivery of the Picture to any Distributor shall be resolved by expedited mandatory binding arbitration conducted in accordance with the arbitration provision set forth in the Notice of Assignment executed by such Distributor with respect to whom it has been alleged that there has been a failure of delivery. Sales Agent hereby covenants and agrees with Lender that it shall promptly notify Lender of any arbitration proceeding commenced with respect to any Distributor, and Sales Agent shall cause Lender to be permitted to become a party to any such arbitration.  Sales Agent further covenants and agrees that, until the indefeasible repayment in full of the Obligations to Lender, Sales Agent shall cause each of the Distributors to execute a Notice of Assignment in the form of Exhibit "A" attached hereto or such other inter-party agreement or notice of assignment approved by Lender; and

            (ii)     Notwithstanding anything to the contrary in the Sales Agency Agreement, or elsewhere, each of the parties hereto agrees that in the event any dispute arises between any of the parties hereto as to whether Delivery has been made to Sales Agent, the parties hereto who are parties to such dispute hereby agree to submit such dispute to binding arbitration as hereinafter provided:

            (A)     Sales Agent shall have fifteen (15) Business Days from and after its receipt of written notice from Borrower or Lender that Sales Agent Delivery Items have been delivered to it, within which to verify that the specifications set forth on Schedule 2 hereof have been satisfied and to notify Borrower and Lender that either:

            (1)     Delivery to Sales Agent has been made ("Acceptance Notice"); or

(2)     Delivery to Sales Agent has not been made ("Objection Notice"), which notice shall specify (with particularity and in reasonable detail) the purported defect(s) in Delivery and all items that must be delivered, corrected or otherwise modified in order to effect Delivery to Sales Agent. Those Sales Agent Delivery Items, if any, that are not specified in the Objection Notice as requiring delivery, correction or other modification in order to complete Delivery to Sales Agent shall be deemed to be either waived or accepted, as applicable, by Sales Agent. If within five (5) Business Days after receiving such Objection Notice, Borrower or Lender requests additional information which it believes in good faith is necessary in order to determine whether Delivery has been made notwithstanding such Objection Notice, or how any defect in Delivery can be cured, Sales Agent shall have five (5) Business Days after its receipt of such request to respond in good faith thereto (the "Response").

(B)     If Sales Agent fails to give either an Acceptance Notice or an Objection Notice within the time periods set forth in subparagraph (A) above, or if, after giving an Objection Notice, Sales Agent fails to respond to a request for additional information made by Borrower or Lender as aforesaid, then Sales Agent shall be deemed to have given an Acceptance Notice for all purposes hereof. If Sales Agent gives a timely Objection Notice as aforesaid, and if applicable, a Response, and is not thereafter deemed to have given an Acceptance Notice hereunder, then the Borrower and Lender shall as soon as reasonably possible, but in no event later than twenty (20) business days (the "Cure Period") commencing on the later of the receipt of the Objection Notice and, if applicable, the Response or the return to the Borrower of any purported defective Delivery Materials if so required, either:

(1)     Re-tender the appropriate Delivery Materials to the Sales Agent in accordance with the specifications of the applicable Objection Notice (but in no event more than the requirements as specified in Paragraph 9(a) hereof) and (if applicable) the Response, and give a notice (the "Cure Notice") to the Sales Agent stating that the affected Delivery Materials have been re-tendered to the Sales Agent. Nothing herein shall be deemed to require Borrower to cure all objections identified in the Objection Notice if Borrower does not agree that such items require cure (each such item a "Non-Cured Item"), and in such event, Borrower, shall have the right to claim during any later arbitration that such Non-Cured Items were not defective when originally tendered to Sales Agent but nothing herein shall be deemed to waive Sales Agent's right to assert that Delivery has not been made to it; or

(2)     Give Sales Agent a notice ("Arbitration Notice") stating that the Borrower, and/or Lender has elected to submit the issue of whether Delivery to Sales Agent has been made for expedited arbitration in accordance with subparagraph (E) below.

(C)     Borrower shall effect any cure and within the Cure Period effect Delivery to Sales Agent and give written notice thereof to Sales Agent and Lender. Sales Agent shall have ten (10) Business Days from and after its receipt of same within which to inspect and verify that Delivery has been effected and to notify Borrower and Lender that either:

(1)     Delivery to Sales Agent has been made as aforesaid, and Sales Agent shall thereupon issue the Acceptance Notice; or

16

(2)     Delivery to Sales Agent has not been made ("Second Objection Notice") and Sales Agent in such notice shall specify any remaining deficiencies and Lender shall have the right to either effect the cure (within fifteen (15) Business Days plus any remaining days in the Cure Period if it has not expired) or give an Arbitration Notice and the procedure set forth in subparagraphs (B) and (C) above shall again be applicable within the Cure Period.  For the avoidance of doubt, and by means of an example, if Borrower utilizes fifteen (15) Business Days to effectuate the first cure of the Sales Agent Delivery Items, then Borrower shall have twenty (20) Business Days to effectuate the second cure of any Sales Agent Delivery Items which Sales Agent does not accept.

(D)     If Sales Agent fails to give either of the notices described in clauses (1) and (2) of subparagraph (C) above as aforesaid, then Sales Agent shall be deemed to have given the notice described in clause (1) of said subparagraph (C) for all purposes hereof, and Delivery shall be deemed to have been made to Sales Agent, and Sales Agent shall be deemed to have issued the Acceptance Notice to Lender.

(E)     In the event that either Lender, Borrower or Sales Agent elect to submit the issue of whether Delivery to Sales Agent has been made to expedited, binding arbitration pursuant to this Paragraph 10, the following provisions shall apply:

(1)     The arbitration shall be submitted to one arbitrator who shall be selected as follows:

Promptly following the giving of any Arbitration Notice hereunder, Sales Agent, Borrower, and Lender shall promptly meet and attempt in good faith to select a single arbitrator acceptable to all such parties.  If a single arbitrator is not selected by mutual consent within five (5) Business Days after the giving of the Arbitration Notice, then Sales Agent and Borrower shall each appoint one arbitrator with knowledge and experience in the U.S. motion picture industry and the technical delivery issues relating to motion pictures, which arbitrators shall then appoint a third arbitrator with similar knowledge and experience (such third arbitrator, the "Arbitrator") who shall have full authority to act as the sole arbitrator of such arbitration and shall give written notice thereof to Lender, Borrower and Sales Agent within two (2) days of such appointment and provided, however, that if either Sales Agent or Borrower shall fail to appoint its respective arbitrator within five (5) Business Days after receipt of an Arbitration Notice, then the arbitrator appointed by the other party shall have full authority to act as the sole arbitrator of such arbitration.  In the event that the arbitrators so selected by Sales Agent and Borrower cannot agree upon a third neutral arbitrator, then such arbitrator shall be appointed pursuant to the JAMS Comprehensive Arbitration Rules and Procedures in effect as of the date hereof (the "Arbitration Rules") and such appointee shall act as the sole arbitrator hereunder.

(2)     The arbitration shall commence at a location in Beverly Hills or Los Angeles, California, to be chosen by the arbitrator ("Arbitrator") selected pursuant to the preceding clause (i), within ten (10) Business Days after the Arbitrator has been selected as aforesaid, and such arbitration shall continue on each consecutive Business Day

17

therefrom until fully concluded, but in no event, unless continued by the Arbitrator for good cause shown, shall such arbitration continue for more than ten (10) Business Days from the commencement thereof.   Except as expressly provided herein, such arbitration shall be conducted in accordance with the commercial rules and procedures of the Arbitration Rules applicable to expedited arbitrations.

(3)     There shall be made available to the Arbitrator all unprivileged relevant documents and materials.  The parties shall participate in an exchange of information before the hearing.  In this regard, the parties to the arbitration shall be entitled to reasonable discovery for the purposes of such arbitration, including, without limitation, document production and the taking of depositions.  If any such discovery is not voluntarily exchanged among the parties, the party desiring such discovery may apply to the Arbitrator at the outset of the arbitration for particular discovery requests.  The Arbitrator may deny only such discovery as is privileged, unreasonable or is intended to unduly delay the prompt conclusion of the arbitration.

(4)     The arbitration must result (inter alia) in either a finding that Delivery to Sales Agent has been effected or a finding that Delivery to Sales Agent has not been effected and the Arbitrator shall promptly notify Sales Agent, Borrower and Lender in writing of the finding made.  If it is found that Delivery to Sales Agent has been effected, the Arbitrator shall issue a final award against Sales Agent, requiring inter alia Sales Agent immediately to pay interest, costs and expenses (including, without limitation, any outside attorney fees and expenses) incurred by the other parties in connection with the arbitration.  In the event Sales Agent fails to pay such amount within seven (7) Business Days, all rights of Sales Agent under the Sales Agency Agreement shall terminate automatically and without further notice or demand and revert to Lender and Lender may thereafter deal with such rights without further regard to Sales Agent, but without prejudice to Lender's rights at law, in equity or otherwise to enforce its rights and remedies as against Sales Agent for any breach by Sales Agent of this Agreement.  Sales Agent agrees that it shall execute and deliver to Lender, within five (5) Business Days of Lender's request therefor, such documents and other instruments as shall be requested by Lender to evidence such termination, and, Sales Agent hereby appoints Lender as its attorney in fact to execute and deliver, on Sales Agent's behalf, all of such documents and instruments (with copies to Sales Agent) in the event Sales Agent shall not have done so within the time period specified.  Such appointment is coupled with an interest and is irrevocable.  If it is found that Delivery to Sales Agent has not been effected, the Arbitrator shall promptly notify the parties of such finding and shall issue a final arbitration award against Borrower immediately to pay to Lender an amount equal to Borrower's liability to Lender, together with interest, costs and expenses provided for in Paragraphs 14 and 22 below, ("Borrower's Liability").  In such event, all rights of Sales Agent under Sales Agent Agreement shall remain in full force and effect and Borrower shall be required to deliver the Picture to Sales Agent in accordance with the Arbitrator's final decision.

(F)     Notwithstanding anything to the contrary contained in subparagraphs (B) and (D) above, Sales Agent shall not be deemed to have given an Acceptance Notice hereunder by virtue of its failure to give notice pursuant to subparagraphs (B) and (D)

18

unless and until Lender, or Borrower send Sales Agent a written reminder notice ("Reminder Notice") that an Acceptance Notice was deemed to have been given and if Sales Agent shall thereafter fail to deliver to the other parties an Objection Notice or Arbitration Notice, as the case may be, within five (5) Business Days after its receipt of a Reminder Notice, Sales Agent will conclusively be deemed to have given an Acceptance Notice.

(G)     The Arbitrator's award shall provide for the losing party (or parties) of the arbitration to pay Arbitrator's and any court reporter's fees, as well as the reasonable actual outside attorneys' fees incurred by the prevailing party (or parties) (i.e., all parties to the arbitration other than the losing parties) in the arbitration, and shall further provide (unless Lender is the losing party) for the payment by Borrower and/or Sales Agent, as appropriate, to Lender of any interest, costs and expenses amounts payable by them pursuant to Paragraphs 14 and 22 hereof.  For the purposes of the preceding sentence, the party or parties against whom an arbitration award is issued pursuant to subparagraph (E)(4) above shall be the "losing party" and if no such award is issued against Sales Agent or Borrower, Lender shall be deemed to be the losing party.

(H)     The parties hereto may also proceed to arbitration as herein provided in the event that Borrower acknowledges that Delivery to Sales Agent has not been made and/or payment of all sums owed to Lender hereunder are not timely made.  In any such arbitration, Lender shall have the right to appoint the arbitrator which would otherwise be appointed by Sales Agent pursuant to subparagraph (A) above.

(b)     Non-Delivery Disputes.     All controversies, claims, disputes, or counterclaims between the parties hereto concerning, based in any way upon, arising under, relating to, or arising in connection with the Picture, this Agreement, or any resulting transaction, including, but not limited to, their respective obligations hereunder, payment of the Distribution Proceeds (other than a dispute concerning Delivery, which shall be resolved in accordance with the procedures specified in Paragraph 11(a) hereof), a disagreement about the meaning, interpretation, application performance, breach, termination, enforceability, or validity of this Agreement, and whether based on statute, tort, contract, common law or otherwise, shall be subject to and resolved by binding arbitration conducted under the auspices of the Arbitration Rules.  All such arbitration proceedings shall be conducted in accordance with the Rules.  To the extent not otherwise covered by the Rules, the arbitration shall be conducted in accordance with Title 9 of the U.S. Code.  The party seeking to commence an arbitration shall send a written demand for arbitration to each other party that is involved in such dispute in accordance with the Rules.  The parties to such dispute shall attempt in good faith to select a single neutral arbitrator for the resolution of the dispute within five (5) Business Days after the receipt of the notice demanding arbitration.  If an arbitrator is not so selected within such five (5) Business Day period, then the arbitrator shall be selected in accordance with the Rules.  The arbitration proceeding shall be conducted in the English language.  The arbitration proceedings shall be held in Los Angeles or Beverly Hills, California.  The award issued by the arbitrator in any arbitration proceeding may be enforced in the courts of the Superior Court for the County of Los Angeles or the United States District Court for the Central District of California or any courts having personal jurisdiction over any of the parties, and the parties waive any and all objections to

19

personal jurisdiction in such case which they may otherwise have.  Service of process in any such court proceeding may be made in the same manner that a notice is given under Paragraph 12 hereof:

(i)     Any arbitration conducted pursuant to this section shall be conducted by the arbitrator as expeditiously as possible and in all events within thirty (30) calendar days after the arbitrator has been selected or assigned.  The arbitrator shall determine all questions of arbitrability, including, without limitation, the scope of this agreement to arbitrate, the subject matter of the dispute, whether any agreement to arbitrate exits and, if so, whether it covers the dispute in question and any other form of disagreement or conflict among the parties to this Agreement (other than a dispute concerning Delivery, which shall be resolved in accordance with the procedures specified in Paragraph 11(a) hereof), whether such dispute existed prior to, or arises after, the date of this Agreement.  Unless more extensive discovery is expressly permitted by the arbitrator, each party shall only have the right to one document production request, shall serve but one set of interrogatories and shall be entitled to depose only those witnesses which the arbitrator expressly permits, it being the parties' intention to minimize discovery procedures and to hold the arbitration hearing on an expedited basis.  The arbitrator shall establish the discovery schedule promptly following submission of the joint statement of contentions (or the filing of an answer to the petition) which schedule shall be strictly adhered to.

(ii)    Notwithstanding the provisions of this Paragraph 11(b), (i) any dispute solely between Borrower and Sales Agent under the Sales Agency Agreement (other than a dispute with respect to Delivery) shall be resolved in accordance with the terms of the Sales Agency Agreement; and (ii) any dispute solely between Lender and Borrower under the Loan Agreement or any of the other Loan Documents shall be resolved in accordance with the terms of the Loan Agreement.

(iii)   In any arbitration proceeding commenced under this Paragraph 11(b), all fees and costs of such arbitration shall initially be shared equally by the parties to such arbitration prior to the issuance of an arbitration award.  The arbitrator shall, however, award reasonable legal fees, disbursements and other expenses to a prevailing party for all amounts which such arbitrator determines to be reasonable and appropriate.  A party who is served with a notice of arbitration and thereby is made a party to the arbitration, shall be deemed a prevailing party if no relief is granted against such party.  A party commencing the arbitration proceeding shall be deemed not to be a prevailing party, if no relief is awarded in favor of such party by the arbitrator.  In case of an arbitration under this Paragraph 11(b), all parties other than the party which is adjudged liable to pay Lender shall be deemed prevailing parties.

(iv)    The Arbitrators shall issue a final award in accordance with the provisions of this Paragraph 11(b) not later than ten (10) days after the conclusion of the arbitration.

(c)     Each party agrees to abide by the award rendered in any arbitration pursuant hereto, and agrees that a judgment of a court having jurisdiction may be entered upon the award.

LA 132359103v1

11.   Notices.  For purposes of this Agreement, in order to be effective, all consents, approvals, waivers, notices, requests, demands or other communications required or permitted to be given under the terms hereof, and copies thereof, must be in writing and shall be delivered (1) by hand or by Federal Express, DHL or other internationally recognized courier service, or (2) by facsimile transmission with a copy by mail; and (B) shall be deemed to have been delivered, received or given (i) when delivered by hand, (ii) two (2) Business Days after its dispatch by Federal Express, DHL or other internationally recognized courier service, or (iii) one Business Day after sender's receipt of confirmation from the sender's facsimile machine if sent by facsimile and mail.  If a notice or other document is sent simultaneously by both courier and facsimile transmission, such document shall be deemed delivered or given upon sender's receipt of confirmation from the sender's facsimile machine.   The address for notices to each of Borrower, Sales Agent and Lender (until notice of a change thereof is served as provided in this Paragraph 12) shall be as follows:

|  |  |
|---|---|
| To Borrower: | **URGE PRODUCTIONS LLC**<br>c/o Sculptor Media, LLC<br>154 West 14th Street, 4th Floor<br>New York, New York 10011<br>Email: wgoz@sculptormedia.com<br>Contact:  Warren Goz |
| To Sales Agent: | **GREEN-LIGHT INTERNATIONAL LLC**<br>9107 Wilshire Blvd., Suite 450<br>Beverly Hills, California 90210<br>Attention: Jeff Elliott<br>Fax No.:<br>Email: jeff@glgpictures.com |
| To Lender: | **RAVEN ASSET-BASED OPPORTUNITY FUND II LP**<br>110 Greene Street, Suite 9G<br>New York, New York 10012<br>Attention:  James Masciello<br>Fax No.:  (212) 226-7836<br>Email:  james@ravencm.com |
| With a courtesy copy to: | **GREENBERG TRAURIG, LLP**<br>1840 Century Park East, Suite 1900<br>Los Angeles, California  90067<br>Attention:  Robert J. Sherman, Esq.<br>Fax No.:  (310) 586-0550<br>Email:  robert.sherman@gtlaw.com |

21

With a courtesy copy to:　　　　**SCULPTOR MEDIA, LLC**
154 West 14th Street, 4th Floor
New York, New York 10011
Attention:  Warren T. Goz
Fax No.:  (646) 304.1762
Email:  rwgoz@sculptormedia.com

12.　　　Service of Process.  Service of process in any judicial or other proceeding (including proceedings to judicially confirm any arbitration award) may be made in the manner provided in Paragraph 12 hereof and shall be deemed effective as provided herein.

13.　　　Obligations to Pay Interest Pending Cure or Arbitration.  Notwithstanding anything to the contrary contained in the Sales Agency Agreement:

　　　(a)　　In the event that Delivery is not tendered to Sales Agent by the Delivery Date (or the Outside Delivery Date, if applicable) and thereafter either Delivery is effected to Sales Agent by Borrower after the Delivery Date (or the Outside Delivery Date, if applicable) or it is determined by Borrower or pursuant to an arbitration that Delivery has not been effected to Sales Agent, Borrower shall (i) pay to Lender, an amount equal to the interest (computed at the non-default interest rate(s) specified in the Loan Agreement) that has accrued on the Obligations from the Delivery Date (or the Outside Delivery Date, if applicable) through either the date that Delivery is effected to Sales Agent or the date it is determined that Delivery of Sales Agent Delivery Items has not been effected to Sales Agent and (ii) pay to Sales Agent and Lender any costs and expenses incurred by Sales Agent and/or Lender as a result of the dispute as to whether or not Delivery was effected.  If the arbitrator determines that Delivery to Sales Agent was tendered to Sales Agent by the Delivery Date (or the Outside Delivery Date, if applicable), then Sales Agent shall immediately (A) pay to Lender an amount equal to the interest (computed at the non-default interest rate(s) specified in the Loan Agreement) that shall have accrued on the Obligations from the Delivery Date (or the Outside Delivery Date, if applicable), from the date Delivery was effected to Sales Agent until the date that payment is made to Lender, and (B) pay to Lender all costs and expenses incurred by Borrower and/or Lender as a result of the dispute as to whether or not Delivery was effected; and

　　　(b)　　The provisions of this Paragraph 14 shall be enforceable by Lender by compelling an arbitration under Paragraph 11 hereof.

14.　　　Termination Events; Remedies.

　　　(a)　　Termination Events.  The occurrence of any of the following events shall constitute a Termination Event ("Termination Event") hereunder:

22

(i)        If Sales Agent's material representations or warranties made in the Sales Agency Agreement, this Agreement, any of the other Loan Documents to which Sales Agent is a Party, any related notice of assignment, or any statement, agreement, or certificate at any time given in writing pursuant thereto or in connection therewith, shall be false or misleading in any material respect as of the date made or furnished and such inaccuracy would materially and adversely affect the timely payment of the Obligations, the ability of Sales Agent to perform its obligations hereunder and/or the Collateral (all as determined by Lender in its sole and absolute discretion); or

(ii)        Sales Agent fails or refuses to direct (or to use its commercially reasonable efforts to cause) any of the Distributors to pay, directly to the Collection Account any amounts due from such Person as and when due hereunder and/or under the applicable Notice of Assignment, or Sales Agent fails or refuses to remit to the Collection Account any Assigned Receipts in its possession, custody, or control as and when due hereunder, following (in the event of a failure to direct or remit only), notice thereof and five (5) Business Days to cure; or

(iii)        Any failure or refusal or neglect of Sales Agent to observe or perform any of the other material terms of the Sales Agency Agreement, this Agreement, any of the other Loan Documents to which Sales Agent is a Party or any related notice of assignment within five (5) Business Days after written notice to Sales Agent by Lender of such failure and such failure would materially and adversely affect the timely payment of the Obligations, the ability of Sales Agent to perform its obligations under this Agreement and/or the Collateral, all as determined by Lender in its sole and absolute discretion; or

(iv)        If the Sales Agency Agreement shall be terminated or become unenforceable for any reason whatsoever other than as a result of a termination effected per this Agreement; or

(v)        If Sales Agent becomes insolvent; or generally unable to pay its debts as they mature; or files a voluntary petition or has an involuntary petition filed against it which is not dismissed within thirty (30) days in bankruptcy or seeking reorganization or to effect a plan or other arrangement with creditors; or files an answer admitting the jurisdiction of any court and the material allegations of an involuntary petition filed pursuant to any act of Congress relating to bankruptcy or reorganization; or joins in any such petition for an adjudication or for a reorganization or other arrangement; or becomes or is adjudicated bankrupt; or applies for or consents to the appointment of or consent that an order be made appointing any receiver or trustee for itself or for any of its properties, assets or business; or if an order is entered against any of the foregoing parties pursuant to any Act of Congress relating to bankruptcy or reorganization; or if a receiver or a trustee should be appointed otherwise than upon its own application or consent for all or a substantial part of its properties, assets or business; or

(vi)        Any money, judgment, writ or warrant of attachment, or similar process shall be entered or filed against Sales Agent or any material portion of its assets and shall remain unvacated, unbonded or unstayed for a period of thirty (30) days or in any event no later than five (5) days prior to the date of any proposed sale thereunder and Lender reasonably

23

believes that any Collateral has been adversely effected as a result of a claim asserted by a third Person; or

        (vii)    The abandonment of production of the Picture; or

        (viii)    Sales Agent attempts to exercise a termination right under the Sales Agency Agreement in violation of the terms of this Agreement; or

        (ix)    Prior to the Maturity Date, Sales Agent fails to comply with any instructions issues to it by Lender under this Agreement; or

        (x)    any "Event of Default" (as defined in the Loan Agreement") occurs.

        (b)    <u>Remedies</u>.  Upon the occurrence of any Termination Event, Lender shall have all of the following rights and remedies, in addition to Lender's rights and remedies under the Loan Agreement, the other Loan Documents and under any applicable law:

        (i)    Lender shall have the right, at its option, to exercise its rights under the Power of Sale, it being understood that in the event that Lender terminates Sales Agent, Lender shall not enter into any agreement under such Power of Sale on behalf of Sales Agent or execute any document under such Power of Sale on behalf of Sales Agent,

        (ii)    Lender shall have the right, at its option, to terminate Sales Agent as Sales Agent for the Picture.  If Lender elects to terminate the Sales Agent, then:  (A) all of Sales Agent's rights under the Sales Agency Agreement shall, as applicable, at the option of Lender revert to Borrower (or, if Lender has exercised its respective secured creditor rights subject to and in accordance with the terms of this Agreement, to Lender); (B) none of Sales Agent or Borrower shall take or fail to take any action which materially interferes with or hinders the ability of Lender or any Person retained by Lender to effect Delivery to each applicable Person or to market the Picture; and (C) Sales Agent shall remain entitled to retain the portion of the Non-Deferred Sales Agent Sales Fee so long as such is received or earned, as applicable, prior to the date of termination.  Notwithstanding any such termination, as between Borrower and Sales Agent, Borrower's and Sales Agent's rights and obligations pursuant to the Sales Agency Agreement shall survive in accordance with their terms.

        (iii)    At any time after Lender elects to terminate Sales Agent as permitted in this Agreement, Lender may replace Sales Agent with a Person selected by Lender or to market the Picture itself or through its designees, including the right to license any and all rights in and to the Picture which have not been licensed by Sales Agent (as agent for Borrower) or Borrower on terms and conditions which Lender, in its sole and absolute discretion, deems appropriate under the circumstances.

        (iv)    Each of Borrower and Sales Agent hereby irrevocably waives the right to object to, and hereby ratifies, any and all acts of Lender taken pursuant to the terms and provisions set forth above, subject to the restrictions set forth above.  Lender shall not be liable

<div align="center">24</div>

for any acts or omissions or for any error of judgment or mistake of law with respect to any action taken or not taken.

(v)     The enumeration herein of Lender's rights and remedies is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies that Lender may have under the Loan Documents or applicable law.

(vi)     Lender shall have the right, in its sole discretion, to determine which rights and remedies are to be exercised and in which order.  The exercise of one right or remedy shall not preclude the exercise of any others, all of which shall be cumulative.  Lender may, without limitation, proceed directly against Sales Agent to collect the obligations owing hereunder without any prior recourse to any Collateral.

(c)     <u>Failure or Indulgence Not Waiver</u>.  No failure or delay on the part of Lender in the exercise of any power, right, remedy, or privilege under this Agreement or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right, remedy, or privilege preclude any other or further exercise thereof or of any other right, power, remedy, or privilege.  All rights and remedies existing under this Agreement and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

(d)     <u>Performance of Obligations</u>.  If Borrower and/or Sales Agent fails to do any act or thing which it has covenanted to do hereunder, under any other Loan Document to which it is a party, the Sales Agency Agreement or the distribution agreements, as applicable, or if any representation or warranty of Borrower or Sales Agent under any such agreement shall be breached, then Lender may (but shall not be obligated to) perform such act or thing on behalf of Sales Agent, as the case may be, or cause it to be done or remedy any such breach, and the cost or expense incurred by Lender in so doing shall be added to the Obligations secured by the Loan Documents the cost or expense incurred by Lender in so doing.

(e)     <u>Attorney-in-Fact</u>.  Upon a Termination Event, whether or not Lender terminates Sales Agent, Sales Agent hereby constitutes and appoints Lender as its true and lawful attorney-in-fact, in its place and stead and with full power of substitution, either in Lender's own name, as the case may be or in the name of Sales Agent to do any of the following, as Lender may reasonably deem necessary to further the purposes of this Agreement or to evidence the rights of the parties hereunder, to the same extent that Sales Agent may perform such acts:

(i)     Endorse any notes, checks, drafts, money orders, or other evidences of payment constituting Distribution Proceeds;

(ii)     Require, demand, collect, receive, settle, adjust, compromise and to give acquittances and receipts for the payment of any and all money payable pursuant to the distribution or license agreements or such other agreements included in the Collateral to which Sales Agent is a party and such licenses and agreements as Lender may enter into;

<div align="center">25</div>

         (iii)     Execute, deliver, file, and record all documents consistently herewith evidencing the termination of Sales Agent's rights in the Picture; and/or

         (iv)     Effect Delivery to the Distributors;

provided, however, nothing herein contained shall be construed as requiring or obligating Lender to take any action with respect to any of the forgoing matters, and no action taken or omitted to be taken by Lender with respect thereto shall give rise to any defense, counterclaim or setoff in favor of Sales Agent, or to any claim or action against Lender.  This power, being coupled with an interest, is irrevocable until this Agreement has been terminated and the Obligations have been fully satisfied.

       15.    Effectiveness.  The parties hereto hereby represent and warrant, each for themselves, that this Agreement, when duly executed, will constitute legal, valid and binding obligations of each of the parties hereto, enforceable against each in accordance with the terms hereof.

       16.    Illegality.  In case any one or more of the provisions of this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

       17.    Governing Law; Jurisdiction.  This Agreement and all other documents provided for herein and the rights and obligations of the parties hereto shall be governed by and construed and enforced in accordance with the laws of the State of New York without reference to principles regarding the conflict or choice of law.  Any matter arising under this Agreement or any other document provided for herein (subject to the arbitration provisions hereof and in the Notices of Assignment with each Distributor) and including, without limitation, any suit to enforce an award under the arbitration provisions hereof, may be finally adjudged or determined in any court or courts of the State of California or in the federal courts of the United States for the Central District of California.  By execution of this Agreement, each party hereto irrevocably and exclusively submits to such jurisdiction and irrevocably waives any objection which it may now or hereafter have to the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other agreement or document referred to herein brought in the courts of the State of California in Los Angeles or Beverly Hills, California or in the federal courts of the United States for the Central District of California, and each party hereto hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  Notwithstanding the foregoing, Lender may, at its option, bring suit or institute other judicial proceedings against any party hereto or any of their respective assets in any state or federal court of the United States or in any court of any country or place where such party or such assets may be found.

       18.    Amendments.  No modification, rescission, waiver, release or amendment of or to any provisions of this Agreement shall be made or effective unless in writing and signed by each party hereto.

<div align="center">26</div>

19.     Further Documents.  The parties hereto agree to execute such further documents as may be reasonably necessary to carry out the intent and purposes of this Agreement but unless and until such further documentation is executed and delivered to the applicable party, this Agreement shall constitute the final and binding agreement among the parties hereto, enforceable in accordance with its terms.

20.     Controlling Agreement.  As among Lender and Sales Agent, the Sales Agency Agreementis subject to this Agreement.  In the event of any inconsistency between this Agreement andthe Sales Agency Agreement, the terms and conditions of this Agreement shall control except as expressly set forth herein and except with respect to the distribution of proceeds for which the CAMA (if it has come into effect with Lender as a party) shall control. As between Lender and Borrower, the terms and conditions of the Loan Documents shall control.

21.     Costs, Fees and Expenses.  Each of the parties hereto shall pay to Lender on a several but not joint basis (i) all reasonable costs, fees and other expenses (including, without limitation, reasonable outside attorney fees and expenses) which may be incurred by Lender in connection with its enforcement (including any defense or claims against any of them) of this Agreement as a result of any non-performance or breach of the terms of this Agreement by such party, and (ii) any such additional interest as may be incurred by Borrower under the Loan Documents resulting from any delay in the repayment of the Obligations due Lender thereunder as a result of any non-performance or breach of the terms of this Agreement by such party.

22.     Successors and Assigns.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns, and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that, without the prior consent of Lender, none of Borrower or Sales Agent may assign its respective rights or delegate its respective duties hereunder or any interest herein until the date when all of the Obligations have been indefeasibly paid and performed in full and the Loan Agreement has been terminated, and any such purported assignment or delegation prior to such time shall be null and void.

23.     Counterparts; Copies.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument, respectively. Executed copies of the signature pages of this Agreement sent by facsimile or transmitted electronically in either Tagged Image Format Files ("TIFF") or Portable Document Format ("PDF") shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment.  Any party delivering an executed counterpart of this Agreement by facsimile, TIFF or PDF also shall deliver a manually executed counterpart of this Agreement, but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

24.     Paragraph Headings.  The various headings used in this Agreement are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

*LA 132359103v1*

25.    <u>No Third Party Beneficiaries</u>.  None of the parties hereto intends that any rights, duties, or restrictions contained herein shall inure to the benefit of any third Person.

26.    <u>Reservation of Rights</u>.  Borrower's and Sales Agent's respective waivers, approvals, agreements and undertakings under this Agreement are for the benefit of Lender only and do not limit Borrower's and Sales Agent's respective rights and remedies as against each other pursuant to the Sales Agency Agreement.  Accordingly, Sales Agent and Borrower each reserve its respective rights and remedies against the other pursuant to the Sales Agency Agreement that do not materially adversely affect the rights of Lender hereunder; <u>provided</u>, <u>however</u>, that any dispute regarding Delivery shall be subject to and adjudicated in accordance with the terms and provisions of this Agreement for all purposes.

*LA 132359103v1*

Exhibit B

*[Signatures on next page]*

29

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

**URGE PRODUCTIONS LLC**, a New York limited liability company

By: Sculptor Media, LLC Its Manager

Signed: _____

By: _Warren T. Cuz_

~~Its:~~ Member of its Manager

**GREEN-LIGHT INTERNATIONAL LLC**, a California limited liability company

Signed: _____

By: _____Jeff Elliott_____

Its: _____President_____

**RAVEN ASSET-BASED OPPORTUNITY FUND II LP**, a Delaware limited partnership

**By: RAVEN CAPITAL MANAGEMENT GP LLC**, its general partner

Signed: _____

By: _____

Its: _____

30

*LA 132359103v1*

*LA 132385047v1*

Exhibit B

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

**URGE PRODUCTIONS LLC**, a New York limited liability company

Signed:_____

By:_____

   Its:_____

**GREEN-LIGHT INTERNATIONAL LLC**, a California limited liability company

Signed:_____

By:_____

   Its:_____

**RAVEN ASSET-BASED OPPORTUNITY FUND II LP**, a Delaware limited partnership

**By: RAVEN CAPITAL MANAGEMENT GP LLC**, its general partner

Signed:_____

By:\_\_Josh Green_____

   Its:\_\_Managing Member_____

29

SCHEDULE 1

SALES AGENT DELIVERY ITEMS

32

DELIVERY SCHEDULE- URGE

This Delivery Schedule is attached to and made part of that certain Agreement (the "Agreement") dated as of November 12, 2015 between URGE PRODUCTIONS, LLC ("Producer") and GREEN-LIGHT INTERNATIONAL LLC ("Agent") with respect to the motion picture entitled: **"URGE"** (the "Picture").

All capitalized terms shall have the meaning assigned in the Agreement unless otherwise defined herein. Delivery of the Picture shall consist of Producer making physical delivery, at the sole cost and expense of the Producer, at the address of Agent as listed in the Agreement or as otherwise directed by Agent, of the materials ("Delivery Materials") set forth herein with respect to the Picture, in accordance with the standard set forth with respect to the applicable item herein and/or in the Agreement, or, if no standard is set forth with respect to the particular item, then acceptable in form, substance and/or content to the reasonable satisfaction of the appropriate personnel of Agent or Agent's designees.

 Producer shall deliver, and/or grant free access as requested, to Agent all Delivery Materials without payment of any creation, manufacturing, duplication, delivery, permission or other fee by Agent. Where laboratory access is granted to Agent, Producer shall use the Laboratory Access Letter substantially in the form of Exhibit "X-1", attached hereto. Where in the event any additional delivery materials ("Additional Delivery Materials") are needed and become necessary for distribution (ie., 35mm theatrical elements, conforming contractual logos, etc.), including any Delivery Materials labeled as "if available", "if created", or "if applicable", or any item listed or omitted not delivered by Producer, Agent shall create such Additional Delivery Materials as a recoupable expense, the amount of which shall be excluded from and shall not count toward any listed marketing or distribution cap in the Agreement.

Should Producer make any picture and/or audio changes after delivery, including the name of the main title, it is Producer's sole responsibility to retrieve all picture and audio elements from Agent, which shall include Producer's original Delivery Materials and any Additional Delivery Materials to Agent, including any publicity, legal or other documentation that may need to be updated as a consequence of any picture or audio changes (for example, the Music Cue Sheet and CCSL), and all items, if any, created by Agent or its Licensees, and make such changes at the sole cost and expense of the Producer.

Notwithstanding anything to the contrary contained herein, in the event the completion guarantor (if any) in connection with the Picture does not bond all of the Delivery Materials as set forth herein, Producer shall still be responsible to deliver all Delivery Materials in accordance with this Delivery Schedule despite anything to the contrary in the bonded delivery schedule for the Picture.

## A.  FEATURE - VIDEO MASTERS

**Language subtitling: If any portion of the Picture contains any type of language subtitles (including English titles), Agent shall receive the below video masters as both subtitled and subtitled-free. All other titles shall remain on both sets of masters including the main titles, locators and end titles.  *All materials must be conformed to the international version credits and logos (ie., proper logo placement at the head of the film including the Green-Light International logo).***

A1.      DIGITAL INTERMEDIATE DATA FILES: Access to the final color corrected digital intermediate files in DPX file format on LTO5.

A2.      One (1) HDCAM-SR (4:4:4) 16:9 (1.85 or 2.35*) aspect ratio – letter boxed Color Corrected 1920x1080 Master:  Master shall be manufactured approved digital intermediate  data files. All textless background sections shall be attached to the tail of the master.  *aspect ratio will be determined by the aspect ratio of the original shot negative. (See below for technical specifications).

A3.      ,One (1) HDCAM-SR (4:4:4) 16:9 (1.78) Full Height Anamorphic Color Corrected 1920x1080 Master: Master shall be manufactured from the digital intermediate  data files. All textless background sections shall be attached to the tail of the master. (See below for technical specifications).

A4.   If available, One (1) HDCAM-SR (4:4:4) 4:3 1.33 Pan and Scanned Color Corrected 1920x1080 Master:  Manufactured from the digital intermediate data files. 4x3 Full Frame versions shall be recorded to 4x3 with sidebars and image pan/scanned where necessary to fill up 4x3 frame. All textless background sections shall be attached to the tail of the master. (See below for technical specifications).

Audio Configuration for all HDCAM-SR (4:4:4) Mastering Elements shall be as follows:

| | |
|---|---|
| Channel 1&2: | LT/RT Stereo Mix |
| Channel 3&4: | LT/RT Stereo M&E |
| Channel 5: | Left Front |
| Channel 6: | Right Front |
| Channel 7: | Center |
| Channel 8: | LFE |
| Channel 9: | Left Surround |
| Channel 10: | Right Surround |

Video format for the above referenced HDCAM-SR masters shall be as follows:

(a)   All video masters must be recorded 1080p at 23.98psf, 4:4:4 (22:22:22) 10-bit sampling.

(b)   Masters shall be approved by the Director and/or Director of Photography using the HD REC (709) color profile.

(c)   All masters shall include textless backgrounds  60 seconds after program. The time code for the textless background should match the timecode of the corresponding portion of the program and should be frame accurate.

(d)   Continuous time code should begin at 00:57:00:00

(e)   First frame of program video on Part 1 starts at 01:00:00:00

(f)   First frame of video for subsequent parts should start at next frame of video after the last frame of video from the previous part (i.e., if part 1 ends at 01:50:25:01, part 2 should start at 01:50:25:02).

(g)   60 seconds of color bars (SMPTE) with 1kHz tone @ 0.0VU (-20 dBFS) on all program audio channels starting at 00:58:00:00

(h)   60 seconds of color black with no audio following the end of program.

(i)   10-30 seconds of slate beginning at 00:59:00:00 – slate shall include the following information:

Feature Film Title
Version (i.e. Theatrical)
Record format (i.e. 23.98 – 4:4:4)
Aspect ratio (i.e.16:9 Letterbox 2.35)
Run time (without textless materials)
Date & Facility of origin
Audio configuration (as outlined above)
Part 1 of " " – if the master is a multiple part master

A5.   Master Evaluation Quality Control Reports: Post production facility's QC reports should be included with the video masters. One copy of the final Master Video Technical Evaluation report as created by any pre-approved lab for each video master delivered. Should the evaluation prove that any of the master videotapes are not of acceptable quality, it is the producer's responsibility to repair any faults listed on the evaluation report. This evaluation report must be submitted prior to final acceptance. **If there are any faults not corrected, a written explanation accompanying the evaluation must be approved by Agent.**

A6.    PAL and NTSC Digital Masters:  If available, The following Digital Betacam down conversions shall be manufactured from the HDCAM-SR masters specified above (A1, A2, and A3):

(a)    Digital Betacam NTSC 4x3 1.33 pan and scan master (non-drop frame)
(b)    Digital Betacam NTSC 16x9 1.85 or 2.35 letterbox (per original aspect ratio). Non-drop frame.
(c)    Digital Betacam NTSC 16x9 1.78 full height anamorphic master. Non-drop frame.
(d)    Digital Betacam PAL 4x3 1.33 pan and scan master.
(e)    Digital Betacam PAL 16x9 1.85 or 2.35 letterbox (per original aspect ratio)
(f)    Digital Betacam PAL 16x9 1.78 full height anamorphic master.

## B.  FEATURE - DIGITAL MASTERS

**Language subtitling: If any portion of the Picture contains any type of language subtitles (including English titles), Agent shall receive the below video masters as both subtitled and subtitled-free. All other titles shall remain on both sets of masters including the main titles, locators and end titles.  *All materials must be conformed to the international version credits and logos (ie., proper logo placement at the head of the film including the Green-Light International logo).***

B1.    Digital Cinema Distribution Master (DCDM): Delivery of one (1) Digital Cinema Distribution Master.

DCDM files should not be compressed, encrypted or packaged, and must be delivered on a hard drive or LTO5.

Textless backgrounds should be included as part of the packages and clearly labeled.

The image must be 2048x1080 pixels (2K) at 24fps in the theatrical aspect ratio (using 2048x858 pixels for scope and 1998x1080 pixels for flat).

Audio configuration shall be 5.1 across audio channels 1-6 as L, R, C, S, LS, RS (audio at 48KHz sample rate, 24 bits per sample) and reference level of  -20dBFS.

B2.    Digital Cinema Package (DCP): Delivery of one (1) complete DCP on a separate hard drive with the corresponding DKDM for a facility to be determined by Agent. DCP shall be compressed (JPEG 2000), encrypted (AES-128) and wrapped (MXF) file on a USB SCSI CRU drive compiled with all applicable image, uncompressed audio, and subtitle files.

Textless backgrounds should be included as part of the packages. The image must be 2048x1080 pixels (2K) at 24fps in the theatrical aspect ratio (using 2048x858 pixels for scope and 1998x1080 pixels for flat). Audio configuration shall be 5.1 across audio channels 1-6 as L, R, C, S, LS, RS (audio at 48KHz sample rate, 24 bits per sample) and reference level of  -20dBFS.

B3.    Mezzanine Digital Master – Apple ProRes 4444 1920x1080 23.98 fps OAR Letterbox MOV File (1.85 or 2.35*Aspect ratio will be determined by the aspect ratio of the original shot negative). All textless materials, sections, and locators shall be attached to the tail of this digital master.

This Mezzanine Digital Master must be created from the QC approved HDSR Video Master (after QC has passed and been approved by the Producer and Sales Agent) and must have the same audio and technical configuration as is on the SR Master (10 Channel). All textless materials, sections, and locators shall be attached to the tail of this digital master.  Delivery must be on hard drive with transfer speeds of no less than Firewire 800.

B4.    1x Apple ProRes 4444 1920x1080 23.98 fps (16x9) 1:78 MOV Full Height Anamorphic Color Corrected Master.  This digital master must be created from the QC approved SR Master with the identical audio and technical configuration (10 Channel).  All textless materials, sections, and locators shall be attached to the tail of this digital master.  Delivery must  be on hard drive with transfer speeds of no less than Firewire 800.

B5.    OMIT

B6.    OMIT~~1x Apple ProRes 444 1920x1080 25fps 50i (16x9) PAL OAR Letterbox Master MOV file.  This Master PAL file must be created from the approved PAL video master with the identical audio configuration (10 Channel).  All textless materials, sections, and locators shall be attached to the tail of this digital master.  Delivery must  be on hard drive with transfer speeds of no less than Firewire 800.~~

B7.    1x Apple ProRes 4444 1920x1080 <mark>25fps</mark> 50i (16x9) PAL 1:78 MOV file.  This Master PAL file must be cross-converted from the approved master HDCAMSR video master with the full technical configuration of the HDSR master and the following audio configuration: **Ch1&2 LTRT; Ch3&4 M&E; Ch5-10 5.1; Ch11-16 5.1 M&E**.  All textless materials, sections, and locators shall be attached to the tail of this digital master.

        Delivery must be on hard drive with transfer speeds of no less than Firewire 800.

B8.    OMIT

B9.    If available, 1x Apple H264 422 1280x720 16x9 1:78 <mark>25fps</mark> 50i (PAL) Full Frame MOV PAL Screener File with the following burn-in over picture "Property of Green-Light International".  This PAL Screener file shall be created from the master file above.  The audio configuration shall be Stereo Lt/RT.

B10.   If available,1x Apple H264 422 1280x720 16x9 1:78 NTSC Non-Drop Frame Full Frame MOV Screener File with the following burn-in over picture "Property of Green-Light International". This PAL Screener file shall be created from the master file above. The audio configuration shall be Stereo Lt/RT.

B11.   <u>Video Work Tapes/Files:</u>  As soon as available when the picture is locked and at least eight weeks prior to the first worldwide release date, QuickTime files containing the final feature film split into separate reels matching the final version of the Picture and the Combined Continuity and Spotting List. The files should be 24fps and contain visible window timecode and footage and frame burn-in matching the exact footage of the final Picture version.

## C.  FEATURE – AUDIO MASTERS

All audio masters listed below must be delivered on a hard drive with transfer speeds no less than Firewire 800.  All elements listed below must be delivered reel by reel AND as continuous files corresponding to the Video and Digital masters listed above.

C1     ProTools Stereo 2-Track and 6-Track Printmasters (6+2): The ProTools session of the Dolby Surround encoded stereo two-track printmaster and 6-track discrete printmaster of the original language dubbed soundtrack of the Picture ("Printmaster").

        Master shall be delivered with the following specifications (NTSC video reference): Film Speed: 23.98 Frames; Timecode: 29.97 Frames; Sample Rating:  48 KHZ; No Noise Reduction.  Channel configuration:  CH1 – L; CH2 – C; CH3 – R; CH4 – LS; CH5 – RS; CH6 – SW (B); CH7 – Lt; CH8 – Rt.

C2.   ProTools Stereo Dialogue/Music/Effects:  The ProTools session of the stereo discrete dialogue, music and effects made from the fully mixed dubbing stems, in perfect synchronization with the Picture.

C3.   ProTools Dialogue/Music/Effects stems: The ProTools session of each of the 6-track dialogue, music and effects stems used to manufacture the print master.  Effects stem must be fully filled and each stem must be in perfect synchronization with the Picture.

C4.   ProTools Stereo 2-Track and 6-Track Music & Effects (6+2): The ProTools session of the 2-track stereo mix and the fully mixed 5.1 Music and Effects Track Master, which shall contain **fully mixed** music and effects with the effects track **completely filled with Foley and duplicating any production sound effects so that there are no effects whatsoever missing**.

Master shall be delivered with the following specifications (NTSC video reference): Film Speed: 23.98 Frames;  Timecode: 29.97 Frames; Sample Rating:  48 KHZ; No Noise Reduction.  Channel configuration:  CH1 – L; CH2 – C; CH3 – R; CH4 – LS; CH5 – RS; CH6 – SW (B); CH7 – Option; CH8 – Dialogue Guide.

C5.   Music Cue Masters: Delivery of one (1) CD copy of all music cues used in the final picture (score and source) assembled in the order that they appear in the feature. **All cues should be complete without dips or fades**.

## D.  TRAILER

Producer shall provide Agent a trailer for the Picture and any additional trailer materials (collectively known as "Trailer Elements") needed for distribution fully cleared (in particular, but not limited to, music licenses, stock shots and clip rights) for exploitation worldwide. In the event Producer fails to provide the Trailer Elements for the Picture and Agent is unable to receive free access to the Trailer Elements created by the domestic distributor, Agent shall create the Trailer Elements and any cost shall be included as a Delivery Cost outside of the Market Attendance and Sales Expenses Fee up to a cap of US$25,000;

The run time of the trailer shall not exceed 2 minutes and 30 seconds in length, with a minimum run time of 1 minute and 15 seconds **and must be conformed to the international version credits and logos (ie., proper logo placement at the head of the film including the Green-Light International logo).. No clips used in the Picture are permitted for use in the trailer unless the licenses permit such use.**

D1.   If available, One (1) Apple Pro Res HQ 422 1920x1080 quicktime file in the original aspect ratio of the picture (OAR) with audio configuration as follows: CH.1&2 ST LT/RT, CH.3&4 ST M&E, CH.5-10: 5.1 printmaster.

D2.   If available, One (1) QuickTime file of the TEXTLESS completed trailer in Apple Pro Res HQ 422 in the original aspect ratio of the Picture (OAR) 1920x1080 with audio configuration as follows: CH.1&2 ST LT/RT, CH.3&4 ST M&E, CH.5 NARR, CH.6 DIA, CH.7 MUSIC, CH.8 EFX.

D3.   If available, One (1) Apple Pro Res HQ 422 1920x1080 quicktime file in 1:78 Full Frame aspect ratio with audio configuration as follows: CH.1&2 ST LT/RT, CH.3&4 ST M&E, CH.5-10: 5.1 printmaster.  This version of the trailer should be manufactured (recut) from the original 1:78 full frame picture and NOT converted from the OAR trailer (causing severe loss of image).

D4.   If available, One (1) QuickTime file of the TEXTLESS completed trailer in Apple Pro Res HQ 422 1920x1080 in 1:78 Full Frame aspect ratio with audio configuration as follows: CH.1&2 ST LT/RT, CH.3&4 ST M&E, CH.5 NARR, CH.6 DIA, CH.7 MUSIC, CH.8 EFX.

D5.   If available, ProTools Stereo 2-Track and 6-Track Printmasters: The two-track printmaster and 6-track discrete printmaster of the original language dubbed soundtrack of the Trailer ("Printmaster"). Master shall be delivered with the following specifications (NTSC video reference): Film Speed: 23.98 Frames; Timecode: 29.97 Frames; Sample Rating:  48 KHZ; No Noise Reduction.  Channel configuration: CH1 – L; CH2 – C; CH3 – R; CH4 – LS; CH5 – RS; CH6 – SW (B); CH7 – Lt; CH8 – Rt.  Delivery on hard drive with no less than Firewire 800 transfer speeds.

D6.   If available, ProTools 2-Track and 6-Track Music and Effects Master:  The fully mixed 5.1 Music and Effects Track Master, which **shall contain fully mixed music and effects with the effects track completely filled with Foley and duplicating any production sound effects so that there are no effects whatsoever missing**. Master shall be delivered with the following specifications (NTSC video reference): Film Speed: 23.98 Frames; Timecode: 29.97 Frames; Sample Rating:  48 KHZ; No Noise Reduction.  Channel configuration:  CH1 – L; CH2 – C; CH3 – R; CH4 – LS; CH5 – RS; CH6 – SW (B); CH7 – Option; CH8 – Dialogue Guide.  Delivery on hard drive with no less than Firewire 800 transfer speeds.

D7.   If available, ProTools Dialogue/Music/Effects stems: The 6-track dialogue, music and effects stems used to manufacture the print master.  Effects stem must be fully filled and each stem must be in perfect synchronization with the original picture negative specified above (Item II.A). Delivery on hard drive with no less than Firewire 800 transfer speeds.

D8.   If available, Digital Cinema Distribution Master (DCDM) **and** Digital Cinema Package (DCP): Delivery of both Flat and Scope versions of the trailer with the same technical requirements as the above Feature elements (section B1 and B2 above). The DCPs shall be delivered on USB flash drives (not SCSI).

D9.   If available, High Definition Masters:
      (a) one (1) HDSR master of the final trailer in the original aspect ratio and must contain both texted and textless versions of the trailer with the following audio configuration:

          1st Pass: TEXTED version
          CH.1&2 ST LT/RT, CH.3&4 ST M&E, CH.5-10: 5.1 printmaster

          2nd Pass: TEXTLESS version
          CH.1&2 ST LT/RT, CH.3&4 ST M&E, CH.5 NARR, CH.6 DIA, CH.7 MUSIC, CH.8 EFX

      (b) one (1) HDSR master of the final trailer in 1:78 aspect and must contain both texted and textless versions of the trailer with the the same audio configuration as listed above (D9.(a)).

D10.  If available, Combined Continuity and Spotting List:  One (1) electronic copy in **Microsoft Word** of a complete industry standard English language Combined Continuity and Spotting List (CCSL) created from the final version of the Trailer. CCSL shall include cut-by-cut frame and footage counts of all shots including location and camera angle, meticulous scene description, soundtrack music starts and stops, and include the complete main and end credits. If the Picture was recorded in a language other than English, the Continuity shall contain a literal English translation.  CCSL should be based on a 23.98 timecode and first frame of picture should start at hour one (01:00:00:00).

D11.  If available, Music Cue Sheet:  One (1) electronic copy of a music cue sheet showing the particulars of all music contained in the Trailer including title of each composition; the names of composers; publishers and copyright owners; the usages.

D12.  If available, Music Contracts/Licenses/Assignments/Payments: Each of the contracts, licenses, license confirmation letters or assignments specified below that conveys to Producer the right to use the music, lyrics or recordings, as applicable, in the Trailer. All licenses shall be delivered in a PDF format and be accompanied by proof of payment according to the terms of the license, and all licenses shall be cleared for worldwide use in perpetuity.

**E.   TELEVISION / AIRLINE / ALTERNATE VERSION**


E1.     If available, one  TV/Airline Spotting List, in **Microsoft Word** (or compatible), detailing any scenes, dialogue, music, and/or effects, in which cover shots, cover ADR, coverage Stock Shots, coverage pan scan, or otherwise, was created or used to mask or effect any area of the Picture to "cover" for the purpose of conforming to an acceptable television/airline version of the Picture.   The TV/Airline Spotting List must include 23.98 timecode corresponding to the HDSR Picture Master for each instance. If no coverage is shot or recorded, a signed letter from the Producer of the Picture stating no coverage was created or completed for the Picture.


E2.   If available, one (1) HDCAM-SR  (4:4:4) 16:9 (1.78) Pan & Scan Full Frame Color Corrected Transfer Master of the television/airline version of the picture which conforms to standards and practices and length requirements for the United States and foreign free television and airline exhibition of the picture.  Program shall contain all or any part of the alternative scenes and/or dialogue and/or eliminations and/or additions for the purpose of conforming to an acceptable television/airline version.  The running time of the television/airline version shall not be less than ninety-two minutes.  All textless background sections should be added to the tail. Video Master shall be 1080/23.98psf and should have the following audio configuration:

> Channel 1: Stereo Left – Original composite mix
> Channel 2: Stereo Right – Original composite mix
> Channel 3: Final M/E Left
> Channel 4: Final M/E Right

E3.   If Available, NTSC and PAL Digital BetaCam TV/Airline Masters: Conforming to standards and practices and length requirements for the United States and foreign free television and airline exhibition of the picture. Program shall contain all or any part of the alternative scenes and/or dialogue and/or eliminations and/or additions for the purpose of conforming to an acceptable television/airline version.  The running time of the television/airline version shall not be less than **ninety-two minutes**.

(a)    If available, one (1) 16:9 1.78 NTSC DBC Master
(b)    If available, one (1) 4:3 1.33 NTSC DBC Master
(c)    If available, one (1) 16:9 1.78 PAL DBC Master
(d)    If available, one (1) 4:3 1.33 NTSC DBC Master

E4.   If available, the ProTools 2-track ~~Printmaster~~ of the television version (left total, right total) which integrates all loop lines for television language censorship purposes.  Delivery on hard drive with transfer speeds of no less than Firewire 800 in both reel-to-reel and continuous timecode format corresponding to the completed Picture.

E5.   If available, the ProTools 2-track Music and Effects fully filled-in television version music and effects track (left total, right total). Please see Exhibit "X-8" for specifications.  Delivery on hard drive with transfer speeds of no less than Firewire 800 in both reel-to-reel and continuous timecode format corresponding to the completed Picture.


**F.   INTENTIONALLY DELETED**


**G.   PUBLICITY / ADVERTISING**

**Publicity and Advertising Items: Producer shall deliver and/or grant free access to Agent without payment of any creation, manufacturing, duplication, delivery, permission or other fee by Agent. *All materials must be conformed to the international version credits and logos.***

G1.  Unit Photography:  All original **RAW** digital files with a corresponding high resolution jpeg image, color transparencies, color negatives and contact sheets of all still photographs taken in connection with the Picture. In no event shall Producer deliver less than 250 pre-approved images or RAW digital files. All photography must note the name of the photographer. ***Any and all approvals or other authorizations that may be required in connection with Agent's use of said photographs will be secured by Producer and delivered to Agent at the time Producer delivers the respective photographs to Agent.***

G2.  Key Art Campaign: All final layered Key Art Campaign files from:

   (a)  Producer created and approved theatrical one-sheet,
   (b)  Free access to the final U.S. theatrical one-sheet and teaser campaigns,
   (c)  Free access to the final U.S. theatrical DVD/Blu-Ray sleeve artwork.
   (d)  Delivery of, and/or Free Access to, any fonts used in any of the above mentioned campaigns.
   (e)  Delivery of, and/or Free Access to, any title treatments used in any of the above mentioned campaigns.
   (f)  Delivery of, and/or Free Access to, any producer or production logos, including any distributor or other contractual logos, used in any of the above mentioned campaigns.
   (g)  Delivery of, and/or Free Access to, any other graphic images used in any of the above mentioned campaigns.

   The Key Art files must be professionally layered hi-res (ie., AI, Photoshop) files, conform to all international requirements including but not limited to logos and images, and be cleared for use worldwide.  In the event the Agent needs to conform, modify, or create any Key Art elements to meet distribution requirements, the expense of doing so will be considered as Additional Delivery Materials.

G3.  Biographies:  One (1) typewritten Biography of each of the principal players, writers, individual producer(s), director and key technical personnel (director of photography, production designer, costume designer, composer, editor).  Biographies must be approved in accordance with any contractual obligations, delivered as a Microsoft Word document, and may be part of the Production Notes.

G4.  Stories/Articles/Press Kit:  Any press kits or stories or articles written by the unit publicist, producer, or other personnel including the press, on various aspects or events during production of the Picture, which are deemed suitable for column placement and feature stories, if any, involving the principal players, supporting players, writer(s), and special interest material that the unit publicist or producer has reason to believe will be of use in marketing the Picture.

G5.  Production notes:  Notes on the production of the Picture prepared by the producer or unit publicist, including history of the production; illuminating comments by the cast and key filmmakers about the Picture, its significance and its special claims on the interest of the moviegoers.  All Production Notes shall be read and approved by producer, the director and anyone else so designated by the Producer before they are delivered to Agent. Production Notes to be delivered as a Microsoft Word document.

G6.  Synopsis:  A brief synopsis in the English language of the story of the Picture (one typewritten page in length). Synopsis to be delivered as a Microsoft Word document.

G7.  Advertising Materials: Producer shall deliver and/or grant free access to Agent to all below materials, either created by Producer or by any third party in connection with the theatrical and home entertainment release of the Picture (ie., domestic or other distributors) without payment of

any access, creation, manufacturing, master duplication, delivery, permission or other fee by Agent. (any fees incurred by Agent will be fully recoupable outside of any marketing or distribution cap), one (1) copy of all advertisements, paper accessories and other advertising and publicity materials prepared by Producer or by any other party in connection with the theatrical and home entertainment release of the Picture, including:

(a) Individual Electronic Press Kit (EPK) Interviews:  The EPK interviews shall include interviews with the actors and other persons connected with the picture, including but not limited to the producer(s), director, writer, and key department personnel.  The EPK interviews must be delivered as separate Apple ProRes HQ quicktime files in 1920x1080 23.98 full frame aspect (audio config: Ch1&2 LTRT, Ch3Dx, Ch4Mx, Ch5Ex).  At the head of each interview must be a title card with the following information: title of the Picture, name of the interviewee, character role or crew position, and total running time of the of the interview.  These separate EPK interviews shall textless and free of any titles against picture.  In the event of an interviewee speaking a language other than English, Producer shall deliver one pass with English subtitles burned to picture, and a 2nd pass textless (free of English subtitles).  No music is allowed as background or otherwise in these individual interviews.  If any music is heard whatsoever, the music must be cleared for worldwide use in perpetuity and music licenses, proof of payments, and a music cue sheet must be provided.

(b) Edited  EPK  Interviews:   A  continuous  Apple  ProRes  HQ  file  (with  the  same  technical specifications as above) consisting solely of the interviews with key creative personnel of the Picture (lead cast, lead Producers, Writer, Director, DP, Editor, Costume Designer if necessary, etc).  Each interview will be separated with the title card as specified above.  Producer shall deliver two passes of this continuous file: 1st texted pass will have the name and title or role of the interviewee burned to picture; the 2nd pass shall be textless.  In the event music is used as background or otherwise, all tracks must be cleared for worldwide use in perpetuity.  Music licenses, proof of payment, and a music cue sheet must be delivered.

(c) Picture Featurette: If available, a Featurette in the form of a "making of" the Picture consisting of interviews and footage from production or other pertinent locations and personnel relating to the Picture.  The Featurette must be fully edited and delivered as an Apple ProRes HQ 1920x1080 quicktime file and in a 23.98 full frame aspect ratio (unless the creative intent suggests otherwise) and fully and professionally mixed.  Audio configuration must be Ch1&2 LTRT, Ch3Dx, Ch4Mx, and Ch5Fx.  In the event music is used or heard in the Featurette, music licenses, proof of payment, and a music cue sheet must be supplied.  In the event there is text over picture (ie., names and titles of personnel), Producer shall provide a texted and textless version of the Featurette.  All music and footage must be approved in accordance with any contractual obligations and cleared for worldwide use in perpetuity.

(d)  B-roll "Behind-the-Scenes Footage" (BTS): If available, Producer shall deliver BTS footage of the actors and filmmakers during production as Apple ProRes HQ 1920x1080 23.98 quicktime file(s).  All BTS footage must be approved in accordance with any contractual obligations and cleared for worldwide use in perpetuity.  If any music is used whatsoever, the music must be cleared for worldwide use in perpetuity and music licenses, proof of payments, and a music cue sheet must be provided.

(e) Television Spots and Other Audio Visual Material: If available, access to any television or other audio visual materials created in connection with the theatrical and home entertainment release of the picture weather created by the Producer or the Domestic distributor. All music and usage rights used in the creation of these materials shall be cleared for worldwide use. Television spots shall include multiple passes including tested and textless versions, one pass containing the full audio mix, and one pass with separate audio channels each for narration, music, dialogue and sound effects.

(f)   DVD/Blu Ray Materials: If available, free access to all "extra" materials used in connection with the DVD/BD release of the picture in the U.S. including, but not limited to, audio commentary, "making of" programs, deleted scenes, music video, alternative scenes, interviews and DVD/BD menus. All music and usage rights used in the creation of these materials shall be cleared for worldwide use and a Music Cue Sheet must be supplied.  If applicable, all audio including the ProTools sessions must be supplied.

(g)   If available, source files for all online marketing materials (i.e. website, webisodes, online spots, social networking assets).

G8.   Work Materials:   A Laboratory Access Letter granting Agent access to the following items. A detailed inventory list indicating the contents of each carton or box packed upon completion of the Picture shall accompany each Laboratory Access Letter.

(a)   All production dailies, and production dialogue; all sound effects units and pre-dubs; all music units and pre-dubs and all dialogue units and pre-dubs.

(b)   Original multi-track recordings of the original music score.

(c)   Original lined or cutting script (with notes) prepared by the Script Supervisor concurrently with the production of the Picture as well as any other documents, notes, logs or reports prepared by the Script Supervisor and used during post production.

(d)   Editor's Code Book indicating the negative key (edge) numbers, the lab negative assembly roll number and production sound roll number for all scenes printed and delivered during the production of the Picture.

(e)   All source materials that were used or created during postproduction. Items would include a copy of all digital media, hard drives, DVDs, CDs, Edit Decision Lists, logs and other databases created during post production including all Avid (or other editing software) files and reference materials.

(f)   Photographic and non-photographic material used to generate Main Titles, End Titles, inserts, local titles, dates, translations and captions, including but not limited to, intermediates, original negatives, Hi-con units, artwork etc.

## H.  DOCUMENTATION

***All paperwork shall be delivered in the English language. All materials must be conformed to the international version credits.***

H1.   Alternate Film and Sound Material:   A Laboratory Access Letter with a detailed inventory list granting access to Agent to all "cover shots", alternate scenes/alternate dialogue so that the Picture can be conformed to rating, censorship requirements and/or television and airline exhibition (if required by Agent) as listed in Section E.

H2.   Information Sheet: An information sheet in the form of Exhibit "X-2" containing technical specs in connection with the Picture.

H3.   Combined Continuity and Spotting List:   One (1) electronic copy in Microsoft Word of a complete industry standard English language Combined Continuity and Spotting List (CCSL) created from the final print of the Picture specified in section I.E above. CCSL shall include cut-by-cut frame and footage counts of all shots including location and camera angle, meticulous scene description, soundtrack music starts and stops, and include the complete main and end credits. If the Picture

was recorded in a language other than English, the Continuity shall contain a literal English translation.

Spotting list must give spot numbers for each subtitle, the footage of the start and end of the subtitle, indication of which character is speaking and the text.

Footages for the CCSL should be calculated on an A/B-reel basis (2,000 foot reels) and referenced to 35mm film running time at 24 frames per second.

H4.   Subtitle List:  If the picture has any type of language subtitles (including English language subtitles), delivery of a complete list of said subtitles with 23.98 continuous (not reel to reel) timecode reference.  Please deliver in Microsoft Word, or comparable, document.

H5.   Literary Materials: A copy of the screenplay and final lined shooting script of the Picture and other literary materials (if applicable) relating to the Picture.

H6.   Music Cue Sheet:  One (1) typewritten original copy and one electronic of a music cue sheet substantially in the form of Exhibit "X-4", attached hereto, showing the particulars of all music contained in the Picture, including title of each composition; the names of composers; publishers and copyright owners; the usages (whether instrumental, instrumental-visual, vocal, vocal-visual or otherwise); the place for each composition showing the film footage and running time for each cue; the performing rights society involved any other information customarily set forth in music cue sheets. Music cue sheet shall be delivered as a Microsoft Word or Excel document.

H7.   Music Contracts/Licenses/Assignments:   Each of the contracts, licenses, license confirmation letters or assignments specified below that conveys to Producer the right to use the music, lyrics or recordings, as applicable, in the Picture, in whole or part, in all media now known or hereafter devised, throughout the universe in perpetuity without payment of any further compensation for the grant of such rights and shall include the right to use the music, lyrics or recordings, as applicable, in connection with the advertising, promotion and publicity of the Picture, in or out of context of the Picture subject only to payment of fees to applicable performing rights societies. All licenses shall be delivered in a pdf format.

(a) Music and Lyric contracts:  Duplicate originals or legible copies of all contracts covering the acquisition and performance of all music and lyrics utilized in connection with the Picture;
(b) Music Licenses:  A copy of valid licenses paid for by Producer for the full period of copyright for the synchronous recording of all copyrighted music and recordings in the Picture and the performance thereof in the licensed territory throughout the entire Term of the Agreement. Copies of the payment of the license is required.

H8.   Clip Cue Sheet: In the event that the Picture contains any stock footage (per item H9), a stock footage cue sheet must be provided. All licenses and releases must include language that prevents injunctive relief and precludes the licensor from terminating the license.

H9.   Stock Footage / Clips / Releases / Clearances: If the Picture contains any stock footage, film clips, TV clips, news clips, media clips, radio clips, print media, paintings, posters, logos, artwork, copyrighted and/or trademarked materials, any materials which include a trademark (whether common law, registered or pending), photographs, portraits, books, publications, any third party likeness, etc., copies of all licenses (and proof of payment of the licensing fee) shall be provided. All licenses and releases must include language that prevents injunctive relief and precludes the licensor from terminating the license.

H10.  Composer Agreement(s):  One (1) copy in a pdf format of the original fully executed contract for the services of the composer of the musical soundtrack of the Picture and the sync license from the publisher.

H11.   Paid and Excluded Ads Statement:  A complete written statement of all advertising  (paid and excluded ad) obligations. Such statement shall include the full text of all contractual credit obligations. Credits must comply with all applicable guild and union requirements and the applicable individual employment agreements for any person or entity accorded credit therein. All credits shall be consistent with the customary policies of major motion picture Agents. Credit Statement shall be delivered as a Microsoft Word or Excel document.

H12.   Billing Block:  A layout of all advertising credits formatted as an industry standard "Billing Block" is to be delivered.  Credits must comply with all applicable guild and union requirements and the applicable individual employment agreements for any person or entity accorded credit therein. All credits shall be consistent with the customary policies of major motion picture Agents.  Billing Block must be delivered with the appropriate copyright notice.  Billing Block shall be delivered in Microsoft Word and in the original graphic design software file such as AI, EPS, or PSD.

H13.   Billing Block Logos: Delivery of all contractually obligated Billing Block logos for international distribution in hi-res graphic design software such as AI, PSD, EPS, or hi-res TIFF files.

H14.   Product Placement Declaration:   A letter, signed by the Producer, setting forth all product placement arrangements entered into in connection with the Picture and the consideration provided by both the supplier (eg., payment, free or discounted product) and the production (eg., visible display f labels, verbal mention if brand, etc.).  For any non-monetary consideration received from suppliers, Producer shall provide an estimate of the value of such consideration (in U.S. Dollars). The letter shall be accompanied by available substantiating documentation (e.g., written agreements, confirmation letters) as well as a listing of the footage notations determined on the same basis as the CCSL at with all such product placements are seen or heard.

H15.   Director's Guild Credit Approval:  If the Picture was produced under the jurisdiction of the Director's Guild of America ("DGA"), a letter from the DGA approving (a) the list of screen credits for the Picture submitted to the DGA pursuant to Article 8-201 of the DGA Basic Agreement, and if appropriate (b) the credits included in the paid advertising campaign material submitted to the DGA pursuant to Article 8-210 of the DGA Basic Agreement.

H16.   Writer's Guild Credit Approval: One (1) copy of the WGA Notice of Tentative Writing Credits and the Final Determination of writing credits.

H17.   Screen Credit Requirements: One (1) typewritten list of the main and end credits of the Picture as they appear on the original negative with an approved lay-out illustration of the screen and advertising credits with relative size and prominence in percentage. Screen Credit Requirements shall be delivered as a Microsoft Word or Excel document.

H18.   Cast List & Crew List:  One (1) copy of a list indicating the name of the character portrayed by each player, including appropriate contact numbers; and one (1) copy of a list of all technical personnel (including their title and assignment) involved in the production, including appropriate contact numbers.

H19.   Licenses/Contracts/Assignments:   Duplicate originals of all fully executed licenses, contracts, assignments and/or other written permissions from the proper parties in interest permitting the use of any product, musical, literary, dramatic, copyrighted, trademarked and other materials of whatever nature used in the production, exploitation or advertising of the Picture.

Written list confirming (digital copy) any product placement, sponsorship or production aid contained in the Picture.

H20.   Sound Licenses:  Executed copy of the License Agreement for worldwide use without limitations of Dolby, and if applicable, SDDS and DTS sound in connection with the Picture.

H21. Employment Agreements: Copies of all fully executed documents relating to the employment of all personnel that appear in the final paid ad billing block, engaged to render services in connection with the Picture, including but not limited to the individual producer(s), director, screenwriter(s), actors, musical performing artist(s), below the line crew, technicians and administrative staff.

H22. Residuals Information:   If applicable. A statement from Producer indicating all union, guild or federation agreements to which Producer is a party, a complete list of all personnel (and lending companies, if applicable) rendering services in connection with the Picture who are entitled to residuals, together with all information necessary to complete payment of such residual obligations including Social Security or EIN information for all personnel.  Producer agrees to indemnify Agent and hold Agent harmless from and against any and all damages, losses or expenses incurred as a result of Producer supplying Agent with any incorrect, inaccurate or incomplete information.

H23. Negative Cost Statement: A statement of the final negative cost of the Picture, certified as being true, correct and complete by an officer of Producer; and a "top sheet" from the final budget for the Picture (signed by Producer and director).

H24. Dubbing Restrictions/Approvals:  A statement of: (1) any limitation on use of photographic or non-photographic likeness (2) any restrictions as to the dubbing of the voice of any player including dubbing dialogue in a language other than the language in which the Picture was recorded (if applicable).

H25. Clearance Research Report: Please refer to Exhibit "X-5" for detailed clearance policies and procedures.

H26. MPAA Rating Certificate:  If applicable and when available, a certificate evidencing a rating from the Motion Picture Association of America ("MPAA") that is not more restrictive than that specified in the Agreement (if applicable).

H27. Certificates of Origin:  Ten (10) original Certificates of Origin certified and signed by a notary or Commissioner for Oaths, together with confirmation from the appropriate governmental agency (if origin is outside of the United States). The format of the Certificate of Origin must conform to Exhibit "X-6".

H28. French Authorship Certificate:  If requested, Two (2) original fully-executed French Authorship Certificates (in the form of Exhibit "X-7" attached hereto).

H29. Copyright Information:  Detailed information with regard to the copyright proprietor of the Picture, the precise copyright notice to be affixed to all advertising and packaging.  Producer shall provide Agent with one copy of the U.S. Certificate of Copyright Registration for both the screenplay and motion picture.

H30. Chain of Title:  Three (3) signed copies of a Chain of Title affidavit in the form of Exhibit "X-9". Upon request, one signed and notarized copy of the Chain of Title affidavit in compliance with each distributor or licensee specification. In addition, One (1) copy of all documents evidencing Producer's right to produce, distribute and exploit the Picture including all transfer-of-rights agreements from the author to the Producer.

H31. Chain of Title Opinion: A signed Chain of Title opinion issued by (i) Dennis Angel, (ii) Leopold, Petrich & Smith, or (iii) any other issuer approved in writing by Agent stating that it is the issuer's opinion that, based upon their review of the chain of title for the Picture, the Picture's screenplay, and all underlying works associated therewith, that the Producer has all rights necessary to exploit the Picture throughout the world in perpetuity.  The Chain of Title opinion shall include a Schedule detailing each item in the Chain of Title in chronological order and shall be issued under California law.  An electronic copy of the Chain of Title Opinion is sufficient for Agent's purposes unless otherwise requested.

H32. Errors and Omissions Policy:   A copy of a "Motion Picture Producer and Agent Errors and Omissions" insurance policy from an insurance company acceptable to Agent, which names Agent and each of the parties indemnified in the Agreement as additional insured.  A copy of the proof of payment of the Errors and Omissions Policy shall also be provided to Agent.   The following language shall be used with respect to Agent's addition to the Errors and Omissions Policy: "Green-Light International and its successors, licensees and assigns and the respective officers, directors, agents and employees of any of the foregoing as an additional insured party."   The policy shall provide insurance against any and all claims relating to the Picture and shall have limits of at least USD$3,000,000.00 with respect to any one claim relating to the Picture, USD$5,000,000.00 with respect to all claims relating to the Picture in the aggregate and the deductible of the Policy shall not exceed USD$10,000.00.   The Policy shall be for an initial period commencing as soon as reasonably practicable and in no event later than commencement of principal photography of the Picture and terminating no earlier than 5 years thereafter, with an option for an additional year and shall be delivered.   Such Certificate of Insurance shall include language that provides that such Insurance (i) cannot be modified, terminated or cancelled by the carrier without first notifying Agent of such event at least thirty (30) days in advance, and (ii) is not subject to any non-standard exclusions from, restrictions of or limitations in coverage.  Such policy shall contain an endorsement that negates the "other insurance" clause in the policy.   Said policy shall also provide that the insurance being provided is primary and that any errors and omissions insurance carried by Agent or any other person or entity (other than Producer) is neither primary nor contributing.

H33. Copyright Report and Title Report & Opinion:  Copyright Report and Opinion and Title report and Opinion issued by Thomson & Thomson/Brylawski, Leeds & Komen or Dennis Angel.

H34. Certification of Residency: Fifty (50) certifications issued by the Department of the Treasury for the current year in the form of a form 6166 certifying that the production company is a resident of the United States for purposes of U.S. taxation and will remain so throughout the current taxable year.  Producer may receive Form 6166 (in as many quantities as specified for no additional cost) by submitting form 8802.  With respect to form 8802, If the production company is a limited liability company, then such company must include the entity's single owner information on line 6 of the form, including the owner's name and entity type (e.g. corporation, partnership, TIN, and all other certification information required for the owner's type of entity, or otherwise it is not eligible to receive a form 6166.

<u>LABORATORY ACCESS LETTER</u>
Exhibit "X-1"


Date:

*(Laboratory name and address)*



re: (*film title*)


To:  *(name of laboratory)*

1. Picture/Term/Territory: The undersigned, _____ ("Producer"), has granted to Green-Light International LLC ("Agent") certain distribution rights in connection with the above-referenced motion picture (the "Picture") throughout _____ (the "Territory") for a duration of _____ years (the "Term").

2. Materials: The following materials (the "Materials") are currently on deposit with your facility:

                            *(List of materials )*

During the Term, the Materials shall remain in your possession and under your control at your facility located at the address set forth above or at one of your satellite vault locations and shall not be removed without the express written consent of Producer and Agent. All materials ordered and manufactured by either party in accordance with this agreement may be removed from the laboratory without the prior written consent of the other party.

3. Agent's Orders: This will authorize, direct and instruct you to fill all orders of Agent or Agent's designees at any time during the Term for duplicate material as Agent or Agent's designees shall request at the sole cost and expense of the ordering Agent. Notwithstanding any claim or lien which you may now or hereafter assert against Producer, Agent or others or against the Picture or the Materials, you agree that you will not, by asserting or enforcing any such claim or lien, refuse to accept or perform any requests placed by the other Agent or its designees as herein provided.

4. Irrevocability: The instructions, authorizations and directions herein contained in favor of Agent are being relied on by Agent and are coupled with an interest and may not be revoked, rescinded or in any way modified without the written consent of Agent.

5. No Claim Against Agent: You agree that you will not look to Agent and will not assert any claim or lien, statutory or otherwise, against Agent by reason of any obligation owed to you for any work, labor, material or service which you may perform at the expense of Producers or designees of Producer. You agree that you will not look to producer and will not assert any claim or lien, statutory or otherwise, against Producer by reason of any obligation owed to you for any work, labor, material or service which you may perform at the expense of Agent.

6. Facility Acknowledgment: By signing in the space provided below, you agree that: (i) you will will fill all orders from Agent or Agent's designees, as the case may be, in accordance with the authority granted herein without regard to any outstanding invoices or obligation to you or Producer or any third party and (ii) it will fill all orders from Producer or Producer's designees, as the case may be, in accordance with the authority granted herein without regard to any outstanding invoices or obligation to you or Agent or any third party. You agree to be bound by the foregoing instructions and directions.

By signing below the signatories agree to all the terms and conditions set forth herein.

Sincerely,

_____ ("Producer")

By: _____

Title:_____

Acknowledged and Agreed To:

GREEN-LIGHT INTERNATIONAL LLC
("Agent")

By: _____

Title: _____

_____
("Laboratory")

By: _____

Title: _____

Exhibit B

TECHNICAL SPECIFICATION FORM
Exhibit "X-2"

Title: _____

Production Company: _____

Address: _____

Phone: _____ Email: _____

Start Photography: _____Wrap Photography: _____MPAA Rating: _____

Footage: _____ Running Time: _____ Aspect Ratio: _____ # of Reels:_____

Sound: Dolby A ___, Dolby SR ___, Dolby SR-D ___, SDDS ____ DTS _____

Locations: _____

Producer(s): _____

Director: _____

Writer(s):_____

Director of Photography: _____

Editor: _____ Editor Phone: _____

Processing lab:_____ Contact (w/phone #): _____

Storage lab: _____ Contact w/phone #): _____

Titles:_____

Opticals:_____

Color timing lab:_____ Timer (w/ phone #): _____

Post Production Supervisor: _____Phone #: _____

Sound Facility: _____ Phone #: _____

Optical Track:_____

Composer:_____

Video Transfer Facility: _____Phone #: _____

Final Answer Print Creation Date: _____

MUSIC CUE SHEET - SAMPLE FORMAT
Exhibit "X-4"

| Cue # | Cue Title | TC In | TC Out | Duration | Usage | Composer | Publisher | Comments |
|-------|-----------|-------|--------|----------|-------|----------|-----------|----------|
| 1M01 | Example 1 | 01:0048:00 | 01:01:52:10 | 1:04 | BI | Composer Name | Publisher Name | Main Title |
| 1M02s | Example 2 | 01:02:13:13 | 01:02:47:08 | 0:33 | BV | Composer Name | Publisher Name | |
| 1M03s | Example 3 | 01:02:47:11 | 01:04:52:22 | 2:05 | BV | Composer Name | Publisher Name | |

<u>CLEARANCE POLICIES AND PROCEDURES</u>
EXHIBIT "X-5"

1. Once Producer receives the legal clearance research report, please forward to Agent.

2. The "Materials Release" (in a form provided by Agent) must be used for all materials. If the owner of the materials insists upon using their own form, it must contain a "no injunctive relief" provision.

3. New script pages should be submitted directly by the production office to the contract administrator, research company and the clearance service (unless they are one and the same) on an on-going basis.

4. As a general rule, please consider the following as items for which clearance must be obtained:
    a.    Posters, billboards, drawings, games, sculptures, paintings, prints, calendars, puzzles, games, toys, maps, etc.
    b.    Covers and inside pages of newspapers, magazines, brochures, racing forms, etc.
    c.    Books including the cover, inside text and/or illustrations
    d.    Photographs
    e.    Any individuals who appear recognizably in any photographs, paintings, magazines, newspapers etc.
    f.    Decals, bumper stickers, buttons with a message
    g.    Logos, insignias, patches, seals, etc. of real organizations including  awards from a real organization (e.g., Nobel Prize, Pulitzer Prize, Academy Award)
    h.    Credit cards and checks
    i.    Names and logos (e.g. company name and logo or trademark; radio and TV station call letters; sports teams' names, colors and insignias; clothing brand names and logos)
    j.    Film clips (including from the owner of the clip and from any talent appearing in the clip) unless produced specifically for the Picture
    k.    Specific names, license plates, addresses, telephone numbers and email addresses
    l.    Phrases taken from a copyrighted work (e.g., reading from a book of poetry or quoting lines from a play or movie)
    m.    Music, whether sung, hummed, whistled or quoted (see "Music/Songs" below)

5. **Please be aware:** The need for obtaining clearance is not avoided by the production making a copy of an item protected by copyright or trademark (e.g., a painting, photograph, poster, costume, etc.). The creation and use of a copy requires permission from the owner just as if you are using the real thing. This is true even if you change, modify or alter the item. If the original item and the copy are at all similar, you must get permission. Also, purchasing a painting, photograph, sculpture, etc. does not necessarily give you the copyright in such item. You must still seek permission from the copyright holder.

6. All scenes that include parodies, sound-alikes or look-alikes must be discussed with the Project Attorney prior to shooting.

7. The clearance person assigned to the picture will be reviewing dailies for clearance purposes and any unauthorized material will have to be either deleted, reshot or digitally "fuzzed out." Therefore, it is important that these issues be addressed prior to the actual day a particular item is going to be used.

8. In addition, any and all background music, radio broadcasts, TV theme songs, etc. and any singing, humming, whistling or quoting of lyrics from copyrighted songs by actors on screen must be cleared by the Music Supervisor.

<u>CERTIFICATE OF ORIGIN</u>
Exhibit "X-6"

TITLE:

TERRITORY:

AUTHORIZED LANGUAGE:

PRODUCERS:

PRODUCED BY (COMPANY):

FILMED IN (COUNTRY):

NATIONALITY OF FILM:

YEAR OF PRODUCTION:

RUNNING TIME (minutes):

DIRECTOR:

CAST:

WRITER:


(Producer)

By _____
(Name and title)

_____

State of [  ]                              )
                                                        )
County of [  ]                  )

On the [_____]day of [_____] 200[__] before me, [_____*name*][_____
_____ *title*] [_____] personally appeared before
me/is personally known to me to be the person whose name is subscribed to the within instrument and [__
_____] acknowledged to me ***that he/she the same*** in his authorized capacity
and that by his/her signature on the instrument the person, or the entity upon behalf of which the person
acted, executed the instrument.


WITNESS my hand and official seal.


_____

Exhibit B

FRENCH AUTHORSHIP CERTIFICATE
Exhibit X-7

A T T E S T A T I O N   D ' A U T E U R
A U T H O R ' S   C E R T I F I C A T E

Je sousigne                    _____
(I, the undersigned)

demeurant                      _____
(address)
                               _____

                               _____

declare etre le seul auteur du scenario original non tire
d'une oeuvre anterieure.
(being the sole author of the original screenplay not being taken from any previous work.)

intitule:            _____
(entitled)

et authorise                   _____
(and authorize)

a produire et exploiter un film de cette oeuvre.
(to produce and distribute a film based on this work)

Le presente autorisation est accordee pour une duree de: perpétuité.
(The present authorization is given in perpetuity)

        _____
        Signature of Author

<u>Chain of Title Affidavit</u>

<u>Exhibit "X-9"</u>

*[complete as applicable.  Add all other documents relevant to acquisition of the rights licensed to Distributor. ]*

By a Literary Option/Purchase Agreement dated as of [......................] between [..............] (the "Company") and [.......................................] (the "Author"), the Company acquired the option to acquire the exclusive right throughout the universe in perpetuity to produce and distribute and exploit in all media a feature length film provisionally entitled "[.....]" (the "Picture") based on the [novel].

The Company has exercised the option [on [...]].

By a screenplay agreement dated as of [......................] between the [Company] and [.......................................] (the "Writer"), the Writer agreed to write the [screenplay] for the Picture (the "Screenplay") and assigned to the [Company] all rights, title and interest in and to the Screenplay and the product of the Writer's services.

No individuals other than the Writer contributed to the Screenplay for the Picture. The screenplay is an original work and not based on any underlying work.

The individual producer(s), director and lead cast were engaged on a "work made for hire" basis or, if not, to the extent they have any rights in and to the Picture, such individuals have irrevocably assigned all such rights in and to the Picture in all media in perpetuity to the [Company].

**All payments necessary to secure the chain of title for the Picture have been paid in full.**

By an agreement dated [.....................] between the Company and Agent ("Agent") (the "Sales Agency Agreement") the Company granted Agent the right to license and authorise the exploitation of the Picture in accordance with the terms therein contained.

I certify under penalty that the foregoing statements are true and correct

I hereby certify that the chain or title in connection with the Picture, including the copyright search and evidenced copyright filing with the United States Copyright Office is clear and free from defect and all payments necessary to secure such chain of title (if any) have been made.

By_____
For and on behalf of [Company]

[*following relevant in the US only*]

State of [ ]                                          )

                                                              )

County of [ ]                        )

On the […]day of [………….….] 200[ ] before me, [……………
….*name*][…………………*title*] [………………………] personally appeared before me/is personally known to me to be the person whose name is subscribed to the within instrument and [……………………………] acknowledged to me ***that he/she the same*** in his authorized capacity and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.


WITNESS my hand and official seal.


_____

DELIVEY CALENDAR
Exhibit "X-10"

| Delivery Calendar as applicable to the Agreement and Delivery Schedule | |
| --- | --- |
| ***Due immediately upon closing of the Sales Agency Agreement or immediately after principal photography.:*** <br> G1. Unit Photography <br> G2. Key Art Campaign <br> G4. Stories Articles <br> G5. Production Notes <br> G6. Synopsis <br> G7. Advertising Materials <br> H2. Information Sheet – Exhibit "X-2" <br> H4. Literary Materials <br> H25. Clearance Research Report <br> H29. Copyright Information <br> H30. Chain of Title <br> H31. Chain of Title Opinion <br> H33. Copyright and Title Reports | ***Due 45 Days prior to Final Delivery Date*** <br> G3.  Biographies <br> H7. Composer Agreements <br> H11. Credit Statements <br> H15. DGA Approval <br> H16. WGA Approval <br> H17. Screen Credit Requirements <br> H18. Cast and Crew List <br> H19. Licenses/Contracts/Assignments <br> H21. Employment Agreements <br> H22. Residual Information <br> H24. Dubbing Restrictions/Approvals <br> H27. Certificates of Origin <br> H28. French Authorship Certificate <br> H32. Errors and Omissions Policy <br> H34. Certification of Residency |
| ***Due 30 Days prior to Final Delivery Date*** <br> Section A – 35mm Elements <br> Section B – Feature Video Masters <br> Section C – Feature Digital Masters <br> Section D – Feature Audio Masters <br> Section E – Trailer <br> Section F – T/V Airline version | ***Due 15 Days prior to Final Delivery Date*** <br> H3 – Combined Continuity and Spotting List <br> H5 – Music Cue Sheet <br> H6 – Music Contracts and Licenses <br> H8 – Clip Cue Sheet <br> H9 – Clip Licenses <br> H20 – Sound Licenses <br> H26 – MPAA Rating Certificate |
| **YOUR FINAL DELIVERY DATE IS** <br><br> _____ | |

Exhibit B

SCHEDULE 2

DELIVERY SPECIFICATIONS

The Picture shall:

1.  be based upon the Approved Screenplay, subject to minor variations as may be required by reason of production exigencies and/or minor on-the-floor changes or editorial changes which do not materially affect the storyline or characterizations of the principal roles contained in the Approved Screenplay; and

2.  be no less than 90 minutes (inclusive of main and end title credits) and no more than 120 minutes (exclusive of main and end title credits);

3.  have a rating of no more restrictive that R; and

4.  be shot in the English language on 35mm or HD video.

*LA 132359103v1*

*LA 132385047v1*

Exhibit B

EXHIBIT "A"

FORM OF NOTICE OF ASSIGNMENT

34

EXHIBIT "B"

SALES ESTIMATES

CONFIDENTIAL

**Urge**
IFT Sales Sheets

Date: 11/18/15

| Territory | Ask | Take | Actual Sales | Company | Notes | Rights Sold T | V | P | F | A |
|---|---|---|---|---|---|---|---|---|---|---|
| **Europe** | | | | | | | | | | |
| Benelux | $ 200,000 | $ 100,000 | | | | | | | | |
| France | $ 250,000 | $ 150,000 | | | | | | | | |
| Germany, Austria | $ 300,000 | $ 300,000 | $ 300,000 | KSM | | X | X | X | X | X |
| Greece | $ 25,000 | $ 25,000 | $ 25,000 | Spentzos | | X | X | X | X | X |
| Iceland | $ 10,000 | $ 2,500 | | | | | | | | |
| Israel | $ 25,000 | $ 10,000 | | | | | | | | |
| Italy | $ 200,000 | $ 100,000 | | | | | | | | |
| Portugal | $ 25,000 | $ 5,000 | | | | | | | | |
| Scandinavia | $ 200,000 | $ 100,000 | $ 125,000 | Mislabel | | X | X | X | X | X |
| Spain | $ 200,000 | $ 75,000 | | | | | | | | |
| Switzerland | | | | KSM | German spkg | | | | | |
| Turkey | $ 70,000 | $ 70,000 | $ 70,000 | Central Park | | X | X | X | X | X |
| UK | $ 350,000 | $ 200,000 | | | | | | | | |
| **Total Other Europe** | **$ 1,855,000** | **$ 1,137,500** | **$ 520,000** | | | | | | | |
| **Eastern Europe** | | | | | | | | | | |
| Baltic States | | | | | | | | | | |
| Bulgaria | $ 10,000 | $ 5,000 | | | | | | | | |
| Czech/Slovak Republics | $ 35,000 | $ 15,000 | | | | | | | | |
| Ex-Yugoslavia | $ 30,000 | $ 30,000 | $ 30,000 | Discovery | | X | X | X | X | X |
| Hungary | $ 25,000 | $ 10,000 | | | | | | | | |
| Poland | $ 50,000 | $ 50,000 | $ 50,000 | Monolith | | X | X | X | X | X |
| Romania | $ 25,000 | $ 10,000 | | | | | | | | |
| Russia/CIS | $ 150,000 | $ 150,000 | $ 150,000 | 25th Floor | | X | X | X | X | X |
| **Total Eastern Europe** | **$ 325,000** | **$ 270,000** | **$ 230,000** | | | | | | | |
| **Asia** | | | | | | | | | | |
| Pan Asia PTV | $ 30,000 | $ 10,000 | | | | | | | | |
| China | $ 40,000 | $ 5,000 | | | | | | | | |
| Hong Kong | $ 20,000 | $ 5,000 | | | | | | | | |
| India | $ 20,000 | $ 20,000 | $ 20,000 | Star | | X | X | X | X | X |
| Indonesia | $ 50,000 | $ 50,000 | $ 50,000 | PT Prima | | X | X | X | X | X |
| Japan | $ 150,000 | $ 50,000 | | | | | | | | |
| Malaysia | $ 12,000 | $ 12,000 | $ 12,000 | Tanweer | | X | X | X | X | X |
| Middle East | $ 175,000 | $ 175,000 | $ 175,000 | Falcon | | X | X | X | X | X |
| Philippines | $ 15,000 | $ 15,000 | $ 15,000 | Octoarts | | X | X | X | X | X |
| Singapore | $ 5,000 | $ 5,000 | | | | | | | | |
| South Korea | $ 65,000 | $ 65,000 | $ 65,000 | Linetree | | X | X | X | X | X |
| Taiwan | $ 35,000 | $ 10,000 | | | | | | | | |
| Thailand | $ 65,000 | $ 65,000 | $ 65,000 | IPA | | X | X | X | X | X |
| Vietnam | $ - | $ - | | IPA | | X | X | X | X | X |
| **Total Asia** | **$ 682,000** | **$ 487,000** | **$ 402,000** | | | | | | | |
| **Latin America** | | | | | | | | | | |
| Pan-Latin America PTV | | | | | | | | | | |
| Argentina, Uruguay, Paraguay | | | | | | | | | | |
| Brazil | | | | | | | | | | |
| Central America | | | | | | | | | | |
| Chile | | | | | | | | | | |
| Colombia | | | | | | | | | | |
| Mexico | | | | | | | | | | |
| Peru, Bolivia, Ecuador | | | | | | | | | | |
| Venezuela | | | | | | | | | | |
| **Total Latin America** | **$ 350,000** | **$ 175,000** | | | | | | | | |
| **Africa** | | | | | | | | | | |
| East/West Africa | $ - | $ - | | | | | | | | |
| South Africa | $ 50,000 | $ 25,000 | | | | | | | | |
| **Total Africa** | **$ 50,000** | **$ 25,000** | **$ -** | | | | | | | |
| **Oceania** | | | | | | | | | | |
| Australia/New Zealand | $ 200,000 | $ 100,000 | | | | | | | | |
| **Total Oceania** | **$ 200,000** | **$ 100,000** | **$ -** | | | | | | | |
| **Ancillary** | | | | | | | | | | |
| Airlines | $ 125,000 | $ 50,000 | | | | | | | | |
| **Total Ancillary** | **$ 125,000** | **$ 50,000** | **$ -** | | | | | | | |
| **North America** | | | | | | | | | | |
| Canada | | | | | Assuming North | | | | | |
| USA | | | | | America deal | | | | | |
| **Total North America** | **$ -** | **$ -** | **$ -** | | | | | | | |
| **Total International (*)** | **$ 3,587,000** | **$ 2,244,500** | **$ 1,152,000** | | | | | | | |

Exhibit B

Exhibit C

JAMS ARBITRATION
JAMS CASE NO. 1220053540

| | |
|---|---|
| Raven-Asset Based Opportunity | ) |
| Fund II LP and Raven-Asset Based | ) |
| Opportunity Fund III LP, | ) |
| | ) |
|     Claimants, | ) |
| | ) |
|     v. | ) |
| | ) |
| Green-Light International LLC, | ) |
| | ) |
| | ) |
|     Respondent. | ) |
| ———————————————— | ) |

**ORDER GRANTING, IN PART, AND DENYING, IN PART, CLAIMANTS'
APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW
CAUSE RE PRELIMINARY INJUNCTION**

On May 3, 2015, Claimants Raven-Asset Based Opportunity Fund II LP (Fund II) and Raven-Asset Based Opportunity Fund III LP (Fund III) filed a Notice of Application and an Application for a Temporary Restraining Order (TRO) and Issuance of an Order to Show Cause (OSC) Re: Preliminary Injunction and a supporting Memorandum of Points and Authorities; the supporting declarations of Messrs. Robert J. Sherman and Warren Goz, both with numerous exhibits, were previously filed on April 29, 2016.  On May 6, 2016, Respondent Green-light International LLC filed a Memorandum of Points and Authorities in Opposition to the Application and the supporting declaration of Jeff Elliott, with exhibits.  And on May 9, 2016, Claimants filed a reply.

Oral argument was held before Arbitrator Hon. Rosalyn Chapman (Ret.) on May 10, 2016. Mathew S. Rosengart and Matthew Gershman, shareholders with the law firm Greenberg Traurig LLP, appeared on behalf of Claimants and John Burgee, a partner with the law firm Burgee & Abramoff, appeared on behalf of Respondent.  Following the oral argument, the Arbitrator pronounced her ruling, advised counsel that a written reasoned order would issue immediately, requested Claimant Fund II submit a Proposed TRO; set a hearing on the OSC on May 26, 2016, at 9:00 a.m., at the JAMS Resolution Center in Century City; and set a briefing schedule on the OSC re Preliminary Injunction.

1

Exhibit C

# I.
## Procedural History

### A. Scheduling Conference.

On April 29, 2016, Claimants concurrently filed a Demand for Arbitration against Respondent and also sent a letter to JAMS, with a copy to Respondent and its counsel, requesting the appointment of an Emergency Arbitrator under Rule 2(c) of the JAMS Comprehensive Arbitration Rules & Procedures ("Rules"). The declarations of Messrs. Robert J. Sherman and Warren Goz, both with numerous exhibits, were attached to the Demand for Arbitration.

On May 2, 2016, the Arbitrator held a scheduling conference, determined the letter to JAMS constitutes the Notice required by Rule 2(c)(i), and issued a scheduling order. On May 2, 2016, the Arbitrator also ordered Claimants to file an Amended Demand for Arbitration that complied with Rule 9(b).

### B. Amended Demand.

Claimants filed their Amended Demand on May 3, 2016. The Amended Demand for Arbitration ("ADA") raises four causes of action against Respondent: (1) declaratory relief as to the rights and duties of the parties under the Inter-Party Agreements entered into between Claimants and Respondent (and others) dated November 12, 2015, and September 28, 2015, regarding motion pictures titled "Urge" ("Urge IPA") and "Imperium" ("Imperium IPA"), respectively (collectively "IPAs"); (2) breach of contract; (3) breach of fiduciary duties; and (4) failure to provide a full accounting.

Common to all claims, the following allegations are asserted: "Claimants loaned money for the ongoing productions of the Urge and Imperium films, and … Respondent acted as a sales agent to secure distribution deals for those films in various territories around the world[,]" as explained in the IPAs. (ADA ¶ 5). "Respondent expressly agreed that it would direct all of the distributors to pay those funds directly into a specifically identified 'Control Account' for each film, which account is maintained at East West Bank and administered by a neutral third party." (Id. ¶ 7). Respondent also agreed that it "had no security interest in the distributor proceeds, … to subordinate all of its interest in those funds to Claimants' interests[,]" and to waive all rights of offset and deduction and to set up reserves. (Id. ¶¶ 8-9).

Claimants recently learned that "Respondent had wrongfully instructed various distributors to pay funds under the distributor agreements *to Respondent* instead of to the Collection Account. …" (ADA ¶ 19 (emphasis in original)). Claimants also have learned that the following distributors remitted funds to Respondent's bank account at JP Morgan Chase ("Chase account"), rather than the Urge Collection Account: a distributor named Falcon Films remitted $100,000; a distributor named Polarstar remitted $105,000; a distributor named Mis. Label remitted $100,000; and

2

Exhibit C

distributors named OctoArts and Tanweer Vision Pictures Ltd. remitted funds.  (Id.).

In the IPAs, Respondent agreed "to timely provide Claimants (or Claimants' designee, including Sculptor Media, LLC ('Sculptor')) with certain information and documents regarding the marking of the films. ..."  (ADA ¶ 10).  "On several occasions during the months of March and April 2016, Claimants' designee, Sculptor, asked Respondent for information due under the IPAs. ... Respondent did not produce the requested information."  (Id. ¶ 11).

"One of Respondent's responsibilities – as sales agent – is to attend each of the three major international annual film festivals – of which the Berlin Film Festival is one. ..."  (ADA ¶ 12).  Respondent represented to Claimants' designee, Sculptor, that Respondent would be attending the Berlin Film Festival, and in reliance thereon, Claimants "approved funding for Respondent's marketing (and other) fees."  (Id. ¶ 13).  However, Claimants have learned that Respondent failed to attend the Berlin Film Festival.  (Id. ¶ 14).

On April 25, 2016, Claimants "terminat[ed] Respondent as the sales agent and inform[ed] Respondent that all marketing and sales materials relating to the films ... should be forwarded to [Claimants' counsel]."  (ADA ¶ 17).  On April 27, 2016, "Respondent sent written notices of acceptance of its termination as sales agent ... [a]nd with respect to 'Urge' in particular, ... claimed it was holding the distributor funds ... to 'protect' the distributors. ..."  (Id. ¶ 18).

Claimants seek the following relief on their claims:  (1) a declaration that under the IPAs: (a) Respondent has no security interest in any of the proceeds payable in connection with the distribution agreements;  (b) Respondent's interests in the distributor proceeds are subordinated to Claimants' interests;  (c) Respondent waived all rights of offset and deduction; and (d) all distributor proceeds are required to be paid into the Collection Accounts; (2) damages; (3) an accounting; (4) a temporary restraining order and preliminary and permanent injunctions (see Part VI below); (5) interest; (6) attorneys' fees and costs; (7) emergency relief under Rule 2(c); (8) a hearing at the Century City location of JAMS; (9) application of expedited procedures under Rule 16.1 and 16.2; and (10) other just and proper relief.

## II.
## Arbitrability of Claims

The IPAs contain the following arbitration provision, which is denominated Paragraph 10(b) in the Urge IPA and Paragraph 11(b) in the Imperium IPA:

(b)  Non-Delivery Disputes.  All controversies, claims, disputes, or counterclaims between the parties hereto concerning, based in any way upon, arising under, relating to, or arising in connection with the Picture, this Agreement, or any resulting transaction, including but

Exhibit C

not limited to, their respective obligations hereunder, payment of the Distribution Proceeds (other than a dispute concerning Delivery, which shall be resolved in accordance with the procedures specified in Paragraph [10(a) or] 11(a) hereof), a disagreement about the meaning, interpretation, application performance, breach, termination, enforceability, or validity of this Agreement, and whether based on statute, tort, contract, common law or otherwise, shall be subject to and resolved by binding arbitration conducted under the auspices of the Arbitration Rules.

At the time the Arbitrator issued the Scheduling Order, she did not determine whether the claims raised in the Demand were arbitrable under Paragraphs 10(b) and 11(b) of the Urge IPA and Imperium IPA, respectively; rather, the Arbitrator awaited the filing of the Amended Demand. Having now reviewed the Amended Demand (described above), the Arbitrator determines that the claims or causes of action raised by Claimants are arbitrable under Paragraphs 10(b) and 11(b) of the Urge IPA and Imperium IPA, respectively.

### III.
### Factual Background

Claimants make loans to borrowers, including in the motion picture production and distribution industries. (Declaration of Robert J. Sherman ("Sherman Decl.") ¶ 2). Fund III made a secured "production loan" in the original principal amount of approximately $4.7 million to fund a portion of the production costs of a motion picture titled "Imperium" (hereafter "Imperium"). (Id. ¶ 4). Fund II made a secured "finishing loan" in the original principal amount of approximately $5 million to fund a portion of the production costs of a motion picture titled "Urge" (hereafter "Urge"). (Id. ¶ 3). The Imperium and Urge loans "were identified, underwritten and originated … with the assistance of Sculptor Media LLC ('Sculptor') and its principal, Warren T. Goz." (Id. ¶ 5).

Claimants structured the Imperium and Urge loans as project financings, which means the loans were underwritten, in part, on the value of "pre-sales" and existing sales of domestic and foreign territorial distribution rights for each film. (Sherman Decl. ¶ 6). Such secured debt financings are generally structured by "the borrower/producer engag[ing] a foreign sales agent to provide estimates for the territorial sales/licensing value for the particular motion picture and to act as its sales agent in the sale and/or licensing of such foreign territorial distribution rights. …" (Id. ¶ 7).

Each distributor "customarily pays a deposit upon execution of its distribution agreement (from 10 to 20% of the agreed upon 'minimum guaranty' distribution or license fee) and agrees that it will pay the remainder of the 'minimum guaranty' amount upon delivery of the motion picture to it. …" (Id. ¶ 7). If a completion guaranty is issued, it provides protection that "the motion picture will be completed and timely delivered to distributors whose payment obligations with respect to the remaining 'minimum guaranty' are triggered by such delivery." (Id.).

4

Exhibit C

In August 2015, Fund III engaged Respondent as the foreign sales agent on Imperium. (Declaration of Jeff Elliott ("Elliott Decl.") ¶ 4). As sales agent, Respondent entered into the Imperium IPA with Fund III and the third-party producer, TDSD LLC. (Sherman Decl. ¶ 12, Exh. B). Respondent, Fund III, Freeway CAM BV ("Freeway"), and others also entered into a Collection Account Management Agreement ("CAMA") to create a Collection Account on Imperium. (Elliott Decl. ¶ 6). Freeway is to act as the collection agent on the Collection Account. (Id.).

In November 2015, Fund II engaged Respondent as the foreign sales agent on Urge. (Id. ¶ 8). As sales agent, Respondent entered into the Urge IPA with Fund II and the third-party producer, Urge Productions, LLC. (Sherman Decl. ¶ 12, Exh. A). Additionally, Respondent entered into a Sales Agency Agreement with producer Urge Productions, LLC. (Elliott Decl. ¶ 8, Exh. A). However, Respondent did not enter into a CAMA with Fund II and others to govern a Collection Account on Urge. (Elliott Decl. ¶ 10). Additionally, "there were issues with the producer and Urge Productions has been taken over by Claimants' manager [Mr. Goz]." (Id.).

On April 25, 2016, Claimants sent two, separate letters to Respondent terminating Respondent as sales agent on the Imperium and Urge films. (Declaration of Warren Goz ("Goz Decl.") ¶ 12, Exhs. E & F). On April 27, 2016, Respondent acknowledged it had received the termination letters. (Sherman Decl. ¶ 21, Exhs. D & E).

On or about April 25, 2016, Claimants hired EVP – International Sales and Distribution Inception Film Partners ("Inception") as their new sales agent on the Imperium and Urge films. (Sherman Decl. ¶ 22, Exh. G-3)

## IV.
### Receipts From Distributors

Claimants assert that, as to both Imperium and Urge, Respondent has breached the provisions of Paragraphs 3(a)(ii) and 5(a) of the IPAs, which require Respondent as sales agent to remit receipts from the distributors to the Collection Account and to "use its reasonable best efforts" to cause the distributors to deposit their receipts into the Collection Account. The establishment of the Collection Account is governed by Paragraph 2 of the IPAs, which provides that the Collection Account is managed by a third-party, neutral fiduciary who takes directions from the parties pursuant to a CAMA that directs how the proceeds should be distributed among the parties. Ultimately, the fiduciary is responsible for distributing the funds in the Collection Account, as set forth in Paragraph 4 of the IPAs.

For ease of reference, the paragraphs quoted below reflect the paragraph numbers found in the Urge IPA. Although the same provisions are found in the Imperium IPA, some have different

Exhibit C

paragraph numbers.  Paragraph 3 provides that Respondent remit the distributors receipts to the Collection Account and "use its reasonable best efforts to cause" the distributors to pay the receipts into the Collection Account:

> **3.  Acceptance and Acknowledgment.**  Sales Agent hereby covenants and agrees for the benefit of the Lender only that: (a) …(ii)  To remit any Lender's Assigned Receipts received by Sales Agent, and to use its reasonable best efforts to cause the Distributors to pay the Lender's Assigned Receipts, to the Collection Account provided herein[.]

(Sherman Decl. ¶12, Exh. A).  Paragraph 2 affords a notice of assignment of rights to Claimant, gives Respondent such notice, and provides for the establishment of the Collection Account to be governed by the CAMA.[1]

Paragraph 5(a) requires Respondent to remit all receipts to the Collection Account, as follows:

> **5.  Payments to Lender and Rights of Offset.**
>      (a)  Remittal of Assigned Receipts.  Notwithstanding anything to the contrary contained in … the Sales Agency agreement or otherwise with respect to the Picture, subject to the arbitration provisions set forth in Paragraph  11 [sic] below, Sales Agent agrees that it shall remit all Lender's Assigned Receipts to the

---

[1] Paragraph 2 provides:

> **2.  Notice of Assignment.**
> (a)(i)  Pursuant to the Loan Documents, Borrower and certain third parties have irrevocably collaterally assigned to Lender and have irrevocably granted to Lender a security interest in and to the Lender Collateral, including without limitation, all of Borrower's, Borrower's and such third parties' respective right, title and interest in and to the Picture and all elements thereof, and all proceeds of the Lender Collateral including, without limitation, all amounts payable to Borrower under the Sales Agency Agreement or otherwise.
> (b)  Borrower hereby:
> (i)
> (A)  Notifies Sales Agent of the security interest and assignment described in Paragraph 2(a)(i) above;
> (B)  Borrower hereby authorizes, directs and instructs Sales Agent to remit any Lender's Assigned Receipts received by Sales Agent, and to use Sales Agent's reasonable best efforts to cause the Distributors to pay all Lender's Assigned Receipts to the following Collection Account at East West Bank Account Name: Stichting Freeway Custody … for further disbursement pursuant to that certain collection account management agreement, collection account management agreement or any other similar instrument ("CAMA") to be entered into by and among Sales Agent, Borrower, Lender and the collection account manager, among others[.]

(Sherman Decl. ¶12, Exh. A).

Exhibit C

Collection Account promptly upon receipt thereof as herein provided, without offsets, deductions, counterclaims or defenses which Sales Agent may have or claim against Borrower or any other Person pursuant to the Sales Agency Agreement or otherwise, all of which are expressly reserved by Sales Agent against Borrower and any other Person, but only to the extent that the exercise of such rights does not derogate from Lender's rights to receive payment of Lender's Assigned Receipts (or any portion thereof) hereunder. …

(Sherman Decl. ¶ 12, Exh. A).

*The Imperium IPA*

As set forth in Part III above, the parties established a Collection Account and entered into a CAMA governing the funds in the Collection Account.  Claimant Fund III has not presented any evidence showing Respondent has failed to comply, or threatens to not comply, with its obligations to remit receipts to the Collection Account or to use its reasonable best efforts to have the distributors do so.  To the contrary, Respondent recently advised Claimants that "[a]ll sales on IMPERIUM were completed in a timely manner and all deposits have been collected and are currently in the CAMA, with exception to Universal, which does not offer a deposit. …" (Sherman Decl. ¶ 21, Exh. E).  Similarly, one of Respondent's principals avers that Respondent "has transmitted all deposits it received for Imperium to the Collection Account for that picture" and "had most of the deposits paid by foreign distributors sent directly to the Collection Account. …" (Elliott Decl. ¶ 7).  Accordingly, Claimants have not shown that Respondent has breached its obligations under the Imperium IPA.

*The Urge IPA*

The provisions of the Urge IPA require the establishment of a Collection Account, and a CAMA governing the funds in the Collection Account, as determined above.  In addition, Paragraph 10 of the Sales Agency Agreement entered into by Respondent and Urge Productions LLC, the producer, requires that "the parties shall negotiate in good faith" the terms of a CAMA and utilize a collection agent to administer the CAMA, and under the provision, the parties pre-approved Freeway as the collection agent.

Nevertheless, as set forth in Part III above, the parties did not enter into a CAMA. However, there is a bank account at East West Bank ("East West account") that Claimants contend is a Collection Account which Freeway manages for the parties' benefit.  Respondent has not accepted the East West account as the Collection Account under the Urge IPA or the Sales Agency Agreement, having  been informed by Gadi Wildstrom, a partner and founder of Freeway, that "Claimants could withdraw any funds deposited [in the East West account] at this point without restriction."  (Elliott Decl. ¶ 11).  Claimants have not refuted that they can access the East West account at will.

Exhibit C

Despite the lack of a Collection Account with a governing CAMA, Respondent solicited foreign distributors, entered into distribution or licensing agreements with them, and "is holding[] the[] deposits [from distributors] until the Collection Account is established." (Elliott Decl. ¶ 12). The evidence is clear: Respondent directed the foreign distributors it solicited to remit receipts to its Chase account, and the distributors did as directed. (Goz Decl. ¶¶ 13-14, Exhs. G-L). So far, Claimant Fund II has obtained copies of wire transfers and other documents showing foreign distributors remitted the following receipts to Respondent's Chase account:

- On April 20, 2016, distributor Falcon Films (Middle East) remitted payment in the amount of $100,000;
- On January 15, 2016, distributor Polarstar (Uruguay) remitted payment in the amount of $35,000, and on March 10, 2016,  remitted payment in the amount of $70,000, for a total amount of $105,000;
- On or about February 22, 2016, distributor Mis. Label (Scandinavia) remitted payment in the amount of $100,000;
- On March 22, 2016, distributor OctoArts (Philippines) remitted payment in the amount of $12,000;
- On or about March 8, 2016, distributor Transmission Films TPY Ltd (Australia/New Zealand) remitted payment in the amount of $19,000 or $20,000; and
- On or about March 28, 2016, distributor Tanweer (Malaysia) remitted payment in the amount of $9,600.

(Goz Decl. ¶¶ 14-19, Exhs. G-L). In its invoice to Claimants, Respondent acknowledged distribution agreements on Urge totaling $390,000. (Id. ¶ 20, Exh. M).

Respondent offers two separate and distinct explanations why it has not remitted the receipts to Claimant Fund II.  First, Respondent claims that it must protect the distributors with whom it has signed distribution agreements in the event Urge is not delivered:

This is an unbonded film without a CAMA, therefore there is no breach here.  …  With no CAMA in place and for the reasons just listed [we have no faith you are capable of delivering any film, especially URGE], in an attempt to protect our distributors and keep our valued relationships, we collected a portion of the deposits.  These deposits are fully intact in a holding account until the time when the film is officially delivered and not to be released before.  Again, this was necessary as you have failed to deliver the film completely and we have no confidence that you would refund our buyers upon failing to deliver the film so we had to protect our distributors and the company. …

(Sherman Decl. ¶ 21, Exh. D); *see also* (Goz Decl. ¶ 20, Exh. M) ("[W]e have collected and are holding certain URGE deposits in an attempt to protect our buyers from your constant unnecessary

8

Exhibit C

and unwarranted rule changes on both films, especially un-bonded and no CAMA URGE. These deposits are intact an[d] no portion of them have been spent. This was necessary as you have failed to deliver the film completely and we have no confidence that you would refund our buyers of [sic] failing to deliver the film so we had to protect our distributors and the company due to your volatile behavior. ...).

> According to Respondent, Claimants have breached the delivery requirements for Urge:

> Claimants, who have effectively taken over Urge, are in breach of delivery requirements for that picture. Although part of [Respondent's] duties as sales agent was to effect delivery of the picture to foreign distributors, since [it] has been terminated it no longer has control over delivery to ensure that Claimants comply with the delivery requirements. In this regard, Claimants are already in breach in failing to deliver "Key Art". Foreign distributors therefore have the ability to declare a default under the distribution agreements and demand that any deposit that they have paid be returned. Since [Respondent] signed the distribution agreements with the distributors, [Respondent] is concerned that it is potentially liable to the foreign distributors. The deposits [Respondent] is holding therefore need to be protected and not placed into an account that can be raided by Claimants.

(Elliott Decl. ¶ 23). "Once the picture is delivered, the funds can be released to the Collection Account (if there is one)." (Id. ¶ 13).

> Second, Respondent asserts Claimants owe it commissions and fees for services rendered as sales agent prior to its termination:

> Upon these illegitimate and unjust terminations, it is fair for [Respondent] to lay claim to all monies owed (deferred or un-deferred) on both projects, which includes sales fee, services fees, executive producer "lock box" fees and marketing and sales expenses fees. ... Therefore, please see the attached invoice [in the amount of $569,984.09] for all monies owed for both projects. ... This amount outweighs the deposits we were able to collect so once the film is delivered you can either pay in full this invoice and we can send back the deposits or you can wire the difference. To avoid arbitration, either way is fine with us.

(Goz Decl. ¶ 20, Exh. M). As to Urge, the invoice lists Respondent's fees in the total amount of $133,850:

- Marketing fees -- $20,000;
- foreign sales commission (10% of $390,000) -- $39,000;
- fortitude servicing fee (5% of $1.7 million) -- $54,850; and
- legal fees -- $20,000.

9

Exhibit C

(Id.).

To support its claim for commissions and fees, Respondent relies on Paragraph 3(a)(v) of the Urge IPA and Paragraph 11 of the Sales Agency Agreement, which provide that Respondent "is entitled to be paid half of its sales commissions and all of its marketing expenses before any money is paid to Claimants." (Oppo. at 3:20-21). Paragraph 3(a)(v) of the IPA provides:

> **3.  Acceptance and Acknowledgment.**  Sales Agent hereby covenants and agrees for the benefit of the Lender only that: (a) … (v) Notwithstanding anything to the contrary in the Sales Agency Agreement …, except for the fees set forth below in this Section 3(a)(v) …, the payment of any sales fees, commissions, distribution and marketing costs incurred by and payable or reimbursable to Sales Agency … in connection with the Picture shall be deferred … until the obligations have been indefeasibly satisfied and paid in full and all of Lender's obligations under the Loan Agreement have terminated:
>
> > (A)  fifty percent (50%) of the "Sales Fee" and "Service Fee" …; and
> > (B)  one hundred percent (100%) of the "Market Attendance and Sales Expenses Fee" and "Delivery Costs" … shall be payable prior to the Obligations.

(Sherman Decl. ¶ 12, Exh. A).

Paragraph 11 of the Sales Agency Agreement provides, in part:

> **11.  Gross Receipts:**  … Sales Agent and Licensor agree that all Gross Receipts shall be disbursed in accordance with the following schedule:
> > a.  First, any foreign taxes or withholding costs, bank charges, costs to convert proceeds in U.S. dollars, and/or other similar expenses shall be paid from the Gross Receipts;
> > b.  Second, the Collection Agent shall be entitled to recoup its costs to set up the Collection Account … , in addition to its customary fees and expenses in connection with the operation of the Collection Account and the calculation and disbursement of the proceeds in accordance with this Agreement;
> > c.  Third, Sales Agent for the Sales Fee (non-deferred portion) and Service Fee (non-deferred portion);
> > d.  Fourth, Sales Agent for the (i) Market Attendance and Sales Expenses Fee; and (ii) Delivery Costs (if any);
> > e.  Fifth, to the senior lender until recoupment of the senior loan …;
> > f.  Sixth, Sales Agent for the Deferred Sales Fee and Deferred Service Fee;
> > g.  Seventh, Sales Agent for the Event Costs (if any), legal Costs (if any) and Audit Costs (if any); and

Exhibit C

h.  Eighth, all remaining Gross Receipts shall be paid in accordance with the CAMA.

(Elliott Decl. ¶ 8, Exh. A).

Claimants argue Respondent cannot assert these defenses, relying on several standard provisions in the Urge IPA that are designed to protect Claimants' security interest in receipts from the distributors and to protect Claimants from any diversion of those receipts. Specifically, Claimants rely on: Paragraph 1(b)(iv), which provides that the sales agent has no right to any security interest; Paragraph 5(a), which provides that the sales agent has no rights to offset, deduction or to set up a reserve; and Paragraph 6(a), which is an acknowledgment by the sales agent that Claimant has a first priority lien and security interest in its collateral, including any proceeds from Urge.

It is not necessary, at this time, for the Arbitrator to determine whether Respondent may raise these defenses. However, the nature of the defenses presented by Respondent leads the Arbitrator to infer that Respondent may file a Cross-Demand or counter-claim to the Amended Demand for Arbitration, seeking payment for outstanding commissions and fees which, *inter alia*, may implicate Claimants' right to the receipts from distributors Respondent currently holds.

Based on the foregoing discussion, the Arbitrator determines that Claimants have made a prima facie case showing that Respondent breached its obligations under paragraphs 3(a)(ii) and 5(a) of the Urge IPA.

## V.
## Requests for Information

Claimants assert that Respondent has breached its contractual obligations under Paragraphs 1(b)(x) and 3(a)(iii) of the IPAs to promptly furnish financial and other documents to them upon reasonable request. They assert that despite several requests by Mr. Goz and their counsel for information, Respondent has not replied to any of their requests.

Paragraph 1(b)(x) of the IPAs provides:

**1.  Sales Agent's Agreements.**  For the benefit of the Lender only, …Sales Agent hereby represents, warrants, covenants and agrees as follows: … (b) <u>Amendments to Sales Agency Agreement.</u> Notwithstanding anything to the contrary contained in, referred to, or incorporated by reference in, the Sales Agency Agreement or otherwise:
<p style="text-align:center">* * *</p>

(x) <u>Sales Information.</u>  Borrower and Sales Agent, as applicable, shall promptly furnish to Lender (and its designees, including Sculptor Media, LLC, …) all

Exhibit C

financial and other information relating to the exploitation of the Picture as Lender or Sculptor may reasonably request.  Without limiting the generality of the foregoing, Borrower and Sales Agent shall furnish to Lender and Sculptor, in detail as Lender or Sculptor shall reasonably request, the following:

    (A)  As soon as reasonably practicable, copies of all invoices for payments due under all license and distribution agreements sent to Distributors by Borrower or Sales Agent since the date such invoices were last delivered to Lender;

    (B)  As soon as reasonably practicable, statements of all completed sales for the Picture, including a list of the name and address of each Distributor and the financial details of each license and distribution agreement;

    (C)  As soon as reasonably practicable, copies of all invoices and other correspondence between Borrower or Sales Agent and any Distributor concerning or mentioning the payment of the minimum guarantee due thereunder; and

    (D)  As soon as reasonably practicable, upon any change to the "Sales Estimates" attached hereto as Exhibit "B" …, the updated and most current Sales Estimates.

(Sherman Decl. ¶ 12, Exh. A).   Paragraph 3(a)(iii) of the IPAs provides:

**3.  Acceptance and Acknowledgment.**  Sales Agent hereby covenants and agrees for the benefit of the Lender only that: (a) … (iii)  To send to Lender and Sculptor duplicates of all notices and statements furnished by Sales agent to borrower under the Sales Agency agreement and otherwise relating to the Picture which relate to the Lender Collateral and/or the Lender Assigned Receipts, to permit Lender or its representative (including Sculptor), in addition to Borrower, to audit, examine and take excerpts from all books and records of Sales Agent pertaining to the Picture at all reasonable times upon reasonable notice (and Sales agent agrees that ten (10) Business Days notice will be deemed reasonable prior to the occurrence of any Default or Event of Default under the Loan Agreement, and following the occurrence of any such Default or Event of default, one (1) business Day shall be deemed reasonable)[.]

(Id.).

      Mr. Goz states that "[o]n several occasions during the months of March and April 2016, [he] … asked Respondent for information, correspondence, documentation, financial information and updated sales estimates for the films" but he did not receive the requested information.  (Goz Decl. ¶ 7).  He also claims that, after he learned Respondent had not attended the Berlin Film Festival, he asked Respondent to provide proof of attendance at the Festival in order to substantiate

Exhibit C

Claimants' approval of funding for Respondent's marketing and other fees. (Goz Decl. ¶¶ 8-9, 11, Exh. D). However, Respondent did not reply to this request. (Id. ¶ 11).

Further, in anticipation of litigation, Claimants sent Respondent a letter dated April 12, 2016, detailing Respondent's alleged breaches of the IPAs, including the failures to provide financial and other information and to allow examination of all books and records pertaining to the two films, and demanding the breaches be cured. (Sherman Decl. ¶20, Exh. C). Claimants did not receive a response to these requests. (Goz Decl. ¶ 10).

On the other hand, Respondent complains that "[i]n recent months, ... Warren Goz ... made increasing demands for information and accountings. Although [Respondent] addressed Mr. Goz's requests, his demands became relentless and far beyond reasonableness and industry standards. At all times, [Respondent] has provided Mr. Goz with appropriate information and documentation." (Elliott Decl. ¶ 15).

As to the Berlin Film Festival, Respondent argues that it "was not contractually obligated to attend that film market and Claimants did not provide any funding to support attending the Festival. ... No expenses for attending the Festival were billed to Claimants." (Elliott Decl. ¶ 17). Although Respondent claims that although it was not present at the Festival, it asserts that "a number of sales were nonetheless made to foreign distributors attending the Festival for both projects." (Id.).

The parties clearly disagree about the information Respondent has provided Claimants under the IPAs. Without documentary evidence, such as correspondence and attachments thereto detailing, *inter alia*, the nature of the requests for information, the dates of the requests, the responses to the requests, and the dates of responses, it is impossible to determine what has really occurred; rather, it is "he said, she said." Under the terms of the IPAs, requests for information must be reasonable, and requests to audit books must also be on reasonable notice and at a reasonable time. Broad pre-litigation requests for information, such as Claimants made in the letter dated April 12, 2016, are of little value in establishing Respondent's breach of its obligations under the IPAs. Thus, the Arbitrator determines that Claimants have not met their burden to show Respondent has not complied with its obligations under the IPAs to promptly respond to reasonable requests for information.

## VI.
## Injunctive Relief

**A. Legal Standard.**

The arbitration provision in the IPAs, quoted in Part II above, does not specify the law – whether state or federal -- the Arbitrator is to apply when considering the claims raised in

Exhibit C

arbitration; it provides only that the binding arbitration shall be subject to, resolved by and conducted under the auspices of the Arbitration Rules.

JAMS Rules address emergency or interim relief in two contexts. As to emergency relief under Rule 2 proceedings, such as our case, Rule 2(iv) provides:

> The Emergency Arbitrator shall determine whether the Party seeking emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief and whether the requesting Party is entitled to such relief. The Emergency Arbitrator shall enter an order or Award granting or denying the relief, as the case may be, and stating the reasons therefor.

As to interim relief under other non-emergency arbitration proceedings, Rule 24(e) provides:

> Interim Measures. The Arbitrator may grant whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods. Such interim measures may take the form of an interim or Partial Final Award, and the Arbitrator may require security for the costs of such measures. …

Applying general principles of statutory construction, specific provisions apply when applicable, over general provisions. Thus, when considering Claimants' application for emergency relief, the Arbitrator will apply the standard set forth in Rule 2(iv) and determine whether (i) "immediate and irreparable loss or damage will result in the absence of emergency relief" and (ii) "whether the requesting Party is entitled to such relief."

This dual standard is quite similar to the standard under California law, which requires that "[t]rial courts should evaluate two interrelated factors when deciding whether or not to issue a [TRO or] preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." *IT Corp. v. Cnty. of Imperial*, 35 Cal.3d 63, 69 (1983); *Hunt v. Superior Court*, 21 Cal.4th 984, 999 (1999); *see also Butt v. State of Cal.*, 4 Cal.4th 668, 678 (1992) ("The trial court's determination must be guided by a 'mix' of the potential-merit and interim harm factors, the greater the plaintiff's showing on one, the less must be shown on the other to support a preliminary injunction…. ).

### B. Claimants' Application.

*Imperium IPA*

The Arbitrator determines that Claimants have failed to make a prima facie showing that Respondent has breached the terms of the Imperium IPA. Accordingly, the Arbitrator determines

Exhibit C

that Claimants have not shown that "immediate and irreparable loss or damage will result in the absence of emergency relief" and that they are "entitled" to emergency relief, within the meaning of Rule 2(iv). Thus, Claimants' application for emergency relief is denied.

*Urge IPA*

Claimants assert that "without emergency relief, [they] will suffer immediate and irreparable loss and damages, including but not limited to damage to two valuable motion picture projects and the likely loss of the inability to recover funds that have unlawfully been diverted by Respondent, *to Respondent's own bank* account, in connection with those projects." (Notice of Application for Emergency Relief ("Notice") at 2:1-5 (emphasis in original)). "[B]y diverting and withholding the funds, Respondent ... has neutered the only cash collateral and security that Claimants bargained for when loaning millions of dollars." (Memorandum of Points and Authorities at 8:26 – 9:1).

As Mr. Sherman explains:

[B]ecause Claimants' loans are not guaranteed or otherwise supported by outside credit, their repayment is dependent upon the honest, timely and diligent performance by the sales agent of its obligations to ensure maximization of sales revenue, timely and complete collection of all distribution proceeds from each distributor and prompt and vigorous enforcement of legal rights against distributors to the extent they are not making contractually mandated payments as and when due under the applicable distribution agreements.

… [A]s films are rolled out into the U.S. and the foreign market on a specific release schedule, if foreign sales are not timely completed and collected, the film loses market value rapidly, and thus Claimants are at great risk of loss due to any delays in the sales agent's performance of its obligations.

(Sherman Decl. ¶¶ 9-10).

Respondent disagrees, noting that "Claimants are aware of the existing distribution contracts and know what foreign territories have not been sold. The assertion that distribution contracts made by [Respondent] are invalid because funds were sent to [Respondent] instead of the non-existent Collection Account, is specious. …Claimants are simply trying to fabricate an alleged injury that is wholly fictitious." (Opposition to Application ("Oppo." at 5:15-21).

Claimants request a TRO and preliminary injunction restraining and enjoining Respondent from four categories of conduct. Claimants' first request for injunctive relief seeks to restrain and enjoin Respondent:

Exhibit C

       a.      from retaining and/or withholding any minimum guaranty proceeds and other monies paid by distributors/licensees; failing to transfer(within one business day of the Arbitrator's Order) and /or failing to direct distributors/licensees to pay all minimum guaranty payments and other amounts due under any distribution or license agreements into the Collection Accounts for each respective film; or diverting and misappropriating any additional monies paid or payable by any distributor/licensee, in each case relating to the films titled 'Urge and 'Imperium[.]'

Claimants have shown that Respondent has not complied with the terms of the Urge IPA requiring it to remit receipts from distributors, and to use its best reasonable efforts to have the foreign distributors remit the receipts, to the Collection Account, as discussed above. In turn, Respondent has shown that there is no Collection Account meeting the requirements under the IPA, i.e. governed by the terms of a CAMA. Under the Sales Agency Agreement, however, Respondent promised to "negotiate in good faith" the CAMA and pre-approved Freeway as the collection agent. Yet, Respondent offers no explanation as to why it did not enter into a CAMA and establish a Collection Account.

Despite the lack of a Collection Account, with a CAMA governing its administration, Respondent nonetheless solicited foreign distributors, entered into distribution or licensing agreements with the distributors, and directed the distributors to remit the receipts to Respondent's Chase account, which is not an account administered by a neutral fiduciary subject to the parties' mutual direction. Thus, Claimant Fund II has made a prima facie showing that Respondent breached its obligations under Paragraphs 3(a)(ii) and 5(a) of the Urge IPA and it is entitled to relief.

Considering the nature of the movie production loan on Urge, and balancing the equities on each side, the Arbitrator determines that Claimant Fund II's request for injunctive relief should be granted to preserve the *status quo*. The evidence shows that, to date, approximately $390,000 in receipts from foreign distributors have been paid into Respondent's Chase account, which Respondent may access; but neither Claimant Fund II nor a neutral fiduciary can reach. As these funds are vital for Claimant Fund II to recoup its investment in Urge, Claimants will suffer immediate and irreparable loss if the funds disappear. Thus, injunctive relief should be awarded to prevent Respondent from dissipating receipts from distributors in the Chase account and to maintain the *status quo* pending the arbitration. Further, it is prudent to order Respondent to transfer the receipts from distributors in the Chase account to some sort of neutral receiver or depository *pendente lite*. Of course, the neutral depository could be a Collection Account governed by a CAMA and managed by a neutral fiduciary, such as Freeway, if the parties can reach agreement on the terms of the CAMA and the neutral fiduciary. Otherwise, the Arbitrator can appoint a receiver for the funds, who would take directions from the Arbitrator.

Exhibit C

Transfer of the foreign distributors receipts from Respondent's Chase Account to some sort of neutral receiver or depository *pendente lite* will not prejudice Respondent, who has represented that these receipts "are fully intact in a holding account" and "no portion ... have been spent." In fact, it will protect Respondent from claims by distributors seeking refunds, as the funds are not under Respondent's control.

Claimants' second request for injunctive relief seeks to restrain and enjoin Respondent "... from claiming it still is (or refusing to acknowledge to the collection account manager and other relevant third parties that it has been terminated as) the sales agent for the films entitled 'Urge' and 'Imperium.'" However, Claimants have presented no evidence to show that Respondent continues to represent, or threatens to represent, that it is the sales agent on Urge. To the contrary, Respondent promptly acknowledged to Claimants that it had been terminated as sales agent and avers that "we are no longer making efforts to sell the film projects. [Respondent] is not claiming to be the sales agent for the pictures and informing foreign distributors, upon inquiry, that [it] is no longer the sales agent." (Elliott Decl. ¶ 19). Thus, Claimants' are not entitled to this relief and their request is denied.

Claimants' third request for injunctive relief seeks to restrain and enjoin Respondent:

c.      from refusing to promptly and without further delay provide Claimants full and complete copies of all invoices, statements, bank statements, remittances and evidences of payment, and any and all notices, correspondence and financial information with or relating to any distributor/licensee for the films titled 'Urge' and 'Imperium', in each case that relates to payments due under the respective distribution/license agreements for each such film, and such other documents and information as and when required under the IPA[.]

As determined in Part V above, Claimants are not entitled to this relief and their request for emergency relief is denied. Nevertheless, solely for the purpose of insuring that the injunction serves its purpose, and maintaining the *status quo* pending resolution of this dispute, the Arbitrator determines that Respondent must immediately provide Claimants with the following documents: a list of the foreign distributors, with their names, addresses and contact information; copies of all foreign distributor agreements; all financial information relating to those agreements, including invoices or statements to the distributors and all receipts or payments from the distributors; and financial statements showing the location of the receipts from the distributors. Such information should include invoices sent to foreign distributors who have not yet paid, to assure no future payments are remitted to the Chase account.

Claimants' fourth request for injunctive relief seeks to restrain and enjoin Respondent "... from interfering in any way with the enforcement of rights under any existing distribution/license

Exhibit C

agreements or the ongoing sales/licensing activities of Claimants and/or their agents relating to the films entitled 'Urge' and 'Imperium[.]'" However, Claimants have not presented any evidence showing that Respondent has interfered, or threatens to interfere, with the enforcement rights under any existing distribution or license agreement or with Claimants or their agents relating to Urge. Thus, Claimants' are not entitled to this relief and their request is denied.

For all these reasons, Claimant Fund II's application for a TRO and OSC re Preliminary Injunction is granted, in part, and denied, in part.

### C. Bond.

Respondent claims a bond is mandatory to support any injunctive relief under California Code of Civil Procedure Section 529(a).[2] (Opposition to Application ("Oppo.") at 7:7-13). And Respondent requests that a bond in the amount of $750,000 should be undertaken, in order to cover its "prospective damages," which exceed $570,000 plus interest and attorney's fees. (Id. at 7: 9-13). On the other hand, Claimants assert there is no bond requirement under Rule 2 and, in any event, it is Respondent who should post a bond in the event Claimants' request for emergency relief is not granted. (Reply at 7:12-23).

As California Code of Civil Procedure section 529 does not apply to a temporary restraining order which is effective only until a determination is made whether to issue a preliminary injunction, *Biasca v. Superior Court*, 194 Cal. 861, 228 P. 861 (1924) (per curiam); *Allen v. Pitchess*, 36 Cal. App. 3d 321, 329-30 (1973), the Arbitrator need not at this time decide whether an undertaking is required. However, at the time of the hearing on the preliminary injunction, the parties may address the issue of a bond (under Rule 24(e)) and amount of the bond in the event Claimant Fund II's request for a preliminary injunction is granted.

**IT IS HEREBY ORDERED** that a Temporary Restraining Order shall issue against Respondent Green-Light International LLC, as a separate document, and Claimant Fund II shall submit a Proposed Temporary Restraining Order, no later than May 10, 2016, at 5:00 p.m. The Proposed Temporary Restraining Order shall require Green-Light:

(1) to immediately transfer all receipts from foreign distributors on the motion picture Urge to a neutral depository managed by a third-party fiduciary, which neither Fund II nor Respondent may access and which will remain *pendente lite*;

---

[2] California Code of Civil Procedure Section 529(a) provides, in part:

> On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding the amount to be specified, the party may sustain the reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction.

Cal. Civ. Pro. Code § 529(a).

18

Exhibit C

(2) to refrain from spending or otherwise dissipating any and all receipts from foreign distributors on the motion picture Urge; and

(3) to provide Fund II's counsel, no later than 48 hours from the date the Temporary Restraining Order is issued, with a list of all foreign distributors on Urge, including their names, addresses and contact information; copies of all foreign distributor agreements; all financial information relating to those agreements, including invoices or statements to the distributors and all receipts or payments from the distributors; and financial statements showing the location of the receipts from the distributors.   Such information should include invoices sent to foreign distributors who have not yet paid, to assure no future payments are remitted to the Chase account.

**IT IS FURTHER ORDERED** that Respondent shall appear and show cause before the Arbitrator on May 26, 2016, at 9:00 a.m., at the JAMS Century City Resolution Center, located at 1925 Century Park East, Suite 1400, Los Angeles CA 90067, as to why a Preliminary Injunction should not be entered on the same terms as the Temporary Restraining Order.

The Arbitrator requests that Claimants produce Mr. Gadi Wildstrom at the hearing, in the event the parties do not agree on the neutral depository to be established under the Temporary Restraining Order.

If any party requests to present oral testimony at the hearing, that party should make the request in its brief and should identify the witness, set forth a short statement establishing good cause for the oral testimony, and provide an estimate of the length of the direct examination.   If any party desires to have a court reporter present at the hearing, it should advise JAMS and the opposing party at least 48 hours in advance of the hearing.

**IT IS STILL FURTHER ORDERED** that Respondent's opposition, if any, to the issuance of a Preliminary Injunction shall be filed no later than May 16, 2016, AT 5:00 p.m.; and Claimant Fund II's reply brief shall be filed no later than May 23, 2016, at 5:00 p.m.

**FURTHER, IT IS HEREBY ORDERED** that Senior Case Manager Anne Lieu shall promptly file this Order and serve it on the parties.

May 10, 2016                        By: _____
                                        Hon. Rosalyn Chapman (Ret.), Arbitrator

120053540.2
5/10/2016

19

Exhibit C

## PROOF OF SERVICE BY E-Mail

Re: Raven Asset-Based Opportunity Fund II LP, et al. vs. Green-Light International LLC
Reference No. 1220053540

I, Anne Lieu, not a party to the within action, hereby declare that on  May 10, 2016, I served the
attached Order Granting, In Part, and Denying, In Part, Claimants' Application for Temporary Restraining Order
and Order to Show Cause Re Preliminary Injunction on the parties in the within action by electronic mail at Los
Angeles, CALIFORNIA, addressed as follows:

Mathew Rosengart Esq.
Matthew R. Gershman Esq.
Greenberg Traurig LLP
1840 Century Park East
19th Floor
Los Angeles, CA  90067
Phone: 310-586-7700
rosengartm@gtlaw.com
gershmanm@gtlaw.com
   Parties Represented:
   Raven Asset-Based Opportunity Fund II LP
   Raven Asset-Based Opportunity Fund III LP

Mr. Chad Moore
Mr. Jeffrey Elliott
Green-Light International LLC
8447 Wilshire Blvd.
Ste. 401
Beverly Hills, CA  90211
Phone: 310-281-2887
chad@glgpictures.com
jeff@glgpictures.com
   Parties Represented:
   Green-Light International LLC

John G. Burgee Esq.
Burgee & Abramoff P.C.
20501 Ventura Blvd.
Suite 262
Woodland Hills, CA   91364
Phone: 818-264-7575
jburgee@bandalaw.net
   Parties Represented:
   Green-Light International LLC

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,
CALIFORNIA on  May 10, 2016.

Anne Lieu
JAMS
alieu@jamsadr.com

Exhibit C

Exhibit D

**JAMS ARBITRATION**
**JAMS CASE NO. 1220053540**

| | |
|---|---|
| **Raven-Asset Based Opportunity Fund II LP and Raven-Asset Based Opportunity Fund III LP,** | ) ) ) ) |
| **Claimants,** | ) ) |
| **v.** | ) ) |
| **Green-Light International LLC,** | ) ) ) |
| **Respondent.** | ) ) ) |

**TEMPORARY RESTRAINING ORDER**

On May 10, 2016, the Arbitrator issued an Order Granting, in part, and Denying, in part, Claimants' Application for a Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, finding Claimant Raven-Asset Based Opportunity Fund II LP ("Claimant Fund II") has demonstrated an entitlement to issuance of a Temporary Restraining Order against Respondent Green-Light International LLC ("Respondent"), and stating the Temporary Restraining Order would issue separately. Pursuant to the Order dated the May 10, 2016, this is the Temporary Restraining Order.

**THEREFORE, IT IS HEREBY ORDERED:**

A.     Respondent shall transfer any and all receipts and revenues from foreign distributors in connection with the motion picture Urge (the "Urge Distributor Proceeds"), previously received or received hereafter, to a Temporary Collection Account to be established forthwith by counsel for both parties at a U.S. bank. The Temporary Collection Account shall require the signatures of counsel for both parties, as trustees, to access the Urge Distributor Proceeds and shall remain under the control of counsel until Freeway (Gadi Wildstrom) or, in the event Freeway declines to be the neutral third-party fiduciary, such other third-party neutral fiduciary as the parties may agree upon or the Arbitrator may select, shall hold custody of the funds. The Urge Distributor Proceeds shall be transferred by Respondent to the Temporary Collection Account as soon as the Temporary Collection Account is established by counsel. The parties shall cooperate fully with Freeway or such other neutral third-party fiduciary in executing any customary agreement to establish a neutral third-party's role as custodian of the Temporary

Collection Account.  Neither Claimant Fund II nor Respondent may directly access the Temporary Collection Account, which will remain *pendente lite*, pending further order of the Arbitrator.

   B.  Respondent is enjoined and prohibited from spending or otherwise dissipating any of the Urge Distributor Proceeds, regardless of when received by Respondent.

   C.  Respondent shall provide Claimant Fund II, no later than 48 hours from the issuance of this Temporary Restraining Order, the following documentation regarding "Urge:"
    1.   A list of all foreign distributors, including their names, addresses and contact information;
    2.   Copies of all foreign distributor agreements; and
    3.   All financial information relating to the distribution agreements, including invoices or statements to the distributors and receipts or payments from the distributors.

**IT IS HEREBY ORDERED** that Senior Case Manager Anne Lieu shall promptly file this Temporary Restraining Order and serve it on the parties.

May 11, 2016       By: _____
            Hon. Rosalyn Chapman (Ret.), Arbitrator

120053540.3
5/11/2016

## PROOF OF SERVICE BY E-Mail

Re: Raven Asset-Based Opportunity Fund II LP, et al. vs. Green-Light International LLC
Reference No. 1220053540

I, Anne Lieu, not a party to the within action, hereby declare that on  May 11, 2016, I served the

attached Temporary Restraining Order on the parties in the within action by electronic mail at Los Angeles,

CALIFORNIA, addressed as follows:

Mathew Rosengart Esq.
Matthew R. Gershman Esq.
Greenberg Traurig LLP
1840 Century Park East
19th Floor
Los Angeles, CA  90067
Phone: 310-586-7700
rosengartm@gtlaw.com
gershmanm@gtlaw.com
    Parties Represented:
    Raven Asset-Based Opportunity Fund II LP
    Raven Asset-Based Opportunity Fund III LP

John G. Burgee Esq.
Burgee & Abramoff P.C.
20501 Ventura Blvd.
Suite 262
Woodland Hills, CA   91364
Phone: 818-264-7575
jburgee@bandalaw.net
    Parties Represented:
    Green-Light International LLC

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,

CALIFORNIA on  May 11, 2016.

_____
Anne Lieu
JAMS
ALieu@jamsadr.com

Exhibit D

Exhibit E

1 | GREENBERG TRAURIG, LLP
 | MATHEW S. ROSENGART (SBN 255750)
2 | MATTHEW R. GERSHMAN (SBN 253031)
 | 1840 Century Park East, Suite 1900
3 | Los Angeles, CA 90067-2121
 | Telephone:  310-586-7700
4 | Facsimile:   310-586-7800

5 | Attorneys for Claimants,
 | RAVEN ASSET-BASED OPPORTUNITY FUND II LP
6 | RAVEN ASSET-BASED OPPORTUNITY FUND III LP

7 |

8 | **JUDICIAL ARBITRATION AND MEDIATION SERVICES**
 | **EXPEDITED ARBITRATION**
9 | **LOS ANGELES, CALIFORNIA**

10 | RAVEN ASSET-BASED | JAMS Case No. 1220053540
11 | OPPORTUNITY FUND II LP; and
 | RAVEN ASSET-BASED | **CLAIMANTS' APPLICATION FOR**
12 | OPPORTUNITY FUND III LP | **SANCTIONS FOR RESPONDENT'S**
 | | **MISCONDUCT AND CONTEMPT**
13 | Claimants, | **OF THE ARBITRATOR'S TRO**
 | | **AND PARTIAL FINAL AWARD;**
14 | -against- | **REQUEST FOR ATTORNEYS'**
 | | **FEES; SUPPORTING**
15 | | **DECLARATIONS OF MATHEW S.**
 | GREEN-LIGHT INTERNATIONAL LLC | **ROSENGART AND WARREN GOZ**
16 | Respondent.
17 | | Hearing:  July 12, 2016
18 | | Time:  9 a.m.
 | | Place:  JAMS, 1925 Century Park East,
19 | | Ste. 1400, Los Angeles, CA 90067
 | | Emergency Arbitrator:  Hon. Rosalyn
20 | | Chapman (Ret.)

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

CLAIMANTS' APPLICATION FOR SANCTIONS AND FEES

*LA 132607362v4*

## I. **INTRODUCTION**

The record shows not only that Respondent breached the underlying contract at issue (*see*, *e.g.*, June 2, 2016 Order at 11 ["Thus, the Arbitrator determines that Respondent has breached Paragraphs 3(a)(ii) and 5(a) of the Urge IPA"]), but also that Respondent has willfully disobeyed Judge Rosalyn Chapman's clear and unequivocal Orders in this case.  Even worse, putting aside Respondent's underlying misconduct, the evidence adduced during the past several weeks demonstrates that Respondent—through its principals Jeff Elliott, Christian de Gallegos, and Chad Moore—has lied to Claimants; lied to JAMS; lied to the Arbitrator (Judge Chapman); submitted a false Declaration to the Arbitrator and to JAMS (*i.e.*, the May 6, 2016 Jeff Elliott Declaration, *see infra*); misappropriated more than $400,000 of funds and diverted those funds to their own JP Morgan Chase Bank Account; and evidently converted and dissipated those funds.

Respondent—and its principals—must be punished for their brazen and larcenous misconduct, and the JAMS Rules themselves (which Respondent agreed would govern this dispute) coupled with common law, provide the procedural and substantive bases for that punishment.  Specifically, because Respondent's principal Jeff Elliott has committed perjury, the Arbitrator should enter an Order with a finding of perjury and award sanctions against Mr. Elliott personally.  *See, e.g., In re Rainbow Magazine, Inc.*, 77 F.3d 278, 281, 285 (9th Cir. 1996) (affirming award of sanctions personally against party's principal, who, through his control of the party, abused the process by signing a false statement for the party and orchestrated a bad-faith bankruptcy filing).  Further, Respondent, Elliott and Respondent's other principals (Christian de Gallegos and Chad Moore) should be ordered to pay monetary sanctions.  Finally, among other relief, pursuant to the plain, agreed-upon terms of the governing contract (the URGE Inter-Party Agreement), Respondent must pay Claimants' attorneys' fees.

Given the record in this matter, severe sanctions against Respondent *and its principals* are mandated.  Anything less would only serve to embolden, rather than deter, Mr. Elliott and his cohorts from continuing their unlawful conduct in this case, and presumably others.

---

1

CLAIMANTS' APPLICATION FOR SANCTIONS AND FEES

LA 132607362v4

Exhibit E

## II.    SUMMARY OF RESPONDENT'S MISCONDUCT

As noted above, by now, the list of Respondent's undisputed misconduct—which occurred prior to and during this proceeding (and remains *ongoing*)—has grown long.  It is summarized below.

### A.    Respondent Willfully Disobeyed The TRO.

Prior to granting Claimants' Application for a TRO, the Arbitrator requested extensive briefing from the parties and heard extensive argument.  Subsequently, in granting the TRO, the Arbitrator Ordered that Respondent transfer the URGE distributor receipts into a neutral, third-party Temporary Collection Account, to prevent dissipation (or third-party creditor attachment) of the funds pending the outcome of the arbitration.  Respondent's counsel expressly agreed that such a Temporary Collection Account account could be created and managed by Freeway Entertainment, a well-established industry leader in collection account and film revenue management.  (*See e.g.*, May 22, 2016 Gershman Declaration at Exhibits A, B, and D [May 11 and 12, 2016 e-mails from Respondent's counsel, John Burgee].)

Freeway agreed to establish the Account and to follow the direction of the Arbitrator or a court with respect to the holding of the funds.  (June 2, 2016 Partial Final Award at 15.)  The Account was promptly established by Freeway and has existed since May 12, 2016.  That same day, Claimants' counsel provided the Account Information and Wire Instructions to Respondent's counsel.  (*Id.*)  Although Respondent's counsel acknowledged receipt of the Account Information and Wire Instructions, Respondent willfully disobeyed the TRO, refusing to transfer the funds into the Temporary Collection Account.  (*Id.* at 15-16.)

Notably, Respondent's counsel had earlier acknowledged Respondent's obligation to transfer the funds pursuant to the TRO.  He even represented that Respondent would try to transfer the funds with a wire transfer (as he was, in any event, *required to do* as a matter of law).  (*See* Rosengart Decl., ¶ 2, Ex. 1 [May 12-13, 2016 e-mail chain].)  This demonstrates that Respondent knew what it had to do and how to do it.  It also demonstrates—if the Arbitrator takes Respondent's counsel at his word (which we do)— that Respondent's counsel evidently tried to persuade his client and their principals (Messrs. Elliott, de Gallegos, and Moore) to comply with the TRO, but that Respondent simply refused.

1    Weeks later, at the May 26, 2016 hearing, Respondent's counsel renewed Respondent's initial

2    flimsy excuse for failing to transfer the funds—that Respondent's principals had for weeks been "in

3    France"  Of course, the Arbitrator knows that was grossly, inasmuch as Mr. Elliott publicly shared on

4    social media his vacation pictures from the Italian Riviera at a time when Respondent was claiming to

5    be "too busy" in France to comply with the Arbitrator's TRO.  And of course, there is no absence of

6    banking institutions in France, let alone branches of a major bank such as JP Morgan Chase, where

7    Respondent had illegally diverted the funds and from where it could have easily effectuated the transfer

8    of funds to the Temporary Collection Account.[1]  Moreover, at the very moment Claimant's counsel

9    proffered his clients' silly excuses at the hearing,[2] Mr. Chad Moore, another of Respondent's principals,

10   was sitting directly next to him.  Moore also could have easily effectuated the simple wire transfer from

11   JP Morgan Chase to the Freeway Account.

12   Ultimately, the real reason why the transfer never occurred is because Respondent did not want

13   to comply with the Arbitrator's Order (or it could *not* do so, because its principals had illegally spent the

14   funds).  Although obvious, this was only finally admitted when, after repeated direct questioning from

15   the Arbitrator at the May 26, 2016 hearing, Respondent's counsel conceded that Respondent had not

16   transferred the funds.[3]  At the same time, Respondent refused to provide any accounting of the funds or

17   disclose their current location, indicating that that Respondent had, in fact, evidently stolen and

18   dissipated the funds in further violation of the Arbitrator's TRO and other applicable law.  (*See* June 2,

19   2016 Partial Final Award at 16.)

20

21

22

23

---

[1] While no supporting evidence is needed for this self-evident point, according to J.P. Morgan's website, it has been operating in France and has held a branch at 14, place Vendôme since as early as 1916.  *See* J.P. Morgan Company History, France <https://www.jpmorgan.com/country/FR/EN/company-history>; *see also* Comité Vendôme website, as translated by Google Translate <https://translate.google.com/translate?sl=auto&tl=en&js=y&prev=_t&hl=en&ie=UTF-8&u=http%3A%2F%2Fcomite-vendome.fr%2Fboutiques%2Fj-p-morgan%2F&edit-text=&act=url>.

[2] One of his prior, bizarre, excuses was that the "Patriot Act" was somehow an impediment to the transfer.  *See* Rosengart Decl, Ex. 1 (attaching e-mail of Respondnet's counsel John Burgee).

[3] Groping for another excuse, Respondent also incorrectly contended the order was somehow "invalid."  As the Arbitrator is well aware, the TRO was not only validly issued, it was also extremely thorough and well supported.

3

CLAIMANTS' APPLICATION FOR SANCTIONS AND FEES

Exhibit E

1        **B.  Respondent's Extraordinary Pattern Of Dishonesty—to Claimants, to JAMS,**

2             **and to the Arbitrator—Now Includes the Perjury of its Principal Jeff Elliott.**

3        In a desperate effort to stave off a TRO and retain (and then evidently *spend*) the third-party

4  funds that they had unlawfully diverted to their own JP Morgan Chase Account, on May 6, 2016,

5  Respondent's President, Jeff Elliott, submitted a Declaration under penalty of perjury, in which he

6  declared the following:  "I have recently spoken with Gadi Wildstrom, a Partner and founder of

7  Freeway.  Gadi confirmed that until there is an executed CAMA, the account Freeway has at East West

8  Bank for Urge is simply a bank account subject to the direction of Claimants.  He further stated that

9  Claimants could withdraw any funds deposited at this point without restriction."  (May 6, 2016 Elliott

10  Decl., ¶ 11.)  As the record unequivocally demonstrates, these statements were false.

11        *First,* as Mr. Goz explained in his May 23, 2016 declaration, the East West account was not

12  subject to Claimants' direction or control.

13        *Second,* contrary to Elliott's sworn statement, Mr. Wildstrom (an esteemed attorney and

14  professional, neutral third party with no stake in this dispute) confirmed in writing to Mr. Goz that, as a

15  neutral account, Freeway never would have allowed Claimants access to the Urge Collection Account at

16  East West Bank, *regardless* of whether an executed CAMA was yet in place.  (May 23, 2016 Goz Decl.,

17  ¶ 7, Ex. I.)

18        *Third,* Mr. Wildstrom confirmed during his live May 26, 2016 testimony, in response to open-

19  ended questions that, in his words, Mr. Elliott's sworn statements were "false."

20        *Fourth,* Mr. Wildstrom's June 9, 2016 Declaration (submitted herewith) further confirms that:

21  "As I testified during the May 26 Hearing in this case, both of these statements that Mr. Elliott attributed

22  to me are false.  I never told Mr. Elliott that an 'executed CAMA' was necessary, nor did I tell him that

23  Claimants 'could withdraw any funds deposited at this point without restriction.'  Indeed, I never would

24  have made those statements because, as I testified, those statements are not only false, they are

25  completely inconsistent with industry practice and the proper and appropriate management of collection

26  accounts."  (Wildstrom Decl., ¶ 6.)

27        Finally, it bears noting that the Arbitrator considered Mr. Wildstrom's May 26 testimony (and

28  even questioned him directly) and specifically found that his statements were "credible."  (June 2, 2016

1  Partial Final Award at 8.)  Thus, regrettable as it is, the record is clear and the conclusion inescapable:

2  Mr. Elliott committed perjury.

3        Mr. Elliott also stated under oath that Claimants had failed "to deliver" the Urge film.  (May 6,

4  2016 Elliott Decl., ¶ 23; *see also* Respondent's May 16, 2016 Response to OSC, at 2:16-18 (claiming a

5  "failure" to deliver).)  As demonstrated in the annexed Declaration of Warren Goz, Mr. Elliott's sworn

6  representation that Claimants failed to deliver Urge also is false.  (Goz Decl., ¶ 2, Ex. 6.)

7        Respondent has misled the Arbitrator in other material respects as well.  For instance, as alluded

8  to above, the Arbitrator will recall that Respondent tried to make much of the fact that there was

9  purportedly "no CAMA" in place for Urge.  But the record now is clear that Respondent's argument was

10  a red-herring.  Initially, as established at the May 26 Hearing and before, a pre-CAMA had always been

11  in place, and the funds could and should have been transferred regardless of whether a CAMA was fully

12  in place.  Further, Respondent (i) "pre-approved Freeway as the collection agent," (ii) agreed to

13  "'negotiate in good faith' the terms of the CAMA," and (iii), "despite pre-approving Freeway as the

14  neutral fiduciary," never "offered any explanation for its failure" to enter into the CAMA.  (June 2, 2016

15  Partial Final Award at 9-11.).  Finally, and relatedly, as Mr. Wildstrom testified, it is not necessary for a

16  CAMA to be in place before funds can be transferred to a Collection Account.  (*Id.* at 8.)  Indeed, this

17  practice is completely appropriate routine—and it has to be—as many films that are "pre-sold" to

18  distributors at festivals such as the Berlin Film Market or the Cannes Film Festival never come to

19  fruition and are never made.

20        By way of further example, Respondent argued in opposition to the TRO that it supposedly was

21  simply "holding" the Urge distributor proceeds because Respondent claimed it had earned that money

22  on Urge; yet, the record later revealed that, according to Respondent's *own document production*, its

23  *own claim* to Urge commissions (even if accurate, and it is not) amounted to no more than $133,850—

24  far less than the $410,430 Respondent misappropriated, diverted, and failed to remit to the Urge

25  Collection Account and later the Temporary Collection Account.  (*See* June 2, 2016 Partial Final Award

26  at 12-13.)[4]  And regardless, as the Arbitrator correctly found, "*Paragraph 5(a) of the Urge IPA provides*

27

28
---
[4] To be clear, Respondent's lack of honesty is not isolated.  It is a pattern.  The Arbitrator also will recall that Claimants demonstrated that Respondent's principal, Christian de Gallegos, lied when he told Mr. Goz he was going to, and then purportedly *did*, attend the Berlin Film Market, when, in fact, Respondent did not attend or send anyone on its behalf.

5

CLAIMANTS' APPLICATION FOR SANCTIONS AND FEES

LA 132607362v4

Exhibit E

1 | *that the sales agent [Respondent] has no rights to offset, deduction or to set up a reserve.*" (*Id.* at 13)

2 | (emphasis added).

3 | ### C. <u>Respondent Has Willfully Disobeyed the Partial Final Award.</u>

4 | The June 2, 2016 Partial Final Award ordered Respondent to "immediately transfer any and all

5 | receipts and revenues from foreign distributors in connection with the motion picture Urge … to the

6 | Temporary Collection Account … which Freeway Entertainment KFT has established at East West

7 | Bank and which Freeway will manage." (June 2, 2016 partial Final Award at 17.)  Respondent has

8 | refused and failed to comply with this provision.  (Wildstrom Decl., ¶ 4.)

9 | Respondent also was ordered to "immediately" produce copies of all monthly financial

10 | statements showing the location of the Urge distributor proceeds from December 1, 2015 to the present.

11 | (June 2, 2016 Partial Final Award at 18.)  Respondent has refused and failed to comply with this

12 | provision.  (Rosengart Decl., ¶ 3.)  The reasonable inference is obvious:  Respondent has now dissipated

13 | the funds that they unlawfully misappropriated.  Indeed, the Arbitrator already has seen evidence of Mr.

14 | Elliott's publications of his post-Cannes Film Festival vacation in the Italian Riviera, during (and after)

15 | the time he was ordered to transfer the URGE distributor proceeds from his own JP Morgan Chase

16 | Account into the neutral, third-party bank account.  (*See* May 23, 2016 Goz Decl., ¶ 3, & Exs. F, G, H.)

17 | The Arbitrator also witnessed another of Respondent's principals, Chad Moore, attend the May

18 | 26 hearing without offering any explanation for Respondent's contempt or regarding the status and

19 | location of the misappropriated, diverted, and now evidently dissipated funds.

20 | ### D. <u>Respondent Has Failed to Pay JAMS Fees, in Violation of JAMS Rules.</u>

21 | As of June 3, 2016, JAMS advised Claimants' counsel that Respondent's portion of the

22 | outstanding JAMS fees and expenses had not been paid.  JAMS Rule 31 requires that Respondent pay

23 | its share of the fees and expenses.  It also provides that, in these circumstances, where one party refuses

24 |

25 | Indeed, Mr. Elliott was subsequently forced to admit that Respondent never went to Berlin, and, in doing so, Mr. Elliott *did not deny Respondent had previously told Mr. Goz exactly the opposite.* (May 6, 2016 Elliott Decl., ¶ 17.)

26 | Further, with regard to the IMPERIUM film, while not presently at issue in this proceeding, Respondent's suggestion that

27 | it handled that film properly is false as well.  While we will present further evidence at the July 12 Hearing, by way of illustration only, Respondent's principal, Christian de Gallegos, failed to comply with basic requests of a foreign distributor, causing that distributor to cancel and Claimant Fund I and the licensor for Imperium to lose out on that sale,

28 | which would have amounted to at least $40,000.  (*See* Goz. Decl., ¶ 3, Ex. 7.)

<center>6</center>

<center>CLAIMANTS' APPLICATION FOR SANCTIONS AND FEES</center>

LA 132607362v4

<div align="right">Exhibit E</div>

1  to pay its share and the other is forced to pay more than its share, the Arbitrator may issue an award

2  against the party that has not paid for the unpaid fees and expenses, as well as suspend the party's

3  affirmative claims pursuant to JAMS Rule 6(c).

4    **III.   SEVERE MONETARY SANCTIONS SHOULD ISSUE AGAINST RESPONDENT**

5         ***AND ITS PRINCIPALS*; RESPONDENT ALSO MUST PAY CLAIMANTS'**

6         **ATTORNEYS' FEES.**

7         Fundamental principles of common law, as well as JAMS Rule 29, provide the Arbitrator the

8  power to "order appropriate sanctions" for failure to comply "with an order of the Arbitrator." "These

9  sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator

10 compensation and expenses; any other costs occasioned by the actionable conduct, including reasonable

11 attorneys' fees; exclusion of certain evidence; drawing adverse inferences; or, in extreme cases,

12 determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply."

13 JAMS Rule 29; *cf.* Cal. Civ. Proc. Code § 1209(a)(5) ("The following acts or omissions in respect to a

14 court of justice, or proceedings therein, are contempts of the authority of the court:  (5) Disobedience of

15 any lawful judgment, order, or process of the court"); Schwarzer, et al., *Cal. Prac. Guide Fed. Civ. Pro.*

16 *Before Trial*, at ¶ 13:229 (The Rutter Group 2016) ("Failure to obey the terms of a TRO or preliminary

17 injunction constitutes a contempt of court.  Federal courts have both inherent and statutory authority to

18 punish such contempt and to coerce compliance with their orders."); *Chambers v. NASCO, Inc.*, 501

19 U.S. 32, 45 (1991) ("court's discretion to determine '[t]he degree of punishment for contempt' permits

20 the court to impose as part of the fine attorney's fees representing the entire cost of the litigation").

21        It is undisputed that Respondent has flagrantly defied the Arbitrator's TRO and Partial Final

22 Award (and each of their sub-parts), by, among other things, refusing to transfer funds to the Temporary

23 Collection Account and by refusing to produce the specified financial information in those Orders.

24        **A.  The Arbitrator Should Issue Monetary Sanctions**

25        Putting aside its effect on the Urge film and the chaos it has created, Respondent's refusal to

26 transfer the funds to the neutral account established pursuant to the Arbitrator's Orders pending the

27 outcome of the arbitration renders it impossible for the Arbitrator to maintain control over the disputed

28 funds and ultimately to enter any Award with any meaningful impact.  It also completely undermines

1  the integrity of the arbitral and legal process, which depends on the ability of the neutral panelist to

2  award emergency relief or other interim measures to preserve the disputed funds for an ultimate ruling.

3  *See, e.g.*, JAMS Rules 2, 24(d)-(e).  This is why Rule 29's list of possible sanctions is non-exhaustive

4  and provides the Arbitrator with broad discretion to order other types of sanctions, as deemed

5  "appropriate," so that parties are deterred from continuing misconduct and are encouraged to comply

6  with arbitral orders.

7         The conduct of Respondent and its three principals has been egregious and they must be

8  sanctioned, monetarily and severely, as a result of their misconduct, which includes but is not limited to

9  the following:  lying to Claimants, JAMS, and the Arbitrator; unlawfully diverting *hundreds of*

10 *thousands of dollars* from third-party distributors—and then, evidently using those stolen funds for their

11 own personal or other purposes (indeed, given ample opportunity to do so, **Respondent has never**

12 **denied this**);[5] and defying not just one Order, but multiple Orders.  *See* JAMS Rule 29; *accord Young v.*

13 *City of New York*, 104 A.D.3d 452, 454 (N.Y. App. Div. 2013) (affirming monetary sanctions where

14 "defendants were inexcusably slow to produce documents over a period of three years in response to

15 several court orders"); *Shapiro v. Fine*, 102 A.D.2d 735 (N.Y. App. Div. 1984) (ordering monetary

16 sanctions against a party that failed to produce certain documents directed by court order:  "A significant

17 monetary sanction seems to us an appropriate response to the circumstances presented, and one that

18 should have a salutary effect on defendant's future conduct in this litigation.").[6]

19        Under these circumstances, we submit that sanctions should be *at least* 50% of the amount of the

20 funds misappropriated, diverted, and dissipated by Respondent and its principals.  According to the

21 chart presented by Respondent itself to the Arbitrator and Claimants during the May 26, 2016 Hearing,

22 those misappropriated funds total no less than *$410,430.00*.[7]  Accordingly, a fair and reasonable

23
_____
24 [5] *See, e.g.,* May 22, 2016 Gershman Decl., Ex. D.

25 [6] The courts recognize inherent contempt power over parties even in a circumstance where (unlike here) the contemptuous
   behavior did not even interfere with the proceeding, because the concern ultimately is with a party's brash disobedience of
26 court orders.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[I]t is firmly established that '[t]he power to punish
   for contempts is inherent in all courts.' … This power reaches both conduct before the court and that beyond the court's
27 confines, for '[t]he underlying concern that gave rise to the contempt power was not ... merely the disruption of court
   proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered
   with the conduct of trial.'").
28 [7] As noted above, this sum is based only upon what Respondent *admits*.  The sum might, in fact, exceed this amount.

CLAIMANTS' APPLICATION FOR SANCTIONS AND FEES

LA 132607362v4

Exhibit E

sanction against Respondents and their principals should be no less than *$205,215.00*.  Anything less, we respectfully submit, would encourage rather than deter future larcenous and other misconduct.  Put another way, it would effectively entice Respondent's principals to commit new and further misconduct, in this matter and presumably others.

**B.  The Monetary Sanctions Should Also be Issued Against Respondent's Principals Jeff Elliott, Christian de Gallegos, and Chad Moore.**

Respondent's persistent misconduct, frivolous and now-rejected arguments based on false and misleading statements, and perjury (through its principal, Mr. Elliott) unnecessarily compounded the costs and expenses of these proceedings.  The Arbitrator therefore should not only include in its order a finding that Mr. Elliott committed perjury, but also should sanction Mr. Elliott personally not only for lying to the Arbitrator, but also for directing Respondent in making its many misleading statements.  *See In re Rainbow Magazine, Inc.*, 77 F.3d 278, 281, 285 (9th Cir. 1996) (affirming award of sanctions personally against the party's principal, who, through his control of the party, abused the bankruptcy process by filing a false statement and orchestrating a bad-faith bankruptcy filing); *Elec. Workers Pension Trust Fund of Local Union #58 v. Gary's Elect. Serv. Co.*, 340 F.3d 373, 382 (6th Cir. 2003) (holding a corporate officer—although not a party to the underlying action—could properly be held in contempt for the corporation's failure to comply with court orders, and that contempt sanction could take the form of a fine in the amount of funds that were improperly diverted); *Thomas Am. Corp. v. Fitzgerald*, 175 F.R.D. 462, 466-67 (S.D.N.Y. Sept. 3, 1997) (awarding monetary sanctions against party's former officer for lying in a declaration filed with the court); *Ferrara v. Nordev, LLC*, No. CV 10-5844 (JFB) (WDW), 2012 U.S. Dist. LEXIS 77304, at *10-11 (E.D.N.Y. April 10, 2012) (recommending awarding sanctions against non-party officer of a party because it is "'well-established … that an officer, responsible for the corporation's affairs and for its disobedience [to a court order], may be held liable for contempt.'"), *adopted by* 2012 U.S. Dist. LEXIS 77309 (E.D.N.Y. May 30, 2012); *Amerisource Corp. v. Rx USA Int'l Inc.*, 2010 U.S. Dist. LEXIS 67108, at *1, 23 (E.D.N.Y. July 6, 2010 (awarding sanctions against party corporation and non-party principal for, among other things, offering false and misleading testimony).

CLAIMANTS' APPLICATION FOR SANCTIONS AND FEES

LA 132607362v4

Exhibit E

1    Additionally, and for similar reasons, along with Elliott, Respondents other principals (de

2    Gallegos and Moore) should be sanctioned personally or at the very least, they should be held jointly

3    and severally liable for the payment of such sanctions. After all, and as Claimants expect to further

4    demonstrate at the upcoming July 12 Evidentiary Hearing, it is now apparent that GLI exists for one

5    primary reason: to serve as the personal piggy bank for these three principals. Accordingly, in the

6    absence of personal/individual sanctions against these three individuals, it is unlikely that Respondent

7    will ever be able to collect. Further, and equally important, without personally sanctioning them, their

8    misconduct will, in effect have been rewarded.

9        **C. The Arbitrator Should Order Respondent To Pay Claimants' Attorneys' Fees.**

10   Additionally, Respondent should be ordered to pay Claimants' reasonable attorneys' fees.

11   JAMS Rule 29 expressly provides for such an award in these circumstances as a sanction for the failure

12   of one side to "comply … with an order of the Arbitrator." *Accord Chambers v. NASCO, Inc.*, 501 U.S.

13   32, 45 (1991) ("court's discretion to determine '[t]he degree of punishment for contempt' permits the

14   court to impose as part of the fine attorney's fees representing the entire cost of the litigation"). The

15   Arbitrator also will recall that an award of attorneys' fees under these exact circumstances was expressly

16   contemplated by the parties' in Section 5(a) of the Urge IPA:

17

18       portion thereof) have been paid to Lender hereunder, the same shall not be subject to refund or
         return by Lender to Sales Agent for any reason. If Sales Agent fails to remit any Lender's

19       Assigned Receipts (or any portion thereof) to the Collection Account when due as provided in
         this Agreement, Sales Agent shall reimburse Lender for any and all actual, out-of-pocket costs

20       and expenses paid or payable to third parties (including, without limitation, court costs and
         reasonable outside attorneys' fees) incurred by Lender in enforcing collection of Lender's

21       Assigned Receipts (or any portion thereof) from Sales Agent.

22   (Urge IPA, at § 5(a); *see also id.* at § 10(b)(iii) [providing for award of "reasonable legal fees" for

23   prevailing party in an arbitration].) Indeed, the Partial Final Award confirms that Claimant Fund II

24   already has established that Respondent breached this very provision of the Urge IPA: "Thus, the

25   Arbitrator determines that Respondent has breached Paragraphs 3(a)(ii) and *5(a) of the Urge IPA*."

26   (June 2, 2016 Order at 11 [emphasis added].) *See also* (Urge IPA, at § 10(b)(iii) [providing for award of

27   "reasonable legal fees" for prevailing party in an arbitration].)

28

CLAIMANTS' APPLICATION FOR SANCTIONS AND FEES

*LA 132607362v4*

Exhibit E

1    Thus far, Respondent's *already-established breach*, together with its bad-faith defenses and
2  ongoing failure to comply with the duly-authorized arbitral Orders has caused Claimants to incur
3  attorneys' fees in this proceeding of more than $120,000.  Claimants therefore seek an award of
4  attorneys' fees of no less than $120,000.  (*See* Rosengart Decl., ¶¶ 5-6.)

5           **D.  The Arbitrator Should Dismiss Respondent's Counterclaim.**

6    It is manifestly unfair and hypocritical for Respondent to, on the one hand, refuse to comply with
7  orders it does not like, while, on the other hand, submit a counterclaim for resolution to the Arbitrator.
8  Rule 29 expressly provides that, in such extreme cases, the Arbitrator may determine an issue or issues
9  adversely to the party that has failed to comply with Arbitrator orders.  Claimants respectfully submit
10  that this is that case, and that the Arbitrator should therefore dismiss the counterclaim pursuant to Rule
11  29.  Alternatively, at a minimum, the Arbitrator should put the counterclaim into administrative
12  suspension until (i) Respondent fully complies with the Partial Final Award, and (ii) Respondent pays its
13  share of the JAMS fees and expenses.  *See* JAMS Rules 6(c), 29, 31(a) and (c).

14           **E.  The Arbitrator Should Issue An Adverse-Inference Sanction Against**
15                **Respondent.**

16    Because Respondent refuses to transfer the funds to a neutral holding account pending the
17  outcome of this case, and also refuses to produce evidence of the location of the funds, Respondent has
18  rendered it impossible for Claimants or the Arbitrator to ascertain the location of the funds.  This is
19  exactly what Rule 29's adverse-inference sanction was designed to address.  In addition to the above,
20  the Arbitrator should therefore enter a finding drawing the adverse inference that Respondent has
21  already dissipated the Urge funds that they stole, in violation of the parties' IPA, the TRO, the Partial
22  Final Award, and other applicable statutes.  *See* JAMS Rule 29; *accord People v. Deas*, 208 A.D.2d
23  467, 467 (N.Y. App. Div. 1994) (holding lower court's "adverse inference charge was an appropriate
24  sanction for the ... failure to turn over" certain evidence); *Gen. Motors Acceptance Corp. v. N.Y. Cent.*
25  *Mut. Fire Ins. Co.*, 104 A.D.3d 523, 526 (N.Y. App. Div. 2013) (holding lower court reasonably
26  imposed the "sanction of an adverse inference where "certain evidence may have existed, but was not
27  produced by defendant either because it was destroyed or withheld"); *People v. Martinez*, 276 A.D.2d

28

---

11

CLAIMANTS' APPLICATION FOR SANCTIONS AND FEES

Exhibit E

1  645, 645 (N.Y. App. Div. 2000) (holding the "granting of an adverse inference charge was a proper

2  sanction where the People were unable to produce" certain evidence).

3  **IV.**    **CONCLUSION**

4       Rarely is a record of litigation misconduct as brazen or clear as it is here, with no grounds at all

5  for mitigation.  Respondent simply does not care.  Despite expressly agreeing to arbitration before

6  JAMS, and despite filing its own counterclaim in this very forum, Respondent shows utter contempt for

7  the Arbitrator's Orders, and it is unabashed by its misappropriation, diversion, and unlawful conversion

8  of more than $400,000 of funds.  Indeed, it has never even tried to rebut that it has stolen the funds at

9  issue.

10      This is precisely what severe monetary sanctions are meant to address.  The JAMS rules (and the

11 parties, by their agreement to submit to those rules) contemplated every sort of misconduct committed

12 by Respondent here, and provide the Arbitrator with the broad discretion to issue severe sanctions, as set

13 forth herein.

14      For all of the foregoing reasons, those contained in the record, and as Claimants will further

15 demonstrate at the July 12 Hearing, Claimants respectfully submit that its Application for Sanctions and

16 Attorneys' Fees be granted.

17                                          Respectfully submitted,

18 Dated:  June 9, 2016                     GREENBERG TRAURIG, LLP

19

20                               By: _____

21                                   Attorneys for Claimants, RAVEN ASSET-BASED
                                     OPPORTUNITY FUND II LP and RAVEN ASSET-
22                                   BASED OPPORTUNITY FUND III LP

23

24

25

26

27

28

                                          12
                     CLAIMANTS' APPLICATION FOR SANCTIONS AND FEES

*LA 132607362v4*

Exhibit E

Exhibit F

Hon. Rosalyn Chapman (Ret.)
JAMS
555 West Fifth Street, 32nd Floor
Los Angeles, CA 90013
Tel: 213.253.9740
Fax: 213.620.0100
ARBITRATOR


## JAMS ARBITRATION
## JAMS CASE NO. 1220053540


| | |
|---|---|
| **Raven-Asset Based Opportunity Fund II LP and Raven-Asset Based Opportunity Fund III LP,** | ) ) ) ) |
| **Claimants,** | ) ) |
| **v.** | ) ) |
| **Green-Light International LLC,** | ) ) ) |
| **Respondent.** | ) ) |
| _____ | ) |


### ORDER GRANTING APPLICATION OF CLAIMANT RAVEN FUND II'S REQUEST
### FOR SANCTIONS


On June 9, 2016, Claimants filed an Application for Sanctions for Respondent's Misconduct and Contempt of the Arbitrator's TRO and Partial Final Award, Request for Attorneys' Fees (collectively, Application for Sanctions), and the supporting declarations of Mathew S. Rosengart with exhibits, Warren Goz with exhibits, and Gadi Wildstrom with exhibit. On June 23, 2016, Respondent filed its Opposition to Claimants' Application for Sanctions and the declaration of Jeff Elliott with exhibits in support of the Opposition. On June 30, 2016, Claimants filed their Reply Brief and the supplemental declaration of Warren Goz. On July 8, 2016, Respondent filed a Supplemental Opposition and the declaration of Gadi Wildstrom.

Oral argument was held before Arbitrator Hon. Rosalyn Chapman (Ret.) on July 12, 2016. Mathew S. Rosengart and Matthew Gershman, shareholders with the law firm Greenberg Traurig LLP, appeared on behalf of Claimants and John Burgee, a partner with the law firm Burgee & Abramoff, appeared on behalf of Respondent Green-Light International LLC (Respondent).

# I

## Relevant Procedural History

On May 10, 2016, the Arbitrator (sometimes referred to as Emergency Arbitrator) found that Respondent had breached Paragraphs 3(a)(ii) and 5(a) of the Inter-Party Agreement between Claimant Raven Asset-Based Fund II (Claimant Fund II) and Respondent (and others) as to the picture titled "Urge" (known as the Urge IPA), and granted Claimant Fund II's request for a Temporary Restraining Order (TRO). However, the Arbitrator did not find that Claimant Raven Asset-Based Fund III (Claimant Fund III) had shown Respondent breached the terms of the Inter-Party Agreement between it and Respondent (and others) as to the picture titled "Imperium" (known as the Imperium IPA), and thus denied Claimant Fund III's request for emergency or interim relief.

On May 11, 2016, the following TRO was issued as a separate document:

A.     Respondent shall transfer any and all receipts and revenues from foreign distributors in connection with the motion picture Urge (the "Urge Distributor Proceeds"), previously received or received hereafter, to a Temporary Collection Account to be established forthwith by counsel for both parties at a U.S. bank. The Temporary Collection Account shall require the signatures of counsel for both parties, as trustees, to access the Urge Distributor Proceeds and shall remain under the control of counsel until Freeway (Gadi Wildstrom) or, in the event Freeway declines to be the neutral third-party fiduciary, such other third-party neutral fiduciary as the parties may agree upon or the Arbitrator may select, shall hold custody of the funds. The Urge Distributor Proceeds shall be transferred by Respondent to the Temporary Collection Account as soon as the Temporary Collection Account is established by counsel. The parties shall cooperate fully with Freeway or such other neutral third-party fiduciary in executing any customary agreement to establish a neutral third-party's role as custodian of the Temporary Collection Account. Neither Claimant Fund II nor Respondent may directly access the Temporary Collection Account, which will remain *pendente lite*, pending further order of the Arbitrator.

B.  Respondent is enjoined and prohibited from spending or otherwise dissipating any of the Urge Distributor Proceeds, regardless of when received by Respondent.

C.  Respondent shall provide Claimant Fund II, no later than 48 hours from the issuance of

2

this Temporary Restraining Order, the following documentation regarding "Urge:"

    1. A list of all foreign distributors, including their names, addresses and contact information;

    2. Copies of all foreign distributor agreements; and

    3. All financial information relating to the distribution agreements, including invoices or statements to the distributors and receipts or payments from the distributors.

On May 12, 2016, the parties and Freeway established the Temporary Collection Account referenced in Paragraph A of the TRO, and Respondent was instructed on how to transfer the funds it held in its Chase account or elsewhere into the Temporary Collection Account. However, Respondent never transferred any funds into the Temporary Collection Account.

On June 2, 2016, following a noticed hearing, the Arbitrator issued a Partial Final Award in favor of Claimant Fund II. The Partial Final Award includes a Preliminary Injunction that contains the same provisions as the TRO and the following additional subsection to Paragraph C:

    4. Copies of all monthly financial statements from the Chase account, and other financial institutions, if any, showing the location(s) of Urge Distributor Proceeds from December 1, 2015, to the present. Financial information not pertaining to Urge Distributor Proceeds may be redacted from the financial statements.

## II
## Legal Standard

"The scope of the arbitrators' power rests ultimately on the agreement of the parties." *Lundgren v. Freeman*, 307 F.2d 104, 109-110 (9th Cir. 1962) (citations omitted). In other words, arbitrators have the powers the parties give them in the arbitration agreement. The Urge Inter-Party Agreement between Claimant Fund II and Respondent contains an arbitration provision, Paragraph 10(b), that provides "the arbitration shall be conducted in accordance with the [JAMS Comprehensive Arbitration] Rules" and, to the extent not otherwise covered by the Rules, in accordance with the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 et seq. *See, e.g., Greenspan v. Ladt, LLC*, 185 Cal. App. 4th 1413, 1438 (2010) ("The rules of a provider like JAMS may determine the scope of the arbitrator's powers."); *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 908-9 (9th Cir. 1986) (same). In addition to the parties' arbitration agreement, "[a] submission agreement may restrict or broaden the issues contemplated by the arbitration clause." *Greenspan*, 185 Cal. App. 4th at 1437.

In our case, the parties' submission to JAMS includes: (a) Claimants' request for emergency relief and the appointment of an Emergency Arbitrator under Rule 2(c); and (b) Claimants' Demand for Arbitration and Respondent's Response and Counterclaim, or the non-

emergency arbitration.  To date, however, only the Emergency Arbitrator (Judge Chapman) has been appointed and acted; the parties have not yet selected the arbitrator to conduct the non-emergency arbitration.

Rule 2(c)(iv) sets forth the specific duties of the Emergency Arbitrator, as follows:

The Emergency Arbitrator shall determine whether the Party seeking emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief and whether the requesting Party is entitled to such relief.  The Emergency Arbitrator shall enter an order or Award granting or denying the relief, as the case may be and stating the reasons therefor.

At all times, Respondent has accepted the authority of the Arbitrator to act under Rule 2(c). Respondent did not object to the Arbitrator when it appeared before her telephonically for a scheduling conference on May 2, 2016, or when it filed its Opposition to Claimants' Request for Emergency Relief.  *See* Scheduling Order.  Respondent has also accepted the application of the JAMS Rules to the arbitration.  Respondent filed a Response to the Demand for Arbitration and Counterclaim on May 17, 2016 – after the Arbitrator issued the TRO.

Pursuant to Rule 2(c)(iv), the Arbitrator issued a Partial Final Award granting mandatory and prohibitory injunctive relief in favor of Claimant Fund II and against Respondent.  *See, e.g., Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 937 (9th Cir. 2013) ("[A]n arbitrator generally has the authority to enter injunctive relief against a party that has entered into an arbitration agreement."); *Pacific Reinsurance Managem't Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022-23 (9th Cir. 1991) ("Temporary equitable relief in arbitration may be essential to preserve assets or enforce performance which, if not preserved or enforced, may render a final award meaningless.  However, if temporary equitable relief is to have any meaning, the relief must be enforceable at the time it is granted, not after an arbitrator's final decision on the merits.").

In the Ninth Circuit, "temporary equitable orders calculated to preserve assets or performance needed to make a potential final award meaningful … are final orders than can be reviewed for confirmation and enforcement by district courts under the FAA."  *Pacific Reinsurance Managem't Corp.*, 935 F.2d at 1023.  Thus, Claimant Fund II can seek confirmation and enforcement of the Partial Final Award in the courts.  However, the availability of judicial confirmation and enforcement of the Partial Final Award does not preclude Claimant Fund II from seeking sanctions against Respondent.

At the oral hearing, Claimant Fund II argued that arbitrators have the inherent authority or power to impose punitive sanctions stemming from a party's misconduct.  But that is not so.  The Minnesota Supreme Court, in surveying the authority of an arbitrator to impose punitive sanctions,

4

recently held:

> The arbitrator's ability to issue punitive sanctions is controlled by the arbitration agreement.  Therefore, parties are able to include or exclude the use of punitive sanctions when constructing an arbitration agreement, either through express provision or through the incorporation of a particular set of arbitration rules. … While courts possess inherent judicial powers that enable them to impose punitive sanctions, arbitrators have no correlating inherent authority and receive their powers from either the arbitration agreement, or the Legislature.

*Seagate Technology, LLC v. Western Digital Corp.*, 854 N.W.2d 750, 761 (2014) (citations and footnotes omitted); *see also Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 926, 944-45 (N.D. Cal. 2003) ("There is no clear grant of authority to impose mounting punitive sanctions equivalent to civil contempt in the Treaty herein even though the [arbitration] panel's grant of authority is generally broad.")

The Urge IPA is silent as to sanctions, and its reference in Paragraph 5(a) to attorneys' fees authorizes the award of attorneys' fees, but not as sanctions.  The Arbitrator determines, however, that her authority to sanction Respondent rests with the JAMS Rules, which the parties specifically incorporated into the Urge IPA. Sanctions are authorized by Rule 29, which provides:

> The Arbitrator may order appropriate sanctions *for failure of a Party to comply with* its obligations under any of these Rules or with *an order of the Arbitrator*.  These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees; exclusion of certain evidence; drawing adverse inferences; or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

(emphasis added).

### III
### Discussion

Claimants' Application for Sanctions seeks wide-ranging measures against Respondent: (a) monetary sanctions in the amount of "at least" $205,215.00 against Respondent and its principals, Jeff Elliott, Christian de Gallegos and Chad Moore; (b) attorneys' fees of "no less than $120,000" against Respondent; (c) dismissal of Respondent's counterclaim or, alternatively, suspension of the counterclaim until Respondent "fully complies with the Partial Final Award, and … pays its share of the JAMS fees and expenses"; and (d) drawing an adverse-inference sanction to the effect that "Respondent has dissipated the Urge funds that they stole. …"   Claimants'

Application for Sanctions (Application) at 7:4-12:2.  In their Reply, Claimants expand the list of sanctions they seek to include:  (e) an "Order directing Respondent and its principals to transfer the sum of $410,430.00 to the Freeway Temporary Collection Account"; (f) attorneys' fees and costs against Respondent and its principals; (g) an "Order and Finding that … Jeff Elliot has committed Perjury"; (h) an "Order and Finding holding Respondent and its principals in Contempt"; and (i) an "Order directing Respondent and its principals … to reimburse Claimants for all JAMS fees and costs associated with this matter."  Reply at 8:6-19.

Rule 29 allows the Arbitrator to award sanctions for the failure of a party to comply with his or her order.  Since the appointment of the Arbitrator is under Rule 2, as discussed above in Part I, the Arbitrator's power to award sanctions must be directly related to the Arbitrator's functions under Rule 2.  Thus, the Application for Sanctions properly focuses on Respondent's failure to comply with the TRO as the ground for sanctioning Respondent.

This means that only the party that obtained the TRO can seek sanctions against Respondent for not complying with its terms.  In this case, Claimant Fund II obtained the TRO; Claimant Fund III did not.  Thus, it is not proper for both Claimants to seek sanctions against Respondent, as appears from the Application for Sanctions.  (Nor is it proper for any references to be made to the Imperium IPA, which was the basis of Claimant Fund III's claims; Claimant Fund III did not obtain emergency relief.)

The primary purpose for awarding sanctions under Rule 29, in the context of "the failure of a Party to comply" with a TRO, is to reimburse the prevailing party by "assessment of … Arbitrator compensation and expenses; [and] any other costs *occasioned by the actionable conduct*, including reasonable attorneys' fees. …" (emphasis added).  In other words, sanctions should reimburse the party that obtained the TRO for the additional costs resulting from the disobedient party's failure to comply with the TRO.

Without a doubt, the most important provision in the TRO was Paragraph A, which required Respondent to transfer the foreign distributors' funds, totaling approximately $410,000, into the Temporary Collection Account or neutral depository established by the parties and Freeway. If Respondent had complied with Paragraph A of the TRO, Respondent's compliance with Paragraphs B and C of the TRO would have become moot or certainly less urgent, and the preliminary injunction hearing would have become less contested — or even uncontested.  In fact, the parties might have negotiated a stipulation to the entry of a preliminary injunction.  Most important, the foreign distributors' funds would have been preserved *pendente lite*.

Accordingly, the Arbitrator grants Claimant Fund II's request for sanctions pursuant to Rule 29, albeit in the form of attorneys' fees and costs; provided, such attorneys' fees and costs were incurred *subsequent* to the issuance of the TRO and were attendant to the preliminary

injunction (the Partial Final Award) and Application for Sanctions. The costs are the compensation of the Arbitrator for services post-TRO, i.e., in issuing the preliminary injunction (Partial Final Award) and addressing Claimants' Application for Sanctions.

At the oral hearing, Claimant Fund II strongly urged the Arbitrator to award substantial monetary sanctions against Respondent for flagrantly disobeying the TRO, arguing that such willful misconduct undermines the arbitration proceedings and should be punished. Although monetary sanctions are not set forth in Rule 29, it cannot be denied that the language of Rule 29 is broad enough to cover an award of monetary sanctions. Specifically, the Rule allows the Arbitrator to award sanctions that "*may include, but are not limited to*, assessment of … Arbitrator compensation and expenses; [and] assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees…." (emphasis added).

In its Application for Sanctions, Claimant Fund II seeks "at least" $205,215 or fifty percent of the outstanding foreign distributors' funds as sanctions. The Arbitrator finds this to be an excessive amount. Nevertheless, the Arbitrator is of the opinion that Respondent should be severely sanctioned for not complying with the TRO, and the attorneys' fees and costs discussed above will not be sufficiently severe. Determining the proper amount of monetary sanctions is always difficult, especially when sanctions should relate to the conduct being punished. Accordingly, the Arbitrator will set the amount of monetary sanctions to reflect a daily penalty of $3,000 per day for disobeying the TRO – running from the date the Temporary Collection Account was established (May 12th) to the date of the issuance of the Partial Final Award with the preliminary injunction (June 2nd). Sanctions for this twenty-one day period total $63,000.

Claimant Fund II requests that the monetary sanctions, including the attorneys' fees and costs awarded as sanctions, be awarded against Respondent *and* its principals. However, the focus of Rule 29 is the *party's* failure to comply with the Arbitrator's order. And Claimant Fund II has not cited any authority supporting its request for sanctions against Respondent's principals. *See, e.g., InterChem Asia 2000 Pte. Ltd. v. Oceana Petrochemicals AG*, 373 F. Supp. 2d 340, 358-59 (S.D. N.Y. 2005) (holding arbitrator has no authority under arbitration agreement and arbitration rules, and no inherent authority, to sanction attorney representing party). Moreover, the Urge IPA, which contains the arbitration provision and incorporates the JAMS Rules, was entered into by Respondent -- *not* its principals. Accordingly, the Arbitrator declines to sanction Respondent's principals.

Claimant Fund II's request for all other sanctions is denied. Some of the requests, if granted, would affect the parties' claims regarding the picture titled "Imperium," which was not the subject of the TRO; some of the requests relate to enforcement of the Partial Final Award, which is not properly before the Arbitrator; and still other requests do not stem from Respondent's failure to comply with the TRO, as required by Rule 29.

7

Lastly, the declarations submitted by Claimant Fund II in support of the Application for Sanctions do not provide evidence showing the amount of attorneys' fees and costs incurred by Claimant Fund II. And its request for attorneys' fees in the amount of $120,000 appears to include attorneys' fees related to the case as a whole, rather than attorneys' fees resulting solely from Respondent's failure to comply with the TRO. Accordingly, Claimant Fund II should be given the opportunity to present evidence showing the attorneys' fees and costs it incurred *subsequent* to the issuance of the TRO that were attendant to the preliminary injunction (the Partial Final Award) and the Application for Sanctions, and Respondent should be given the opportunity to object to Claimant's evidence, as set forth in the Order below.

## ORDER

Claimant Fund II's Application for Sanctions **IS GRANTED**, as follows**:**

(1) Respondent shall pay Claimant Fund II monetary sanctions in the amount of $63,000; and

(2) Respondent shall pay Claimant Fund II sanctions in the amount of attorneys' fees and costs incurred *subsequent* to the issuance of the TRO that are attendant to the preliminary injunction (the Partial Final Award) and the Application for Sanctions.

In order for the Arbitrator to determine the correct amount of attorneys' fees and costs to award as sanctions, Claimant Fund II shall provide documentary evidence supporting the proposed sanctions award, no later than July 20, 2016;

Respondent may file an Opposition or Objections to Claimant's evidence, if any, no later than July 27, 2016; and

Claimant may file a Reply, if any, no later than August 3, 2016.

After considering these documents, the Arbitrator will issue a Partial Final Award reflecting the findings and conclusions made in this Order, setting the amount of sanctions awarded as attorneys' fees and costs, and ordering payment of all sanctions by a date certain. Once the Partial Final Award issues, the Arbitrator's duties under Rule 2(c) will be completed and her role will cease.

July 13, 2016                          By: _____
                                            Hon. Rosalyn Chapman (Ret.), Arbitrator

8

Exhibit F

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Raven Asset-Based Opportunity Fund II LP, et al. vs. Green-Light International LLC
Reference No. 1220053540

I, Gregory Shackelford, not a party to the within action, hereby declare that on July 13, 2016, I served the attached ORDER GRANTING APPLICATION OF CLAIMANT RAVEN FUND II'S REQUEST FOR SANCTIONS on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Los Angeles, CALIFORNIA, addressed as follows:

Mathew Rosengart Esq.
Matthew R. Gershman Esq.
Greenberg Traurig LLP
1840 Century Park East
19th Floor
Los Angeles, CA   90067
Phone: 310-586-7700
rosengartm@gtlaw.com
gershmanm@gtlaw.com
    Parties Represented:
    Raven Asset-Based Opportunity Fund II LP
    Raven Asset-Based Opportunity Fund III LP

John G. Burgee Esq.
Burgee & Abramoff P.C.
20501 Ventura Blvd.
Suite 262
Woodland Hills, CA   91364
Phone: 818-264-7575
jburgee@bandalaw.net
    Parties Represented:
    Green-Light International LLC

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA on July 13, 2016.

Gregory Shackelford
gshackelford@jamsadr.com

Exhibit F