# EXHIBIT A

Hon. Rosalyn Chapman
JAMS
555 West Fifth Street, 32nd Floor
Los Angeles, CA 90013
Tel: 213.253.9740
Fax: 213.620.0100
ARBITRATOR

## JAMS ARBITRATION
## JAMS CASE NO. 1220053540

**Raven-Asset Based Opportunity** )
**Fund II LP and Raven-Asset Based** )
**Opportunity Fund III LP,** )
                                                   )
      **Claimants,** )
                                                   )
      v. )
                                                 )
**Green-Light International LLC,** )
                                               )
      **Respondent.** )
_____)

## PARTIAL FINAL AWARD
## GRANTING PRELIMINARY INJUNCTION

     On April 29, 2016, Claimant Raven-Asset Based Opportunity Fund II LP (Claimant Fund II) and Claimant Raven-Asset Based Opportunity Fund III LP (Claimant Fund III) (jointly, Claimants) concurrently filed a Demand for Arbitration against Respondent Green-light International LLC (Respondent) and also sent a letter to JAMS, with a copy to Respondent and its counsel, requesting the appointment of an Emergency Arbitrator under Rule 2(c) of the JAMS Comprehensive Arbitration Rules & Procedures (Rules). Pursuant to Claimants' request, JAMS appointed Hon. Rosalyn Chapman (Ret.) to act as Emergency Arbitrator (Emergency Arbitrator or Arbitrator).

1

The Arbitrator, having considered all documentary and testimonial evidence, and having made credibility determinations, applied the appropriate burdens of proof, and weighed the evidence, hereby issues the following Partial Final Award:

## I.

### Temporary Restraining Order; Preliminary Injunction Hearing

On May 3, 2015, Claimants filed a Notice of Application and an Application for a Temporary Restraining Order (TRO) and Issuance of an Order to Show Cause (OSC) Re: Preliminary Injunction; a supporting memorandum of points and authorities; and the supporting declarations of Messrs. Robert J. Sherman and Warren Goz (previously submitted on April 29, 2016). On May 6, 2016, Respondent filed a memorandum of points and authorities in Opposition to the Application and the opposing declaration of Jeff Elliott. And on May 9, 2016, Claimants filed a reply. Oral argument was held telephonically before the Arbitrator on May 10, 2016.

On May 11, 2016, the Arbitrator issued an Order Granting, in part, and Denying, in part, Claimants' Application for TRO and OSC Re: Preliminary Injunction (Order Granting TRO). The Arbitrator granted Claimant Fund II's request for emergency or interim relief as to its claim that Respondent had breached the terms of the Inter-party Agreement (IPA) between Claimant Fund II and Respondent (and others) as to the picture titled "Urge" (known as the Urge IPA), finding Respondent had breached Paragraphs 3(a)(ii) and 5(a), as discussed below. However, the Arbitrator denied Claimant Fund III's request for emergency or interim relief as to its claims that Respondent had breached the terms of the Inter-Agency Agreement (IPA) between Claimant Fund III and Respondent (and others) as to the picture titled "Imperium" (known as the Imperium IPA). On May 11, 2016, a TRO was issued against Respondent, as a separate document.

On May 16, 2016, Respondent filed its Response to the OSC Re: Preliminary Injunction and on May 23, 2016, Claimant Fund II filed its Reply in Support of Application for Preliminary Injunction, with the supporting declaration of Matthew R. Gershman, with exhibits, and the supplemental declaration of Warren Goz, with exhibits.

An evidentiary hearing on the OSC was held before the Arbitrator on May 26, 2016. Mathew S. Rosengart and Matthew R. Gershman, shareholders with the law firm Greenberg Traurig LLP, represented Claimant Fund II. Mr. Chad Moore, a partner in Respondent, appeared on behalf of Respondent, which was represented by John Burgee, a partner with the law firm Burgee & Abramoff. Oral testimony was taken under oath of Mr. Gadi Wildstrom.

## II.
## Procedural History and Pleadings

### A. Scheduling Conference.

On May 2, 2016, the Arbitrator held a scheduling conference, determined that the letter dated April 29, 2016 to JAMS constituted the Notice required by Rule 2(c)(i), and issued a scheduling order. On May 2, 2016, the Arbitrator ordered Claimants to file an Amended Demand for Arbitration that complied with Rule 9(b).

### B. Amended Demand for Arbitration.

Claimants filed their Amended Demand for Arbitration (ADA) on May 3, 2016. The ADA raises four causes of action against Respondent: (1) declaratory relief as to the rights and duties of the parties under the Inter-Party Agreements entered into between Claimants and Respondent (and others) dated November 12, 2015, and September 28, 2015, regarding the motion pictures titled "Urge" and "Imperium," respectively (collectively, IPAs); (2) breach of contract; (3) breach of fiduciary duties; and (4) failure to provide a full accounting.

Common to all causes of action, Claimants make the following allegations in the ADA: "Claimants loaned money for the ongoing productions of the Urge and Imperium films, and ... Respondent acted as a sales agent to secure distribution deals for those films in various territories around the world." (ADA ¶ 5). "Respondent expressly agreed that it would direct all of the distributors to pay those funds directly into a specifically identified 'Control Account' for each film, which account is maintained at East West Bank and administered by a neutral third party." (Id. ¶ 7). Respondent also agreed that it "had no security interest in the distributor proceeds, ... to subordinate all of its interest in those funds to Claimants' interests[,]" and to waive all rights of offset and deduction and to set up reserves. (Id. ¶¶ 8-9).

Claimants recently learned that "Respondent had wrongfully instructed various distributors to pay funds under the distributor agreements *to Respondent* instead of to the Collection Account. ..." (Id. ¶ 19 (emphasis in original)). Claimants also have learned that the following distributors remitted funds to Respondent's personal bank account at JP Morgan Chase (Chase account), rather than the Urge Collection Account: a distributor named Falcon Films remitted $100,000; a distributor named Polarstar remitted $105,000; a distributor named Mis. Label remitted $100,000; and distributors named OctoArts and Tanweer Vision Pictures Ltd. remitted funds. (Id.).

In the IPAs, Respondent agreed "to timely provide Claimants (or Claimants' designee, including Sculptor Media, LLC ('Sculptor')) with certain information and documents regarding the marketing of the films. ..." (Id. ¶ 10). "On several occasions during the months of March and April 2016, Claimants' designee Sculptor asked Respondent for information due under the IPAs. ... Respondent did not produce the requested information." (Id. ¶ 11).

Respondent represented to Claimants' designee Sculptor that Respondent would be attending the Berlin Film Festival, and in reliance thereon, Claimants "approved funding for Respondent's marketing (and other) fees." (Id. ¶ 13). However, Claimants have learned that Respondent failed to attend the Berlin Film Festival. (Id. ¶ 14).

On April 25, 2016, Claimants "terminat[ed] Respondent as the sales agent and inform[ed] Respondent that all marketing and sales materials relating to the films ... should be forwarded to [Claimants' counsel]." (Id. ¶ 17). On April 27, 2016, "Respondent sent written notices of acceptance of its termination as sales agent ... [a]nd with respect to 'Urge' in particular, ... claimed it was holding the distributor funds ... to 'protect' the distributors. ..." (Id. ¶ 18).

Claimants seek the following relief on their claims: (1) a declaration that under the IPAs: (a) Respondent has no security interest in any of the proceeds payable in connection with the distribution agreements; (b) Respondent's interests in the distributor proceeds are subordinated to Claimants' interests; (c) Respondent waived all rights of offset and deduction; and (d) all distributor proceeds are required to be paid into the Collection Accounts; (2) damages; (3) an accounting; (4) a temporary restraining order and preliminary and permanent injunctions; (5) interest; (6) attorneys' fees and costs; (7) emergency relief under Rule 2(c); (8) a hearing; (9) application of expedited procedures under JAMS Rules 16.1 and 16.2; and (10) other just and proper relief.

### C. Response To Amended Demand for Arbitration and Counter-Claim.

On May 17, 2016, Respondent filed its Response to the ADA and a Counter-Claim (CC). Respondent generally denies all allegations and that Claimants have been injured and suffered damages, and raises the following affirmative defenses: (i) lack of consideration; (ii) failure of consideration; (iii) any losses were due to causes beyond the control of Respondent; (iv) all contractual obligations have been fulfilled, discharged, excused or rendered impossible; (v) estoppel; (vi) unclean hands; (vii) waiver of relief by virtue of termination and frustration of the contracts; (viii) Respondent has acted in good faith; (ix) Respondent exercised its business judgment; (x) failure to mitigate damages; (xi) any losses were due to Claimants' own intentional or negligent conduct and refusal to cooperate with Respondent; (xii) lack of standing to pursue claims; (xiii) lack of capacity to pursue claims; (xiv) failure to join necessary parties; (xv) indispensable parties cannot be joined; and (xvi) remedies sought are beyond those available through arbitration. (CC ¶¶ 2-17).

Respondent's Counter-Claim raises causes of action: (a) breach of contract, based on wrongful termination as sales agent for Imperium picture; (b) breach of contract, based on wrongful termination as sales agent for the Urge picture; (c) breach of contract, based on failure to support marketing efforts and hiring other sales agents, among other things; (d) breach of

contract, based on failure to pay amounts due, including fees and commissions, among other things; (e) interference with business relationships; (f) defamation; (g) declaratory relief as to who should retain foreign distributors' funds until third party claims are resolved; and (h) declaratory relief as to Respondent's obligations under the foreign distribution agreements. (Id. ¶¶ 28-35).

Common to all claims, Respondent alleges: Respondent was retained in August 2015, as the foreign sales agent on the Imperium picture and, as such, entered into a Sales Agency Agreement with the third party producer, TDSD, and an IPA with TDSD, Claimant Fund III and Prosight Syndicate 1110 at Lloyd's of London, which was the production completion guarantor. (Id. ¶ 20). Respondent was retained in November 2015, as the foreign sales agent on the Urge picture and, as such, entered into a Sales Agency Agreement with the third party producer, Urge Productions LLC, and an IPA with Urge Productions LLC and Claimant Fund II. (Id. ¶ 21). At some point, Urge Productions LLC was taken over by Claimants' manager. (Id.). There is no production completion guarantor for the Urge picture. (Id.).

Although Respondent was performing its duties as exclusive sales agent, Claimants hired a competing sales agent in February 2016 to represent the Imperium picture, which resulted in confusion and loss of sales. (Id. ¶ 23). In April 2016, Claimants terminated Respondent as sales agent on both the Imperium and Urge pictures. (Id. ¶ 24). In connection with terminating Respondent, Claimants contacted foreign distributors with whom Respondent had established business relationships and wrongly and falsely disparaged Respondent and its personnel, thus harming Respondent's reputation and ability to conduct business. (Id. ¶ 25).

Claimants have breached agreements with Respondent by failing to pay amounts due under marketing budgets and also failing to support marketing efforts, which hampered sales of the pictures. (Id. ¶ 26). Additionally, Claimants have breached delivery requirements for the Urge picture, resulting in distributors seeking to rescind distribution agreements and demanding the return of deposits. (Id. ¶ 27).

Respondent seeks monetary damages (commissions due, commissions that would have been earned, marketing budgets, producing fees, reimbursements and injuries to reputation and interference with business relationships); an order allowing Respondent to retain the deposits from foreign distributors in trust until any claims are resolved; and an order requiring Claimants to assume the distribution contracts and indemnify Respondent from past and future breaches by Claimants or their new sales agent. (Id. ¶¶ 36-38).

//

### III.
### Arbitrability of Claims

The Urge IPA contains the following arbitration provision in Paragraph 10(b):

> (b) <u>Non-Delivery Disputes.</u> All controversies, claims, disputes, or counterclaims between the parties hereto concerning, based in any way upon, arising under, relating to, or arising in connection with the Picture, this Agreement, or any resulting transaction, including but not limited to, their respective obligations hereunder, payment of the Distribution Proceeds (other than a dispute concerning Delivery, which shall be resolved in accordance with the procedures specified in Paragraph [11(a) [sic] hereof), a disagreement about the meaning, interpretation, application performance, breach, termination, enforceability, or validity of this Agreement, and whether based on statute, tort, contract, common law or otherwise, shall be subject to and resolved by binding arbitration conducted under the auspices of the Arbitration Rules.

The Arbitrator determines that the claims or causes of action raised by Claimant Fund II in the ADA, as well as the claims or causes of action raised by Respondent in the Counter-Claim, are arbitrable under Paragraph 10(b) of the Urge IPA.

### IV.
### Applicable Law and Rules.

Paragraph 10(b) of the Urge IPA further provides the rules and law governing arbitrations:

> All such arbitration proceedings shall be conducted in accordance with the [Arbitration] rules. To the extent not otherwise covered by the Rules, the arbitration shall be conducted in accordance with Title 9 of the U.S. Code [the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq.]. ... The award issued by the arbitrator in any arbitration proceeding may be enforced in the courts of the Superior Court for the County of Los Angeles or the United States District Court for the Central District of California or any courts having personal jurisdiction over any of the parties, and the parties waive any and all objections to personal jurisdiction in such case which they may otherwise have. ...

Additionally, Paragraph 10(c) of the Urge IPA provides that "[e]ach party agrees to abide by the award rendered in any arbitration pursuant hereto, and agrees that a judgment of a court having jurisdiction may be entered upon the award." Finally, Paragraph 17 of the Urge IPA states, in part:

> <u>17. Governing Law; Jurisdiction.</u> This Agreement ... and the rights and obligations of the parties hereto shall be governed and construed and enforced in accordance with the laws of the State of New York without reference to principles regarding the conflict or

choice of law. Any matter arising under this Agreement or any other document provided for herein (subject to the arbitration provisions hereof and in the Notices of Assignment with each Distributor) and including, without limitation, any suit to enforce an award under the arbitration provisions hereof, may be finally adjudged or determined in any court or courts of the State of California or in the federal courts of the United States for the Central District of California. ... Lender may, at its option, bring suit or institute other judicial proceedings against any party hereto or any of their respective assets in any state or federal court of the United States or in any court of any country or place where such party or such assets may be found.

## V.
### Factual Findings

Claimant Fund II makes loans to borrowers, including borrowers in the motion picture production and distribution industries. (Declaration of Robert J. Sherman (Sherman Declaration (Decl.)) ¶ 2). Claimant Fund II made a secured "finishing loan" in the original principal amount of approximately $5 million to fund a portion of the production costs of a motion picture titled "Urge." (Id. ¶ 3). The Urge loan was "identified, underwritten and originated ... with the assistance of Sculptor Media LLC ('Sculptor') and its principal, Warren T. Goz." (Id. ¶ 5).

Claimants structured the Urge loan as project financing, which means the loan was underwritten, in part, on the value of "pre-sales" and existing sales of domestic and foreign territorial distribution rights for each film. (Sherman Decl. ¶ 6). Such secured debt financing is generally structured by "the borrower/producer engag[ing] a foreign sales agent to provide estimates for the territorial sales/licensing value for the particular motion picture and to act as its sales agent in the sale and/or licensing of such foreign territorial distribution rights. ..." (Id. ¶ 7).

Each distributor "customarily pays a deposit upon execution of its distribution agreement (from 10 to 20% of the agreed upon 'minimum guaranty' distribution or license fee) and agrees that it will pay the remainder of the 'minimum guaranty' amount upon delivery of the motion picture to it. ..." (Id. ¶ 7). If a completion guaranty is issued, it provides protection that "the motion picture will be completed and timely delivered to distributors whose payment obligations with respect to the remaining 'minimum guaranty" are triggered by such delivery." (Id.).

In November 2015, Claimant Fund II engaged Respondent as the foreign sales agent on Urge. (Declaration of Jeff Elliott (Elliott Declaration (Decl.)) ¶ 8). As sales agent, Respondent entered into the Urge IPA with Claimant Fund II and the third-party producer, Urge Productions, LLC. (Sherman Decl. ¶ 12, Exh. A). Additionally, Respondent entered into a Sales Agency Agreement with producer Urge Productions, LLC. (Elliott Decl. ¶ 8, Exh. A). Respondent pre-approved Freeway Entertainment KFT (Freeway) to act as the collection manager for the Collection Account on Urge. (Id., Exh. A ¶ 10). Mr. Gadi Wildstrom is the founder of, and partner in, Freeway, which is a Dutch entity with its principal place of business in Bucharest,

Hungary. (May 26, 2016 Testimony of Gadi Wildstrom (hereafter Wildstrom Testimony)).

Respondent did not enter into a CAMA with Claimant Fund II and others to govern the Collection Account on Urge. (Elliott Decl. ¶ 10). Nevertheless, it is the custom and practice in the independent film industry for sales agents to remit receipts from foreign distributors to the Collection Account prior to the finalization of a CAMA on the Collection Account. (Testimony of Gadi Wildstrom). Such finalization often takes months, as it requires signatories on behalf of various entertainment-related guilds. (Id.).

Freeway established a bank account at East West Bank (original East West account) to be the Collection Account under the Urge IPA, and Mr. Wildstrom intended to act as a neutral fiduciary on that Collection Account. (Id.). However, Respondent has not accepted the original East West account as the Collection Account under the Urge IPA or the Sales Agency Agreement, contending Claimant Fund II could freely access the funds if deposited into that account. Mr. Wildstrom denies this, and the Arbitrator accepts his statement as credible.

Respondent solicited foreign distributors, entered into distribution or licensing agreements with them, and did not remit those receipts into the Collection Account. (Elliott Decl. ¶ 12). In fact, Respondent directed the foreign distributors it solicited to remit receipts to its personal Chase account, and the distributors did as directed. (Declaration of Warren Goz filed April 29, 2016 (Goz Declaration (Decl.)) ¶¶ 13-14, Exhs. G-L). So far, Claimant Fund II has obtained copies of wire transfers and other documents showing foreign distributors of the Urge picture have remitted the following receipts have to Respondent's personal Chase account:
- On January 15, 2016, distributor Polarstar (Uruguay) remitted payment in the amount of $35,000, and on March 10, 2016, remitted payment in the amount of $70,000, for a total amount of $105,000;
- On or about February 22, 2016, distributor Mis. Label (Scandinavia) remitted payment in the amount of $100,000;
- On March 22, 2016, distributor OctoArts (Philippines) remitted payment in the amount of $12,000;
- On or about March 8, 2016, distributor Transmission Films TPY Ltd (Australia/New Zealand) remitted payment in the amount of $19,000; and
- On or about March 28, 2016, distributor Tanweer (Malaysia) remitted payment in the amount of $9,600; and
- On April 20, 2016, distributor Falcon Films (Middle East) remitted payment in the amount of $100,000.

(Goz Decl. ¶¶ 14-19, Exhs. G-L). Respondent entered into distribution agreements with the following additional distributors on the Urge picture:

8

- On or about January 14, 2016, distributor Lanterna de Pedra Filmes (Portugal) entered into a distribution agreement in the amount of $15,000;
- On or about April 14, 2016, distributor ACE Entertainment Films UK SARL (France) entered into a distribution agreement in the amount of $25,000; and
- On or about April 18, 2016, distributor Fine Films (Japan) entered into a distribution agreement in the amount of $25,000.

(Gershman Declaration (Gershman Declaration (Decl.)) ¶ 6, Exh. E). In its invoice to Claimants, Respondent acknowledges distribution agreements on Urge totaling $390,000 (Goz Decl. ¶ 20, Exh. M), and at the hearing on the OSC, Respondent produced a document acknowledging distribution agreements on Urge totaling $410,430.

On April 25, 2016, Claimant Fund II sent a letter to Respondent terminating Respondent as sales agent on the Urge picture. (Goz Decl. ¶ 12, Exhs. E & F). On April 27, 2016, Respondent acknowledged it had received the termination letters. (Sherman Decl. ¶ 21, Exhs. D & E).

On or about April 25, 2016, Claimants hired EVP – International Sales and Distribution Inception Film Partners ("Inception") as their new sales agent on the Imperium and Urge films. (Sherman Decl. ¶ 22, Exh. G-3).

## VI.
## Breach of Contract

Claimant Fund II asserts that Respondent has breached the provisions of Paragraphs 3(a)(ii) and 5(a) of the Urge IPA, which require Respondent as sales agent to remit receipts from the foreign distributors to the Collection Account and to "use its reasonable best efforts" to cause the distributors to deposit their receipts into the Collection Account.

The establishment of the Collection Account is governed by Paragraph 2 of the Urge IPA, which provides that the Collection Account is managed by a third-party, neutral fiduciary who takes directions from the parties pursuant to a CAMA that directs how the proceeds should be distributed. Paragraph 10 of the Sales Agency Agreement entered into by Respondent and Urge Productions LLC, the producer, requires that "the parties shall negotiate in good faith" the terms of a CAMA and utilize a collection agent to administer the CAMA. The parties, including Respondent, pre-approved Freeway as the collection agent, pursuant to Paragraph 10. Ultimately, the fiduciary (Freeway) is responsible for distributing the funds in the Collection Account, as set forth in Paragraph 4 of the Urge IPA.

9

Paragraph 3 of the Urge IPA provides that Respondent agrees to remit the distributors' receipts to the Collection Account and to "use its reasonable best efforts to cause" the distributors to pay the receipts into the Collection Account:

> **3. Acceptance and Acknowledgment.** Sales Agent hereby covenants and agrees for the benefit of the Lender only that: (a) ...(ii) To remit any Lender's Assigned Receipts received by Sales Agent, and to use its reasonable best efforts to cause the Distributors to pay the Lender's Assigned Receipts, to the Collection Account provided herein[.]

(Sherman Decl. ¶12, Exh. A). Paragraph 2 affords a notice of assignment of rights to Claimant Fund II, gives Respondent such notice, and provides for the establishment of the Collection Account to be governed by the CAMA.[1]

Paragraph 5(a) requires Respondent to remit all receipts to the Collection Account:

> **5. Payments to Lender and Rights of Offset.**
> (a) <u>Remittal of Assigned Receipts.</u> Notwithstanding anything to the contrary contained in ... the Sales Agency agreement or otherwise with respect to the Picture, subject to the arbitration provisions set forth in Paragraph 11 [sic] below, Sales Agent agrees that it shall remit all Lender's Assigned Receipts to the Collection Account promptly upon receipt thereof as herein provided, without

---

[1] Paragraph 2 provides:

**2. Notice of Assignment.**
(a)(i) Pursuant to the Loan Documents, Borrower and certain third parties have irrevocably collaterally assigned to Lender and have irrevocably granted to Lender a security interest in and to the Lender Collateral, including without limitation, all of Borrower's, Borrower's and such third parties' respective right, title and interest in and to the Picture and all elements thereof, and all proceeds of the Lender Collateral including, without limitation, all amounts payable to Borrower under the Sales Agency Agreement or otherwise.
(b) Borrower hereby:
(i)
(A) Notifies Sales Agent of the security interest and assignment described in Paragraph 2(a)(i) above;
(B) Borrower hereby authorizes, directs and instructs Sales Agent to remit any Lender's Assigned Receipts received by Sales Agent, and to use Sales Agent's reasonable best efforts to cause the Distributors to pay all Lender's Assigned Receipts to the following Collection Account at East West Bank Account Name: Stichting Freeway Custody ... for further disbursement pursuant to that certain collection account management agreement, collection account management agreement or any other similar instrument ("CAMA") to be entered into by and among Sales Agent, Borrower, Lender and the collection account manager, among others[.]

(Sherman Decl. ¶12, Exh. A).

offsets, deductions, counterclaims or defenses which Sales Agent may have or claim against Borrower or any other Person pursuant to the Sales Agency Agreement or otherwise, all of which are expressly reserved by Sales Agent against Borrower and any other Person, but only to the extent that the exercise of such rights does not derogate from Lender's rights to receive payment of Lender's Assigned Receipts (or any portion thereof) hereunder. ...

(Sherman Decl. ¶ 12, Exh. A).

As set forth in Part V above, Respondent has not remitted the receipts it received from foreign producers on Urge into the original Collection Account established by Freeway and, in fact, directed the foreign distributors to remit their receipts to Respondent's personal Chase account. Additionally, despite pre-approving Freeway as the neutral fiduciary on the original Collection Account, Respondent has not entered into a CAMA directing the distribution of funds in the Collection Account -- and has not offered any explanation for its failure to do so. Thus, the Arbitrator determines that Respondent has breached Paragraphs 3(a)(ii) and 5(a) of the Urge IPA.

Respondent offers two separate and distinct defenses or explanations why it has not remitted the receipts from the foreign distributors to the Collection Account, as required by the Urge IPA. First, Respondent claims that it must protect the foreign distributors with whom it has signed distribution agreements in the event the Urge picture is not delivered as Urge is an "unbonded film" without a CAMA. *See* Sherman Decl. ¶ 21, Exh. D; *see also* Goz Decl. ¶ 20, Exh. M ("[W]e have collected and are holding certain URGE deposits in an attempt to protect our buyers from your constant unnecessary and unwarranted rule changes on both films, especially un-bonded and no CAMA URGE.").

According to Respondent, Claimants have breached the delivery requirements for Urge:

Claimants, who have effectively taken over Urge, are in breach of delivery requirements for that picture. Although part of [Respondent's] duties as sales agent was to effect delivery of the picture to foreign distributors, since [it] has been terminated it no longer has control over delivery to ensure that Claimants comply with the delivery requirements. In this regard, Claimants are already in breach in failing to deliver "Key Art". Foreign distributors therefore have the ability to declare a default under the distribution agreements and demand that any deposit that they have paid be returned. Since [Respondent] signed the distribution agreements with the distributors, [Respondent] is concerned that it is potentially liable to the foreign distributors. ...

(Elliott Decl. ¶ 23).

11

However, Mr. Goz, who is now the producer on Urge, avers that "no foreign distributors have issued a notice of delivery default to Claimants or the licensor, and no foreign distributor has made any demands to Claimants or the licensor for refunds." (Declaration of Warren Goz filed May 23, 2016 (Goz Supplemental Declaration (Supp. Decl.))) ¶ 2). Moreover, Mr. Wildstrom testified that the custom and practice in the independent film industry is to remit foreign distributors' receipts into the Collection Account even without a CAMA existing for the Collection Account. And further, as Claimant Fund II aptly notes, citing various sections in Third Restatement of Agency, Respondent has been acting solely as Claimant Fund II's *agent* – not as the licensor or the principal who is responsible for compliance with the terms of the distribution agreements. Thus, the Arbitrator determines this defense by Respondent is without merit, being based solely on speculation.

Second, Respondent asserts Claimants owe it commissions and fees for services rendered as the sales agent on the Imperium and Urge pictures. To support this claim, Respondent relies on Paragraph 3(a)(v) of the Urge IPA and Paragraph 11 of the Sales Agency Agreement, which provide that Respondent "is entitled to be paid half of its sales commissions and all of its marketing expenses before any money is paid to Claimants." (Oppo. at 3:20-21).[2]

However, as to the Urge picture, Respondent's invoice lists its fees in the total amount of

---

[2] Paragraph 11 of the Sales Agency Agreement provides, in part:

> **11. Gross Receipts:** ... Sales Agent and Licensor agree that all Gross Receipts shall be disbursed in accordance with the following schedule:
> a. First, any foreign taxes or withholding costs, bank charges, costs to convert proceeds in U.S. dollars, and/or other similar expenses shall be paid from the Gross Receipts;
> b. Second, the Collection Agent shall be entitled to recoup its costs to set up the Collection Account ... , in addition to its customary fees and expenses in connection with the operation of the Collection Account and the calculation and disbursement of the proceeds in accordance with this Agreement;
> c. Third, Sales Agent for the Sales Fee (non-deferred portion) and Service Fee (non-deferred portion);
> d. Fourth, Sales Agent for the (i) Market Attendance and Sales Expenses Fee; and (ii) Delivery Costs (if any);
> e. Fifth, to the senior lender until recoupment of the senior loan ...;
> f. Sixth, Sales Agent for the Deferred Sales Fee and Deferred Service Fee;
> g. Seventh, Sales Agent for the Event Costs (if any), legal Costs (if any) and Audit Costs (if any); and
> h. Eighth, all remaining Gross Receipts shall be paid in accordance with the CAMA.

(Elliott Decl. ¶ 8, Exh. A).

12

$133,850 for: Marketing fees -- $20,000; foreign sales commission (10% of $390,000) -- $39,000; fortitude servicing fee (5% of $1.7 million) -- $54,850; and legal fees -- $20,000. (Goz Decl. ¶ 20, Exh. M). This amount is substantially *less* than the amount of the receipts from foreign distributors Respondent has wrongfully failed to remit to the Collection Account -- $410,000. Thus, there also is no merit to the defense that Respondent is merely withholding fees and commissions owed to it by Claimant Fund II.

Further, Respondent's reliance on Paragraph 3(a)(v) of the Urge IPA and Paragraph 11 of the Sales Agency Agreement is misplaced. Paragraph 3(a)(v) of the Urge IPA provides:

> **3. Acceptance and Acknowledgment.** Sales Agent hereby covenants and agrees *for the benefit of the Lender only* that: (a) … (v) *Notwithstanding anything to the contrary in the Sales Agency Agreement …, except for the fees set forth below* in this Section 3(a)(v) …, the payment of any sales fees, commissions, distribution and marketing costs incurred by and payable or reimbursable to Sales Agency … in connection with the Picture *shall be deferred* … until the obligations have been indefeasibly satisfied and paid in full and all of Lender's obligations under the Loan Agreement have terminated:
>
> (A) fifty percent (50%) of the "Sales Fee" and "Service Fee" …; and
> (B) one hundred percent (100%) of the "Market Attendance and Sales Expenses Fee" and "Delivery Costs" … shall be payable prior to the Obligations.

(Sherman Decl. ¶ 12, Exh. A (emphasis added)). Additionally, Paragraph 1(b)(iv) of the Urge IPA provides that the sales agent (Respondent) has no right to any security interest; Paragraph 5(a) of the Urge IPA provides that the sales agent (Respondent) has no rights to offset, deduction or to set up a reserve; and Paragraph 6(a) of the Urge IPA is an acknowledgment by Respondent as sales agent that Claimant has a first priority lien and security interest in its collateral, including any proceeds from Urge.

It is not necessary, at this time, for the Arbitrator to address these defenses, which will be considered fully at the hearing on the merits of the ADA and Counter-Claim. It is enough for the Arbitrator to conclude that, at this stage of the proceedings, Claimant Fund II has shown that it is more likely than not that it will prevail on its claim that Respondent has breached its obligations under Paragraphs 3(a)(ii) and 5(a) of the Urge IPA.

## VII.
## Injunctive Relief

### A. Legal Standard.

JAMS Rules address emergency or interim relief in two contexts. As to emergency relief under Rule 2 proceedings, Rule 2(iv) provides:

13

> The Emergency Arbitrator shall determine whether the Party seeking emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief and whether the requesting Party is entitled to such relief. The Emergency Arbitrator shall enter an order or Award granting or denying the relief, as the case may be, and stating the reasons therefor.

As to interim relief under other, non-emergency arbitration proceedings, Rule 24(e) provides:

> <u>Interim Measures.</u> The Arbitrator may grant whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods. Such interim measures may take the form of an interim or Partial Final Award, and the Arbitrator may require security for the costs of such measures. …

Applying general principles of statutory construction, where there are applicable specific contract provisions, those provisions govern over general provisions; thus, Rule 2 will govern over Rule 24(e), if it specifically addresses our proceedings for emergency relief. Thus, pursuant to Rule 2(iv), the Arbitrator will determine whether (i) "immediate and irreparable loss or damage will result in the absence of emergency relief" and (ii) "whether the requesting Party is entitled to such relief."

This dual standard is not unlike the standard governing the granting of injunctive relief under California law, which requires that "[t]rial courts should evaluate two interrelated factors when deciding whether or not to issue a [TRO or] preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." *IT Corp. v. Cnty. of Imperial*, 35 Cal.3d 63, 69 (1983); *Hunt v. Superior Court*, 21 Cal.4th 984, 999 (1999); *see also Butt v. State of Cal.*, 4 Cal.4th 668, 678 (1992) ("The trial court's determination must be guided by a 'mix' of the potential-merit and interim harm factors, the greater the plaintiff's showing on one, the less must be shown on the other to support a preliminary injunction.… ).

**B. Relief.**

When issuing the TRO, the Arbitrator determined:

> Claimants have shown that Respondent has not complied with the terms of the Urge IPA requiring it to remit receipts from distributors, and to use its best reasonable efforts to have the foreign distributors remit the receipts, to the Collection Account. … In turn, Respondent has shown that there is no Collection Account meeting the requirements under the IPA, i.e. governed by the terms of a CAMA. Under the Sales Agency Agreement, however, Respondent promised to "negotiate in good faith" the CAMA and

14

> pre-approved Freeway as the collection agent. Yet, Respondent offers no explanation as to why it did not enter into a CAMA and establish a Collection Account.
>
> Despite the lack of a Collection Account, with a CAMA governing its administration, Respondent nonetheless solicited foreign distributors, entered into distribution or licensing agreements with the distributors, and directed the distributors to remit the receipts to Respondent's Chase account, which is not an account administered by a neutral fiduciary subject to the parties' mutual direction. Thus, Claimant Fund II has made a prima facie showing that Respondent breached its obligations under Paragraphs 3(a)(ii) and 5(a) of the Urge IPA and it is entitled to relief.
>
> Considering the nature of the movie production loan on Urge, and balancing the equities on each side, the Arbitrator determines that Claimant Fund II's request for injunctive relief should be granted to preserve the *status quo*. The evidence shows that, to date, approximately $390,000 in receipts from foreign distributors have been paid into Respondent's Chase account, which Respondent may access; but neither Claimant Fund II nor a neutral fiduciary can reach. As these funds are vital for Claimant Fund II to recoup its investment in Urge, Claimants will suffer immediate and irreparable loss if the funds disappear. Thus, injunctive relief should be awarded to prevent Respondent from dissipating receipts from distributors in the Chase account and to maintain the *status quo* pending the arbitration. Further, it is prudent to order Respondent to transfer the receipts from distributors in the Chase account to some sort of neutral receiver or depository *pendente lite*. Of course, the neutral depository could be a Collection Account governed by a CAMA and managed by a neutral fiduciary, such as Freeway, if the parties can reach agreement on the terms of the CAMA and the neutral fiduciary. Otherwise, the Arbitrator can appoint a receiver for the funds, who would take directions from the Arbitrator.

(Order Granting TRO at 16).

Subsequent to the TRO being issued, "Freeway agreed to setup and manage the Temporary Collection Account mandated by the Arbitrator's TRO and Claimant's counsel John Burgee's agreement, and to hold the funds deposited therein until further order of the Arbitrator." (Gershman Decl. ¶ 2). Accordingly, Freeway has established "the Temporary Collection Account ... pursuant to the Arbitrator's TRO," and Claimant Fund II's counsel relayed this information to Respondent's counsel along with "wire instructions for Respondent to transfer the funds into the Temporary Collection Account pursuant to the TRO." (Id.). Mr. Wildstrom confirmed that the Temporary Collection Account has existed since May 12, 2016, and that he, as manager of the Temporary Collection Account, will not disburse funds to anyone without written authority from the Arbitrator or a court. (Wildstrom Testimony). However, as of May

26, 2016, Respondent has not transferred any funds into the Temporary Collection Account. (Id.).

It appears that Respondent has not complied with the provisions of the TRO and placed the disputed funds into the Temporary Collection Account, a neutral depository under the control of a third party fiduciary. Rather, the disputed funds remain under Respondent's exclusive control. Moreover, Respondent has not provided an accounting of the disputed funds or disclosed their current location. The purpose of the TRO to maintain the *status quo* remains unfulfilled. Accordingly, the Arbitrator's rationale behind issuing the TRO continues to apply and a Preliminary Injunction should issue to maintain the *status quo* pending the outcome of the arbitration.

To assure that the Preliminary Injunction is effective, Respondent must disclose whether it has spent or otherwise dissipated any receipts from foreign distributors on Urge and must disclose the current location of the disputed funds. Thus, Respondent will be ordered to provide financial statements to Claimant Fund II showing the amount of receipts from foreign distributors since December 2015, and the current location(s) of such receipts; however, Respondent will be allowed to redact financial information unrelated to the Urge proceeds.

### C. Bond.

Respondent claims a bond is mandatory to support any injunctive relief under California Code of Civil Procedure Section 529(a).[3] (Opposition to Application at 7:7-13). Respondent requests that a bond in the amount of $750,000 should be undertaken in order to cover its "prospective damages," which Respondent argues exceed $570,000 plus interest and attorney's fees. (Id. at 7:9-13). On the other hand, Claimant Fund II asserts there is no bond requirement under Rule 2 and, in any event, it is Respondent who should post a bond in the event Claimant Fund II's request for emergency relief is not granted. (Reply at 7:12-23).

It is true that Rule 2 is silent regarding the posting of a bond or security in an emergency arbitration when injunctive relief is awarded; thus, there is no specific JAMS provision applicable to our proceeding. However, Rule 24(e) generally provides: "An arbitrator may grant whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property. … Such measures may take the form of a[] Partial

---

[3] California Code of Civil Procedure Section 529(a) provides, in part:

> On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding the amount to be specified, the party may sustain the reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction.

Cal. Civ. Pro. Code § 529(a).

16

**16**

Final Award, and the Arbitrator may require security for the costs of such measures." As such, Rule 24(e) applies to the issuance of the Partial Final Award.

Under Rule 24(e), the granting of a request for a bond is discretionary with the Arbitrator. At the hearing on the OSC, Claimant Fund II argued persuasively that requiring a bond as security for an injunction designed to prohibit the dissipation of funds that all along should have been in a secure, neutral depository (not accessible to either party) turns the purposes behind requiring a surety upside down. The Arbitrator agrees. Placing the money in a secure, neutral depository, which is similar to an escrow account, is all the insurance the parties need. Moreover, the amount of bond requested by Respondent has no relationship to the nature of the injunctive relief awarded; rather, it reflects the parties' disputes under the Amended Demand for Arbitration and Counter-Claim, which include the Imperium picture and are much broader than the subject of the injunctive relief – the Urge IPA. Thus, Respondent's request for a bond is denied.

**THE FOLLOWING PARTIAL FINAL AWARD SHALL ISSUE GRANTING CLAIMANT RAVEN-ASSET BASED OPPORTUNITY FUND II'S REQUEST FOR A PRELIMINARY INJUNCTION AGAINST RESPONDENT GREEN-LIGHT INTERNATIONAL LLC:**

    A. Respondent Green-light International LLC shall immediately transfer any and all receipts and revenues from foreign distributors in connection with the motion picture Urge (the Urge Distributor Proceeds), previously received or received hereafter, to the Temporary Collection Account (beneficiary name "Stichting Freeway Custody – Temporary Urge Deposits") which Freeway Entertainment KFT has established at East West Bank and which Freeway will manage. Neither Claimant Raven-Asset Based Opportunity Fund II nor Respondent Green-light International LLC may directly access the Temporary Collection Account, which will remain intact pending further order of the JAMS Arbitrator or a court of competent jurisdiction.

    B. Respondent Green-light International LLC is enjoined and prohibited from accessing, spending, using, transferring, dissipating or otherwise appropriating any of the Urge Distributor Proceeds, regardless of when Respondent received or will receive such Urge Distributor Proceeds, except as set forth in Paragraph A herein.

    C. Respondent Green-light shall immediately, if not already performed, provide Claimant Fund II with the following information:
        1. A list of all foreign distributors, including their names, addresses and contact information;

17

2. Copies of all foreign distributor agreements;

3. All financial information relating to the distribution agreements, including invoices or statements to the distributors and receipts or payments from the distributors; and

4. Copies of all monthly financial statements from the Chase account, and other financial institutions, if any, showing the location(s) of Urge Distributor Proceeds from December 1, 2015, to the present. Financial information not pertaining to Urge Distributor Proceeds may be redacted from the financial statements.

**FURTHER, IT IS HEREBY ORDERED** that Senior Case Manager Anne Lieu shall file this Partial Final Award and serve it on the parties.

June 2, 2016    By: _____
                Hon. Rosalyn Chapman (Ret.), Arbitrator

120053540.5
6/2/2016

## PROOF OF SERVICE BY E-Mail

Re: Raven Asset-Based Opportunity Fund II LP, et al. vs. Green-Light International LLC
Reference No. 1220053540

I, Anne Lieu, not a party to the within action, hereby declare that on June 03, 2016, I served the attached Partial Final Award on the parties in the within action by electronic mail at Los Angeles, CALIFORNIA, addressed as follows:

| | |
|---|---|
| Mathew Rosengart Esq.<br>Matthew R. Gershman Esq.<br>Greenberg Traurig LLP<br>1840 Century Park East<br>19th Floor<br>Los Angeles, CA   90067<br>Phone: 310-586-7700<br>rosengartm@gtlaw.com<br>gershmanm@gtlaw.com<br>    Parties Represented:<br>    Raven Asset-Based Opportunity Fund II LP<br>    Raven Asset-Based Opportunity Fund III LP | John G. Burgee Esq.<br>Burgee & Abramoff P.C.<br>20501 Ventura Blvd.<br>Suite 262<br>Woodland Hills, CA   91364<br>Phone: 818-264-7575<br>jburgee@bandalaw.net<br>    Parties Represented:<br>    Green-Light International LLC |

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA on June 03, 2016.

_____
Anne Lieu
JAMS
ALieu@jamsadr.com